

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

SHAHAB KARMELY and SK GREENWICH  LLC,  :
                                              :

                *Plaintiffs,*              :        Case No. 11-cv-0541 (RPP)

                - against -           :

                                                :

EITAN WERTHEIMER, EZRA DAGMI, ANGLO IRISH  :
BANK CORPORATION LIMITED, W-D GROUP (2006)  :     **COMPLAINT AND JURY**
LLP, W-D GROUP NY1 LLC, and JOHN DOES 1-10  :     **DEMAND**

              *Defendants.*         :

                                                  :

-------------------------------------------------------------- x

## NATURE OF THIS ACTION

1.      This action arises out of a dispute between members of 443 Greenwich Partners

LLC (the "Company"), a company engaged in developing a well-known property in Tribeca.  The

Company intended to develop the property into luxury condominiums and a luxury hotel, with a

value exceeding $400 million.  After the Company's minority member, SK Greenwich LLC ("SK

Greenwich"), invested millions of dollars and completed significant development milestones, the

Company's majority member – W-D Group NY1 LLC ("W-D Delaware") – under the direction

of Israeli billionaire Eitan Wertheimer and his friend, Ezra Dagmi – saw an opportunity to cut SK

Greenwich and its principal Shahab Karmely out of the project without repayment or

compensation and avoid its commitments in connection with the project.

2.      Taking that opportunity, however, would require W-D Delaware to breach not

only the Company's operating agreement and loan agreements, but also to betray its duties to SK

Greenwich, its minority partner and managing member responsible for all aspects of development. With billions of dollars to fuel such unlawful actions, and an opportunity to take the tens of millions of dollars of value already created and contributed by SK Greenwich, together with SK Greenwich's share of the profits, W-D Delaware would not be deterred by its contractual and fiduciary obligations and proceeded to cut SK Greenwich and Karmely out of the project.

3.     The development project began in 2006 when the Company purchased the property at 443-453 Greenwich Street, New York, New York (the "443 Property"). The Company financed the purchase with capital contributions from SK Greenwich (approximately $5 million) and W-D Delaware (approximately $20 million) and approximately $85 million in mortgage financing from Anglo-Irish Bank Corporation Limited ("Anglo Irish Bank").

4.     To further finance the purchase of the property, the Company also elected to procure a mezzanine loan. Notwithstanding other available sources of mezzanine funding – including Deutsche Bank, which had already been approved by Anglo Irish Bank – Wertheimer and Dagmi insisted that the sole member of WD Delaware, W-D Group (2005), LP ("W-D Israel"), be provided the opportunity to provide the mezzanine loan. Wertheimer and Dagmi also denied SK Greenwich and Karmely the opportunity to participate in the mezzanine loan as co-lender. Wertheimer and Dagmi further insisted – after the contract of sale was already signed and SK Greenwich made a non-refundable deposit of $2,270,000 – that the mezzanine loan be secured by all the membership interests in the Company as pledged collateral.

5.     The divergent interests of W-D Delaware as SK Greenwich's equity partner in the Company, and of W-D Delaware's sole member, W-D Israel, as a holder of the Company's debt created a severe, deeply-entrenched conflict of interest. This inescapable conflict of interest

tainted the subsequent decisions of W-D Delaware with respect to the Company and specifically with respect to SK Greenwich.

6.      As debt holder, W-D Israel created a potential opportunity to wrest complete ownership of the company from SK Greenwich without any compensation. W-D Delaware, as equity partner, could refuse to fund the Company or to contribute its share of the payment of the mezzanine loan and cause the Company to default. W-D Israel, as debt holder, could then refuse to further negotiate payment terms, declare default, and simply take the ownership interests by enforcing its security interest. In other words, W-D Delaware and its principals stood nothing to lose and everything to gain if W-D Delaware or the Company defaulted.

7.      That action was contrary to W-D Delaware's fiduciary duties and the explicit rights and procedures of the operating agreement between SK Greenwich and W-D Delaware. Those rights and procedures were designed to protect the interests of SK Greenwich, the minority member who expended years of efforts and significant sums of money to obtain significant development milestones without any compensation (in fact, SK Greenwich is still owed hundreds of thousands of dollars in reimbursements for Company costs that were incurred by SK Greenwich).

8.      W-D Delaware eventually proved that it would not allow contractual provisions, its fiduciary obligations, or equitable principles, to stand in the way of additional profit. W-D Delaware and W-D Israel would eventually cave to temptation and exert their leverage to unilaterally attempt to extinguish SK Greenwich's ownership interests without any compensation to SK Greenwich.

9.      Before nullifying SK Greenwich's membership interests, W-D Delaware, through Wertheimer and Dagmi, extracted as much value out of SK Greenwich and Karmely as possible.

3

For instance, as maturity dates for the mortgage loan approached, Anglo Irish Bank sought to obtain personal guaranties. Although Wertheimer is a multi-billionaire, he insisted that SK Greenwich's principal, Karmely, give Anglo Irish Bank his personal guaranties. Wertheimer and Dagmi and their representatives repeatedly insisted that Karmely issue all personal guaranties, promising him that if he did so, they would back the guaranties and would ensure that the project was financed through completion, even by their own financing if necessary. SK Greenwich and Karmely would not have signed the guarantees and dedicated millions of dollars to the 443 Property and years of work without compensation but for the assurances of Wertheimer and Dagmi that they or their affiliates would fund the project to completion if necessary and satisfy Karmely's personal guaranties.

10.    In addition, they directed SK Greenwich to pursue the development plan, which included the buyout and removal of tenants, the development of extensive architectural plans, and obtaining the necessary permits and approvals from regulatory bodies. After SK Greenwich caused the Company to complete these crucial development benchmarks for the property – and shortly after Karmely made the requested personal guaranties to the senior lender and then requested that W-D Delaware and its members fulfill their funding promises – W-D Delaware and its members refused to do so. Instead, they hatched a plan to cut SK Greenwich, their partner who was asking them to fulfill their commitments, out of the project and to take the Company's opportunities for themselves.

11.    W-D Delaware, through its members and affiliates, accomplished its plan by, among other things, (1) prematurely and improperly foreclosing on SK Greenwich's membership interests, in violation of their operating agreement, loan agreements, and numerous assurances; (2) effectively denying SK Greenwich the opportunity to exercise the equitable right of

4

redemption in the mezzanine loan; (3) taking possession of SK Greenwich's membership interests through a sham auction; (4) removing SK Greenwich as Operations Member in violation of the operating agreement; (5) refusing to allow SK Greenwich or the Company to negotiate an extension, purchase, or satisfaction of the mortgage loan with Anglo Irish Bank; and (6) purchasing the senior debt through an affiliate.  W-D Delaware thereby shirked its obligations to SK Greenwich and cut it out of the Company without any compensation or opportunity to participate in the project.

      12.     Upon information and belief, W-D Delaware and its principals – and Eitan Wertheimer in particular – conducted these acts with a malicious intent for the express purpose of, as expressed by Wertheimer's attorney, teaching Karmely a lesson.  On several occasions, Wertheimer vowed to "destroy" Karmely.  As an example of this malicious intent, although W-D Delaware and its principals have claimed that the value of the 443 Property does not exceed its debts, they have refused offers from SK Greenwich, Karmely, and their affiliates to purchase the property for substantially more than the outstanding debt.

      13.     Plaintiffs have brought this action to seek, among other things, restoration to SK Greenwich of the opportunities to develop and participate in the proceeds of any sale of the 443 Property, and damages for the defendants' participation in W-D Delaware's wrongful conduct.

## PARTIES

      14.     SK Greenwich LLC is a Delaware Limited Liability Company whose sole member, Shahab Karmely, is a resident of New York County.

      15.     Shahab Karmely is an individual residing in New York County.

16.     W-D Group NY1 LLC ("W-D Delaware") is a Delaware Limited Liability Company whose sole member is W-D Group (2006) LP.  W-D Delaware is controlled through various intermediate entities by Eitan Wertheimer and Ezra Dagmi.

17.     Upon information and belief, W-D Group (2006) LP ("W-D Israel") is an Israeli Limited Partnership.  W-D Israel is the sole member of W-D Delaware and is controlled through various intermediate entities by Eitan Wertheimer and Ezra Dagmi.  Upon information and belief, the general partner and limited partners of W-D Israel are incorporated in Israel and have their principal place of business in Israel.

18.     443 Greenwich LLC ("Greenwich Owner"), named herein as John Doe No.1, is a Delaware Limited Liability Company and the owner of a property located at 443-453 Greenwich Street, New York, New York 10013 (the "443 Property").  The sole member of Greenwich Owner is 443 Greenwich Partners LLC.

19.     443 Greenwich Partners LLC (together with Greenwich Owner, the "Company"), named herein as John Doe No. 2, is a Delaware Limited Liability Company.  The Company was formed for the express purpose of purchasing renovating and developing a building located at the 443 Property.

20.     Upon information and belief, the sole member of the Company is now W-D Israel. At the time of formation of the Company, Karmely owned a 20% membership interest and W-D Delaware owned an 80% interest.

21.     W. Family 1 Ltd. (the "Wertheimer Family Company"), named herein as John Doe No. 3, is a privately-held Israeli corporation whose sole beneficial owner is Eitan Wertheimer and his family members.

22.     Eitan Wertheimer ("Wertheimer") is an individual and a citizen of Israel. Wertheimer maintains a residence in New York City.  Wertheimer is one of the ultimate beneficial owners of W-D Delaware and W-D Israel.

23.     Ezra Dagmi ("Dagmi") is an individual who is a dual citizen of Israel and the United Kingdom.  Dagmi maintains a residence in New York City.  Dagmi is one of the ultimate beneficial owners of W-D Delaware and W-D Israel.

24.     John Does 3 through 10 (collectively with Wertheimer, W-D Delaware, W-D Israel, and the Wertheimer Family Company, the "W-D Defendants") are affiliates of W-D Delaware and W-D Israel and other entities owned or controlled by Wertheimer and Dagmi that played a role in their scheme, whose names and identities at present are unknown to plaintiffs.

## JURISDICTION AND VENUE

25.     This action was originally commenced in the Supreme Court of the State of New York in the County of New York by filing and service of a summons with notice dated January 14, 2011.

26.     By notice of removal dated January 26, 2011, Defendants removed this action to this Court pursuant to 28 U.S.C. §§ 1411(a), 1441(d) and 1446.

27.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332 based upon diversity of citizenship and because the amount-in-controversy is over $75,000.

28.     Venue is proper in this Court because the property at the center of this dispute is located in New York County and that is where the transactions at issue took place.

29.     By Notice of Dismissal dated April 26, 2011, this action was dismissed solely as against Anglo Irish Bank.

## BACKGROUND

### *Wertheimer and Dagmi's Propose A Multi-Billion Dollar Real Estate Venture*

30.     Wertheimer is a member of one of the wealthiest families in Israel. In 2006, his family sold an 80% interest in one of the companies founded by his father to Warren Buffet for $4 billion dollars. Forbes magazine identified Wertheimer as the likely successor to his father, the wealthiest man in Israel, thought to be worth approximately $4.4 billion dollars.

31.     Dagmi is Wertheimer's close friend and partner in real estate ventures, and has described himself as Wertheimer's brother. From the beginning of their business relationship and communications with Karmely, Wertheimer repeatedly told Karmely that Dagmi speaks on Wertheimer's behalf and that Dagmi's commitments are binding on Wertheimer.

32.     For over 35 years, Dagmi's family has also had a close, personal relationship with Shahab Karmely and his family. As a result of this friendship and shared cultural and religious bonds and norms, they knew that Karmely would enter a business relationship with Wertheimer and Dagmi and place his full and absolute trust in their representations. They also knew that Karmely had extensive experience and contacts in the real estate industry in New York and Southeast Asia.

33.     Sometime in 2005, Wertheimer and Dagmi approached Karmely and informed him that they wanted to develop a multi-billion dollar real estate portfolio. Wertheimer and Dagmi insisted that Karmely work exclusively for them while they built this portfolio. They required that Karmely not pursue any real estate projects other than on their behalf. They further forbade and prevented Karmely from attracting any additional partners or capital to their venture.

34.     Wertheimer told Karmely that he wanted to become the "Warren Buffet of real estate." Wertheimer and Dagmi also asked Karmely to assist in the purchase, renovation, and

decoration of numerous personal residences and to make arrangements for other various personal affairs.

35.     For the next 3 years, Karmely scouted out and performed intensive due diligence on a number of properties, and began identifying potential investments for Wertheimer and Dagmi in the United States and in Southeast Asia.  Over time, Wertheimer and Dagmi had additionally instructed Karmely to pursue other New York City real estate opportunities, culminating in the negotiation of written cash offers of approximately $1 billion for various real estate properties.  This necessitated the expenditure of significant time and research to identify and analyze these trophy real estate assets.

### *The 443 Property*

36.     With the approval of Wertheimer and Dagmi, Karmely worked toward securing financing and legal documentation for the 443 Property.

37.     Wertheimer, Dagmi, and Karmely formed the Company and then, on September 7, 2006 (the "Purchase Date"), entered into a number of agreements so that they could purchase the 443 Property and arrange for its development.

38.     The Company purchased the 443 Property for $113 million plus closing costs and additional escrow payments.  To help fund the purchase, the Company obtained from Anglo Irish Bank an $85 million mortgage loan (the "Mortgage Loan") and a $20 million dollar mezzanine loan.  The Company also paid $24.9 million as part of the purchase price.  That payment was funded by equity investments in the Company by W-D Delaware and SK Greenwich, respectively approximately $19.9 million and $5.0 million.

39.     During the next several years, SK Greenwich and its sole member, Karmely, spent significant time and resources – to the complete exclusion of any other business investments or

opportunities with other investors or business partners – accomplishing crucial milestones toward developing the 443 Property, as is more fully set forth below.

40.     On occasion, Karmely proposed alternative sources of equity funding and Wertheimer and Dagmi refused, asking Karmely to focus on deals and promising that they would take care of financing any such deals.

41.     In addition, based on Wertheimer and Dagmi's promises that they would fund the project through completion themselves, Karmely expended extensive time and resources working on the development of the 443 Property and negotiated extensions of loans, made personal guaranties, developed architectural and design plans, and performed various other work in order to help build Wertheimer and Dagmi's real estate portfolio and personal properties. Karmely and SK Greenwich would not have invested millions of dollars in the 443 Property and dedicated years of work to the 443 Property without compensation if Wertheimer and Dagmi had not promised to fund the project through completion. Upon information and belief, the W-D Defendants are using the same architectural and design plans developed through the efforts of SK Greenwich and Karmely in the W-D Defendants current efforts to sell the property and the plans to a third party.

42.     After SK Greenwich and Karmely invested millions of dollars and spent years negotiating the removal of current tenants, navigating the regulatory requirements to obtain the necessary zoning permits and approvals, obtaining department of buildings permits, and procuring an exclusive agreement with the top rated boutique luxury hotel brand in the world, Amanresorts, to further brand and develop the hotel and condominiums at the 443 Property, Wertheimer and Dagmi pulled the rug from under them.

43.     Wertheimer and Dagmi exploited their positions as both the holder of equity in the Company through W-D Delaware on the one side, and as the holder of debt of the Company through W-D Israel on the other.  As an equity partner in the Company, they encouraged SK Greenwich and Karmely to shepherd the Company through necessary development hurdles and to make capital investments and commitments by repeatedly promising Karmely that they themselves would, if necessary, fund the project to completion.  As a holder of the Company's debt, they waited for him to complete those value-adding steps.  But, upon being asked to comply with their commitments, they wrongfully sought to foreclose on the Company so they could take SK Greenwich's ownership interests for themselves without payment or compensation of any kind.

44.     The conflict of interest between the simultaneous equity and debt positions held by Wertheimer and Dagmi and their affiliates set the stage for this trap, which was built in from the beginning of the project, but could not be accomplished without breaching the W-D Defendants' duties to SK Greenwich.

### *W-D Delaware's Conflict of Interest & SK Greenwich's Protections*

45.     Throughout the project, W-D Delaware's decisions were tainted by this conflict of interest.  That conflict arose in conjunction with the purchase of the 443 Property, when Wertheimer, Dagmi, and Karmely agreed that the Company should seek a $20 million mezzanine loan.  The mezzanine loan would be an additional loan, on top of the mortgage loan, taken out to fund the purchase of the 443 Property.

46.     Wertheimer and Dagmi insisted that W-D Delaware's sole member, W-D Israel, be given the opportunity to make the $20 million mezzanine loan to the Company (the

"Mezzanine Loan"), notwithstanding the fact that other sources, which were obtained through SK Greenwich's efforts, were available.

47.     For instance, SK Greenwich had negotiated terms for a mezzanine loan from Deutsche Bank. Anglo Irish Bank had reviewed the terms and had already approved the mezzanine loan from Deutsche Bank as part of the purchase transaction.

48.     Wertheimer and Dagmi decided there was no need to pay any interest to a third party mezzanine lender because Wertheimer and Dagmi could cover the finances through their own funding, and wanted to obtain for themselves the benefits of interest as an additional premium on their investment when it came time to sell or refinance the 443 Property.

49.     Karmely also sought to participate as co-lender of the mezzanine loan, but, Wertheimer and Dagmi refused Karmely's request to participate in ownership of and contribute funds to the Mezzanine Loan.

50.     Thus, W-D Delaware's position as majority shareholder – and its fiduciary duties to the minority shareholder, SK Greenwich – was critically conflicted by the position of W-D Israel, its sole member, as a holder of the Company's mezzanine debt.

51.     The result was that there was never any meaningful opportunity at the issuance of the Mezzanine Loan, during its term, or upon a declared default, to negotiate with the lender as a debtor could with an arms-length lender.

52.     That inherent conflict was exacerbated by the Pledge and Security Agreement entered into among W-D Israel, SK Greenwich, and W-D Delaware on September 7, 2006 ("Pledge Agreement"). Under the Pledge Agreement, one hundred percent of the ownership interests in the Company were pledged as collateral for the mezzanine debt, including both the membership interests of SK Greenwich and those of W-D Delaware.

12

53.     Absent certain other protections in the agreements, if W-D Israel could, at some point, fabricate a default under the Mezzanine Loan, and prevent SK Greenwich or anyone else from bidding on the membership interests in the ensuing auction, W-D Israel could simply take the whole Company for itself without making any payment or having to fulfill its commitments to SK Greenwich, as the Operations Manager.

54.     Notwithstanding the Mezzanine Loan's provisions, the Company's Operating Agreement, entered into on September 7, 2006 (the "Operating Agreement"), curtailed those enforcement rights and extended certain protections.

55.     First among the protections provided in the Operating Agreement are Sections 3.1 and 3.3(d).  These provision limit W-D Israel's enforcement rights under the Mezzanine Loan to certain enforcement rights held by W-D Delaware under the Operating Agreement.

56.     Section 3.1 provides that if W-D Delaware or an affiliate made loans to the Company to meet its capital needs, W-D Delaware would have certain limited remedies for repayment of those loans.

57.     Section 3.1(b) provides that, in order to meet any necessary expenditure, including loan repayments, any Member has the right to issue a capital call.

58.     Section 3.1(d) provides that, if any member should not make the necessary capital contribution, that the other members will have the right to contribute that member's share of the necessary contribution and to thereby dilute that members' membership interests, or to make payment and deem the payment a loan.

59.     Section 3.1(d) further provides that if a member has failed to make a capital contribution and another member makes a loan of that sum to meet the capital contribution, and the failing member also fails to repay the loaning member, then the loaning member (or affiliate)

will have the right to receive in repayment of the loan any distributions that would otherwise be paid to the non-contributing member per its percentage membership interest until the loan was repaid in full, or otherwise terminate the loan and have the loan deemed a capital contribution that would dilute the non-contributing member.

60.    Neither Section 3.1 nor any other provision of the Operating Agreement permits contributing members to seize the membership interests of non-contributing members, or to remove the managing member for non-contribution.  The provisions permit only the dilution of non-contributing members.

61.    Section 3.3(d) of the Operating Agreement provides that the enforcement remedies provided by the Mezzanine Loan could not exceed those provided under the Company's Operating Agreement.

62.    Specifically, that section provides that,

> If a Member or one of their Affiliates (an "**Affiliated Investor**") provides such financing or any part thereof, the Members will coordinate their efforts in connection therewith to the end that remedies, decision-making and veto rights, and **enforcement rights granted to such Affiliated Investor together with its affiliated Member shall be no greater than the rights and remedies of such affiliated Member by itself prior to such transaction, unless the same additional rights and remedies are granted to the other Members.**

(emphasis added).

63.    Pursuant to the Operating Agreement, W-D Israel and other affiliates cannot pursue any enforcement rights under the Mezzanine Loan or other loans greater than those granted to W-D Delaware under the Operating Agreement.

64.    Accordingly, W-D Israel could not lawfully foreclose upon and take possession of SK Greenwich's membership interests.

65. The Operating Agreement further required W-D Delaware (and therefore its member, W-D Israel) to coordinate with SK Greenwich in order to avoid dilution of SK Greenwich's interests.

66. Specifically, Section 3.3(d) of the Company's Operating Agreement requires all the members, in connection with a third party lender or equity investor or affiliated investor, to "coordinate their efforts in connection therewith and cooperate with each other to the end that the most favorable terms for any financing required by the Company are obtained and dilution of the Members' interest in the company is minimized."

67. Among the other protections given to SK Greenwich as the minority partner was Section 6.1(c)(ii) of the Operating Agreement, which limited the ability to remove SK Greenwich as the Operations Member and required compensation to SK Greenwich even if SK Greenwich is removed.

68. Part (f) of that subsection prohibits the removal of SK Greenwich as Operations Member unless Karmely ceases to be the controlling member of SK Greenwich or SK Greenwich is "removed for Cause or is a Deafulting [*sic*] Member."

69. It further provides, that, in the event that SK Greenwich is removed,

As compensation for acting as the Operations Member, SK Greenwich shall be entitled to receive the SK Greenwich Preferred Return. In the event SK Greenwich (i) ceases to act as the Operations Member or (ii) is removed as the Operations Member pursuant to the provisions of this Agreement then SK Greenwich shall be entitled to receive a pro rata portion of the SK Greenwich Preferred Return equal to the ratio that the state of completion of the entire project at the time of SK Greenwich's removal bears to the entire cost of the project as a condominium development, as reflected in the most recent Budget of the Company agreed upon by the Board of Managers.

70.     The Mezzanine Loan documents also provided an important limitation on the loan held by the majority partner.  Among the most important was Section 3.1(a) of the Mezzanine Loan Agreement, entered into by and among W-D Delaware, SK Greenwich, and W-D Israel on September 7, 2006 (the "Mezzanine Agreement").  Section 3.1(a) provides that there could be no event of default under the Mezzanine Loan – and thus no enforcement action against SK Greenwich's interests in the Company – for failure to make any payment unless (i) the Company had satisfied all of its obligations under Anglo Irish Bank's senior mortgage loan **and** (ii) had available cash flow or proceeds to make payment.

71.     This requirement reflected the parties' understanding that the W-D Israel mezzanine loan was an additional equity investment and not traditional mezzanine financing.  Structuring it as a loan simply gave Wertheimer and Dagmi a priority payment of that amount before the ordinary *pro rata* distributions to the members, with premium added to their investment through interest.  But the structuring also ensured that if any membership interests ended up in auction to satisfy the Mezzanine Loan, it would not be until after the Company had already been relieved of the burden of tens of millions of dollars of the underlying mortgage debt.  In this scenario, the membership interests could not be seized or taken for a nominal value.

72.     This protection is mirrored by the Subordination and Intercreditor Agreement, entered into between Anglo Irish Bank and W-D Israel on September 7, 2006.  The Subordination and Intercreditor Agreement is explicitly incorporated into the Mezzanine Agreement, the Note for the Mezzanine Loan, and the Pledge Agreement.

73.     The Subordination and Intercreditor Agreement states

>       Until all of Borrower's obligations under the Anglo Senior Loan
>       Documents have been paid and performed in full, no payment whatsoever
>       shall be made to Mezzanine Lender by or on behalf of Borrower,

Mezzanine Borrower, or any Guarantor for or on account of any amount due under the Mezzanine Loan Documents.

74.     Another protection for SK Greenwich was that it was given sole discretion with respect to any decisions related to the Mezzanine Loan. Section 6.5(b) of the Company's Operating Agreement, which provides that, with respect to any "Affiliate Contract with a Member or an Affiliate of a Member, the Non-Affiliated Member shall have the sole authority to take all actions and make all decisions on behalf of the Company concerning the enforcement of the Company's rights under any such Affiliate Contract."

75.     In other words, SK Greenwich should have been provided complete discretion in determining whether to accept additional financing or to make additional capital calls in order to be able to satisfy the mezzanine debt. Instead, Wertheimer and Dagmi repeatedly sought to compel the Company to accept contributions or loans from Wertheimer and Dagmi's friends or related entities that were clearly harmful to SK Greenwich and Karmely's interests. At the same time, they rejected and forbade contributions or loans from entities introduced by SK Greenwich and Shahab Karmely.

76.     Aside from these explicit provisions, SK Greenwich also had common law rights and protections.

77.     For instance, the W-D Defendants owed SK Greenwich a duty of good faith and fair dealing in connection with the mezzanine loan agreements and the mortgage loan agreements.

78.     The W-D Defendants also owed fiduciary duties to SK Greenwich and to the Company. SK Greenwich was also entitled to the equity of redemption, or the ability to preserve its interests simply by paying the debt.

17

79.     Unfortunately, none of these legal protections did SK Greenwich and Karmely any good once the W-D Defendants decided to ignore them.  But, before they cut SK Greenwich and Karmely out of the deal, they induced him to spend substantial time, resources, and money on leading the 443 Property through significant development hurdles.  SK Greenwich had:  invested millions of dollars; developed extensive and complete architectural and design plans; advanced the development to the stage that it could be taken over or sold as a turnkey development – a building in a prime location with no tenants; obtained all the necessary approvals and permits for the Landmarks Preservation Commission, the City Planning Commissions, and the Department of Buildings; entered into personal guaranties of the underlying debt; and secured a unique hotel management agreement with the top rated boutique luxury hotel brand in the world, Amanresorts, to help develop the 443 Property under the Amanresorts brand with exclusive rights to the brand in New York City.

### *The Company Achieves Significant Development Milestones through SK Greenwich's Efforts*

80.     The plan for developing the 443 Property anticipated seven penthouse apartments, 42 condo units, and 57 hotel units.  The plan also anticipated a luxury spa, swimming pool, and retail components.

81.     But, before the 443 Property could be developed, the Company needed to remove the current tenants, develop architectural and design plans, obtain clearance from the Landmarks Preservation Commission and other community boards, obtain zoning permits, obtain proper construction permits, obtain construction financing, and determine appropriate branding and partnership opportunities.

82.     SK Greenwich, as Operations Member, contributed extensive time and resources to help the Company meet these milestones.  Thanks to Plaintiffs' efforts, the Company did in

fact achieve each of these development milestones. Nevertheless, Defendants insisted that SK

Greenwich not be compensated as with a typical developer. SK Greenwich agreed to waive the

standard development fees based upon the W-D Defendants' agreement that SK Greenwich and

Shahab Karmely would receive approximately 40% of the profits from the completed project and

their assurance that the project would be funded to completion by Wertheimer himself, if

necessary.

83.     SK Greenwich developed a budget that was approved. The budget anticipated

expenses of millions of dollars for tenant removal alone.

84.     SK Greenwich achieved the milestones below budget and ahead of schedule, and

has yet to be reimbursed for approximately $800,000 in costs incurred in service of the Company.

85.     The 443 Property had approximately 46 tenants and many more subtenants at the

time it was purchased by the Company. Most of the leases were not set to expire until 2008, and

were renewable to 2010. Several leases extended into 2010.

86.     While some of the tenants' leases expired on their terms, Karmely had to

negotiate at least 40 tenant buyouts. These buyouts included lengthy one-on-one negotiations.

87.     SK Greenwich accomplished buyout and removal of all tenants under budget,

expending only $4.3 million of the $7.5 million that had been budgeted. The buyout and removal

of all tenants was a necessary step in preparing the building for development and added

significant value to the 443 Property.

88.     SK Greenwich also spent over two years meeting more than twice weekly with

zoning attorneys, engineers, architects, and other consultants developing a full set of plans for

submission to various community boards and commissions and the New York Department of

Buildings.

19

89.     SK Greenwich then worked to obtain, and in fact obtained the proper zoning and permits for the development, and approval from community boards and commissions and the New York Department of Buildings.

90.     As a result of these efforts, SK Greenwich transformed the 443 Property into a turnkey project ready for development, vastly increasing the value of the 443 Property.

91.     At the time of purchase, the 443 Property was zoned for manufacturing and office use: hotels and apartments were not allowed.  Development of the property into luxury condominium residences and a hotel would require a variance, which could be obtained upon approval of a restoration plan submitted to the Landmarks Preservation Commission, reviewed by the Municipal Arts Commission, City Planning Commission, and community boards.

92.     These efforts to develop the property were not without opposition, complexity, and difficulty.  In light of that opposition, SK Greenwich retained attorneys, architects, and numerous consultants and spent significant time preparing proposals for the appropriate regulatory agencies and preparing for and attending public hearings.

93.     In effect, both Karmely and SK Greenwich were required to spend 100% of their professional time on projects for the W-D Defendants.

94.     SK Greenwich first applied to the Landmarks Preservation Commission for a Certificate of Appropriateness for the development at the 443 Property in April 2007.  The initial proposal included significant work on the 443 Property, including but not limited to work on the roof, stairwells, loading dock, HVAC system, rooftop water towers, entrances, and openings to the courtyard.  The Landmarks Preservation Commission rejected the initial proposal, citing the size of the proposed penthouse units and their visibility from the street.

95.     SK Greenwich submitted a revised proposal, and obtained a Certificate of Appropriateness for significant development work on July 30, 2007.

96.     On April 7, 2008, after obtaining the Certificate of Appropriateness, SK Greenwich caused the Company to apply to the City Planning Commission for a Special Permit, containing waivers of use regulations, rear-yard equivalent requirements, setback requirements, and rooftop recreation space requirements.

97.     Public hearings were held on April 22, 2008 and June 4, 2008. The City Planning Commission adopted a resolution approving the Company's application for a special permit.

98.     On February 17, 2009, SK Greenwich submitted additional proposals for work in 2009 regarding work to the sidewalks, planter boxes, and outdoor lighting for the 443 Property. Landmarks Preservation Commission approved the additional work and, on March 9, 2009, issued a Certificate of Appropriateness for additional work.

99.     Obtaining the zoning variances, permits and approvals for development of the 443 Property also added tremendous value to the 443 Property. In each instance, the variances, permits, and approvals were the result of Karmely's personal presentations, negotiations, and efforts.

100.    While SK Greenwich worked on buying out tenants and obtaining the necessary permits and approvals, it was also busy developing a construction budget, working with architects, engineers, attorneys, and various consultants to develop architectural plans, negotiating a hotel management agreement with Amanresorts, pursuing other projects at the request of the W-D Defendants, and seeking construction financing.

101.    By May 5, 2008, SK Greenwich had obtained construction financing, or, more specifically, a loan term sheet from Pacific National Bank providing a loan of $215,000,000.

102.    Rather than accept the Pacific National Bank financing urged by SK Greenwich, Wertheimer and Dagmi assured SK Greenwich that Wertheimer's contacts at UBS private wealth management in Geneva Switzerland, including Chairman Marcel Ospel, would arrange for financing from UBS.  Wertheimer and Dagmi instructed SK Greenwich to cease negotiations with Pacific National Bank because he was certain that, given his large personal deposit accounts at UBS, he could obtain more favorable terms from UBS.

103.    Wertheimer & Dagmi instructed Karmely to fly to Geneva with Dagmi to make a presentation to UBS.  SK Greenwich did as Wertheimer and Dagmi instructed, despite Karmely's advice to them that they should close on the Pacific National Bank opportunity.

104.    When UBS finally offered terms on or about June 10, 2008, they were less favorable than the terms that had been offered by Pacific National Bank.

105.    Rather than engage in further negotiation with UBS, where, upon information and belief, Wertheimer held more than a billion dollars in assets, Dagmi summarily rejected UBS's terms without any negotiation.

106.    By the time Dagmi unilaterally terminated negotiations with UBS, Pacific National Bank had committed to other projects and was no longer interested in providing the necessary funding for construction.

107.    In the mean time, SK Greenwich had also laid the groundwork for establishing the 443 Property as an Amanresorts property.

108.    The Amanresorts properties are unique luxury brand hotels located throughout the world in prime locations, including UNESCO world heritage sites.

109.    Karmely, using his personal relationships with Amanresorts' chairman and founder, engaged in lengthy discussions with Amanresorts to negotiate and execute a unique

hotel management agreement to develop the 443 Property as an Amanresort hotel and condominiums on very favorable terms. At the same time, the Company entered into a contract with Amanresorts preferred designer, Denniston International.

110.    Amanresorts touted the deal and the project as an Amanresorts property in an interview for a travel magazine. The agreements with Amanresorts and Denniston International, which specifically commits the Company to develop the project even after the Pacific National Bank and UBS loan opportunities were passed upon, further evidences Wertheimer's and Dagmi's commitments to fund the project to completion.

### *The Personal Guaranties*

111.    At various times while SK Greenwich was guiding the Company through the development hurdles outlined above, SK Greenwich also had to renegotiate or extend the terms of the Anglo Irish Bank Mortgage Loan.

112.    The Company had obtained the Mortgage Loan in order to help finance the purchase of the 443 Property. In connection with the Mortgage Loan, the Company issued a promissory note for $85 million in favor of Anglo Irish Bank (the "Mortgage Note"), and entered into a loan agreement with Anglo Irish Bank (the "Mortgage Agreement").

113.    The Mortgage Loan was scheduled to mature in the Fall of 2008.

114.    In August 2008, the Company began negotiating with Anglo Irish Bank to extend the term of the Mortgage Loan. Anglo Irish Bank eventually agreed, but required personal guaranties and completion guaranties, which were accepted only when Dagmi confirmed and reaffirmed that Wertheimer would be funding the entire construction project.

115.    Karmely, before signing the personal guaranties, sought assurances from Wertheimer and Dagmi that they would fund the project to completion without any dilution of

the partners. These assurances were provided in face to face meetings and telephone conversations with Dagmi and his daughter Desiree, and in meetings in the presence of Anglo Irish Bank representatives.

116.    For instance, early in that summer, outstanding invoices were due to Denniston International, the designated hotel designer for the Amanresorts project, under the hotel management agreement and the contract with Denniston International. Payments were also due to the New York Department of Buildings for building permits.

117.    Karmely had phone calls with Dagmi and his daughter Desiree to confirm whether the project was proceeding and whether or not he should deliver checks to Denniston International and the New York Department of Buildings to pay for those fees. Dagmi and Desiree were with Wertheimer on his yacht in Turkey at the time, they each assured Karmely in separate phone calls that they had spoken to Wertheimer and Wertheimer was funding 100% of the 443 Property development and would not dilute Karmely's interests. They instructed Karmely to go ahead and deliver the checks without delay.

118.    In reliance upon these promises, SK Greenwich ceased discussions with other institutional lenders, sent checks for approximately $350,000 to Denniston International and $180,000 to the New York Department of Buildings, and continued to work exclusively on Wertheimer and Dagmi-related projects, primarily the 443 Property.

119.    On October 4, 2008, Wertheimer and Dagmi's representative, Yaron Mehulal acknowledged by email, "[W]e undertake to perform at least $10M of capex work by July 2009, according to an agreed plan. I understand that this will be financed from our [Wertheimer and Dagmi's] own sources."

24

120.    On December 24, 2008, Dagmi committed further financing, telling Karmely to tell Anglo Irish Bank "that in 2009 we intend to spend approximately 20 mm and the rest in 2010/11." The "rest" referred to $80 million, the remainder of the approximately $100 million development budget.

121.    Also in reliance on Wertheimer and Dagmi's assurances, Karmely signed and funded the 2008 extension of the Mortgage Loan, and agreed for the first time to provide personal guaranties and completion guaranties to finalize the extension of the Mortgage Loan.

122.    As an additional condition of the 2008 extension, Anglo Irish Bank required the Company's principals to post an additional capital contribution of $20 million.  In reliance upon Wertheimer and Dagmi's promises and assurances, SK Greenwich paid $4.3 million in cash. W-D Delaware funded its share.

123.    The Mortgage Loan again became due toward the end of 2009, and SK Greenwich entered into negotiations to extend the Mortgage Loan with Anglo Irish Bank.  Anglo Irish Bank again required payment of interest and the amendment and restatement of guaranties.

124.    Once again, Dagmi gave assurances to Karmely that Wertheimer and Dagmi would back up Karmely's personal guaranties, and committed to contribute $5 million toward capital expenditures.

125.    Jakob Klein, a representative of Wertheimer, and Ezra Dagmi represented that Wertheimer would fund the completion guaranty as long as whatever payments made would be treated as a loan with priority over equity distributions.

126.    Wertheimer and Dagmi never lived up to these promises.

127.    Relying upon those assurances, SK Greenwich also agreed to an amendment to treat as a loan $16 million that Wertheimer and Dagmi contributed through a letter of credit that Anglo Irish Bank had previously drawn down.

128.    On April 26, 2010, SK Greenwich and W-D Israel voted to approve the term sheet presented by Anglo Irish Bank for further extension of the Mortgage Loan.

129.    On July 10, 2010, Anglo Irish Bank agreed with the Company to extend the term of the Mortgage Loan, effective December 31, 2009.

130.    On July 30, 2010, Karmely paid $300,000 in interest to Anglo Irish Bank, executed the amended and restated personal guaranties required by the bank, including an Amended and Restated Limited Repayment Guaranty, an Amended and Restated Debt Service and Operating Expenses Shortfall Guaranty, an Amended and Restated Non-Recourse Carveout Guaranty, and an Amended and Restated Guaranty of Capex Obligations.

131.    As soon as the extension and personal guaranties were signed, Wertheimer and Dagmi proceeded with their plan to dispossess Karmely and SK Greenwich. Upon information and belief, at that point, they determined that they had extracted all the value they could out of Karmely and SK Greenwich, and it was time to take his interests in the Company.

132.    In the fall of 2010, shortly after signing the extension and guaranties, the W-D Defendants' attorney, Stephen Gellman, at Wachtell, Lipton, Rosen & Katz ("Wachtell") contacted Karmely's attorney to ask Karmely to come to a meeting in his offices to discuss possible foreclosure of the membership interests.

133.    Karmely and his counsel, Larry Hutcher, went to Wachtell's offices as requested. Stephen Gellman and Bernard Nussbaum, attorneys at Wachtell told Karmely that he should agree to list the property for sale with a broker, rather than seek to complete the project.

134.    Karmely responded that they were asking him to sign his death warrant for the project, and Nussbaum agreed that was the position that Karmely was in.

135.    Gellman and Nussbaum further told Karmely that W-D Delaware and W-D Israel intended to sell the property immediately, didn't need his consent to list the property for sale, and that if he did not agree to do so, they would declare the Company in default of the Mezzanine Loan and remove SK Greenwich as a member and as the managing member.

136.    In response, Karmely proposed that if they marketed the property, he be given the right of first refusal for any third party offer. Gellman and Nussbaum denied the request.

137.    Karmely and SK Greenwich offered to pay SK Greenwich's *pro rata* share of the mezzanine debt. Gellman and Nussbaum rejected that offer, stating that it was unacceptable and that Wertheimer intended to hold Karmely and SK Greenwich jointly and severally liable to pay the Mezzanine Loan debt in full without any contribution from W-D Delaware, Wertheimer, or Dagmi.

138.    Karmely and SK Greenwich then offered to pay $25 million to retire the Mezzanine Loan debt and for all ownership interests in the Company, including W-D Delaware's 80% interest.

139.    Gellman again rejected the offer. Wertheimer, Dagmi, and the W-D Defendants then embarked on their plan, as they called it, to "teach [Karmely] a lesson" and to "destroy" him. They would maliciously cut SK Greenwich and Karmely out of the partnership and out of the 443 Property, without compensation for the millions of dollars and years of efforts invested by SK Greenwich and Karmely in the property.

### W-D Delaware, Its Members, and Affiliates Seize the Company and Through A Sham Auction

140.    On September 30, 2010, W-D Israel sent a letter to SK Greenwich (and to W-D Delaware) declaring an Event of Default under the Mezzanine Agreement and the Pledge Agreement (the "Mezzanine Default Letter").

141.    The Mezzanine Default Letter stated that the Mezzanine Loan matured on October 1, 2009, and noted the principal amount of the loan of $20,000,000 plus accrued interest in the amount of $7,459,999.

142.    Prior to issuing the Mezzanine Default Letter, W-D Israel and W-D Delaware did not allow the Company to engage in any of the kind of negotiations concerning the payment of the Mezzanine Loan that would have taken place with an arms-length lender.

143.    After declaring default, Wertheimer and Dagmi refused to communicate with SK Greenwich or its principal, Karmely.

144.    W-D Delaware also made no effort to contribute capital to pay off the Mezzanine Loan, and made no offer to be diluted if SK Greenwich agreed to pay W-D Delaware's pro rata share of the Mezzanine Loan.

145.    The Mezzanine Default Letter did not demand any payment, did not advise SK Greenwich of the full amount that was due and owing, and did not advise SK Greenwich how any purported default could be cured or any manner in which an equitable right of redemption could be exercised.

146.    Upon information and belief, W-D Israel did not demand payment, because no such payment was permitted under the terms of the Mezzanine Loan documents.  Even if SK Greenwich did make a payment to W-D Israel, W-D Israel would have to immediately forward such payment to Anglo Irish Bank.

147.    The position stated in the Mezzanine Default Letter violated the provisions of the Mezzanine Note, the Mezzanine Agreement, the Subordination and Intercreditor Agreement, and the Pledge and Security Agreement.

148.    Under those documents, no payments could be made to the Mezzanine Lender until the Mortgage Loan was repaid in full.  Accordingly, there was no default.

149.    Wertheimer's representative, Dan Goldman, and his attorneys stated that the W-D Defendants were not interested in any offer from SK Greenwich or Karmely, but that "our client is interested in teaching your client a lesson.  There will be no discussion here."

150.    After refusing to discuss with SK Greenwich the possibility of paying off the balance of the Mezzanine Loan, W-D Israel commenced a sham auction of SK Greenwich's membership interests in the Company.

151.    On October 4, 2010, W-D Israel sent a letter entitled "Notification of Disposition of Collateral," providing just 16 days notice that W-D Israel intended to "sell the twenty percent (20%) membership interest owned by SK Greenwich, LLC in 443 Greenwich Partners, LLC."

152.    W-D Israel offered only a minority ownership interest in the Company at auction and did not offer for sale the other eighty percent (80%) of membership interests, which correlates with the membership interests of W-D Delaware.

153.    Upon information and belief, W-D Israel was unwilling to speak with SK Greenwich or Karmely about resolving the Mezzanine Loan or to auction anything more than 20% of the collateral because W-D Israel was not seeking value for the Mezzanine Loan: W-D Israel sought, out of malice and greed, only to cut SK Greenwich out of the business, notwithstanding the provisions of the Mezzanine Agreement that precluded any payments.

154.    W-D Israel took other steps to discourage bidders as well. The short notice of the sale was designed to discourage bidders from attending the auction. W-D Israel did not advertise the auction until October 10, 2010, just ten days before the auction. To further discourage any bidders, W-D Israel required any bidders to be personally present, and forbade anyone who had not made a $750,000 deposit in advance from attending.

155.    W-D Israel also failed to pay the Anglo Irish Bank mortgage loan prior to asserting any claims of default under the Mezzanine Loan. As stated above, this requirement ensured that the membership interests would have substantial value at the time of any auction and would preclude the loss of those interests for a nominal value. The failure to comply with these requirements not only prevented a commercially reasonable sale, but also breached the protective provisions agreed upon by the parties in the Mezzanine Agreement.

156.    In addition, the failure to state the amount claimed to be due and owing, and the short notice of the auction – just twenty days from the Mezzanine Default Letter to the auction – were designed to avoid giving SK Greenwich time to object or to organize sufficient funds – which must have been approximately $30,000,000 or so – to exercise the right of redemption.

157.    In fact, any proceeds from the auction would never benefit the mezzanine lender because all sums were required to be paid to Anglo Irish Bank, pursuant to the Intercreditor Agreement.

158.    In short, the foreclosure and pending auction bore none of the marks of a legitimate, arms-length transaction, much less a commercially reasonable sale.

159.    W-D Israel's attorneys, Steven Gellman and Bernard Nussbaum, also told Karmely that he could not redeem the loan by paying his pro rata share of the Company's indebtedness under the Mezzanine Loan, but must also pay W-D Delaware's 80% share.

160.    SK Greenwich then commenced an action and sought a preliminary injunction to attempt to stay the auction.

161.    However, on the morning of October 20, 2010, minutes before the auction, the Court notified the parties that it would permit the auction to go forward. SK Greenwich's application for a short stay was denied.

162.    W-D Israel continued without delay to conduct the auction at 11:40 a.m. that morning

163.    SK Greenwich's attorney hurriedly dispatched a representative to attend, but did not have opportunity to obtain further instructions from SK Greenwich. W-D Israel refused entry to SK Greenwich's representative, stating that, if she had no authority to make a bid, she would not be permitted to attend.

164.    W-D Israel's representative was the only attendant at the auction. The auctioneer noted, "As there were no other registered bidders present, there was no competitive or spirited bidding that ensued."

165.    W-D Israel did not even bother to credit-bid the minimum deposit it had required for anyone else who would have attended the auction. Instead, it credit bid $100,000 for the 20% interest.

166.    W-D Israel then notified SK Greenwich that it was removing SK Greenwich as managing member and retaining $300,000 that SK Greenwich had posted for the last extension from Anglo Irish Bank.

167.    SK Greenwich has since attempted to redeem the debt and obtain a return of its membership interests for $30,000,000 the full amount of the W-D Israel loan. W-D Israel has refused, and has refused to negotiate any other resolutions.

31

168.     On January 4, 2011, Anglo Irish Bank sent a letter declaring the Company in default of the Mortgage Loan, stating that the Company had not made the payment due on the maturity of the Mortgage Loan (the "Mortgage Default Letter").  Upon information and belief, the W-D Defendants procured Anglo Irish Bank's Mortgage Default Letter as part of the W-D Defendants' strategic plan.

169.     Just days after the Mortgage Default Letter, the Wertheimer Family Company purchased the mortgage loan from Anglo Irish Bank.

170.     The excision of SK Greenwich was complete.

171.     From 2006 through 2010, SK Greenwich had worked for the W-D Defendants to the exclusion of any other work, identified this and many other properties in the United States and Asia, developed architectural and design plans, orchestrated the purchase and financing, organized the removal or buyout of tenants, secured the necessary approvals and permits for construction, and elicited a corporate sponsor for the project.

172.     In addition to these efforts, SK Greenwich had made a $9.5 million capital contribution to the project and delivered personal guaranties and more than $800,000 in unreimbursed costs.

173.     It took just three months for Wertheimer, Dagmi, and the other W-D Defendants to take away all of SK Greenwich's ownership interests in the Company and the value created by SK Greenwich's time and skilled efforts, without a single dollar of consideration or compensation for all the time, money, and effort SK Greenwich had contributed.

174.     Upon information and belief, if SK Greenwich were allowed to develop the property to completion, it would still produce proceeds of over $400,000,000.

175.    Upon information and belief, W-D Israel and W-D Delaware have turned down purchase offers of $130 million and more (exceeding the combined debt and capital investment in the property) and have not listed the 443 Property for sale.

## FIRST CLAIM
### Breach of Fiduciary Duty
### (Against All W-D Defendants)

176.    Plaintiffs repeat and reallege paragraphs 1 through 175 as though fully stated herein.

177.    W-D Delaware, as the majority shareholder in the Company, owed a fiduciary duty to SK Greenwich, as the minority shareholder, including, inter alia, the duties of care, loyalty, and utmost good faith and fair dealing.

178.    W-D Delaware and its successors and assigns continue to owe a fiduciary duty to SK Greenwich, notwithstanding the auction sale of SK Greenwich's membership interests, because the auction sale is void for the reasons stated herein, including the failure to comply with the Mezzanine Agreement among the parties, and because the auction was not commercially reasonable.

179.    Moreover, SK Greenwich continues to have a contingent interest in the Company because the Wertheimer Family Company – as the new holder of the Mortgage Loan – has already threatened its intent to enforce the personal guaranties made by Karmely, notwithstanding the fact that the value of the 443 Property exceeds the principal amount of the mortgage loan for which the guaranties were provided.

180.    Pursuant to Section 3.4 of the Company's Operating Agreement, any payments made under the personal guaranties – personal guaranties made pursuant to the Operating

Agreement – which are not indemnified by the Company's other members will be deemed to be a Capital Contribution.

181.    Accordingly, SK Greenwich continues to have both vested and contingent interests in the Company. Therefore, W-D Delaware and/or W-D Israel, as the majority shareholder of the Company (and/or their successors and assigns) continue to have a fiduciary duty to SK Greenwich.

182.    W-D Delaware breached its fiduciary duties to SK Greenwich by, among other things:

    a.  refusing to negotiate the terms of the mezzanine debt with W-D Israel, the mezzanine lender;

    b.  refusing to allow SK Greenwich to negotiate the terms of the mezzanine debt with W-D Israel;

    c.  through its alter ego, W-D Israel, prematurely declaring default and/or forcing the Company to default;

    d.  failing to exercise the equitable right of redemption or allowing SK Greenwich or the Company to exercise the equitable right of redemption;

    e.  through its alter ego, W-D Israel, conducting a commercially unreasonable auction of SK Greenwich's membership interests;

    f.  refusing to consider, negotiate, or discuss financing opportunities presented to the Company by SK Greenwich;

    g.  refusing to fund the obligations to Amanresorts and Denniston International;

    h.  through its alter egos, W-D Israel and the Wertheimer Family Company, usurping business opportunities of the Company, such as the opportunity to exercise the equitable right of redemption with regard to the Mezzanine Loan, the opportunity to exercise the equitable right of redemption with regard to the Mortgage Loan, the opportunity to negotiate satisfaction or purchase of the Mezzanine Loan or Mortgage Loan, and the opportunity to develop and/or sell the 443 Property.

183.    Wertheimer and Dagmi dominated and controlled W-D Delaware, W-D Israel, and Wertheimer Family Company, operating them as a single unit, in order to pursue their own interests rather than those of the distinct entities or of the Company.  Wertheimer and Dagmi, through their domination and control of W-D Delaware, W-D Israel, and Wertheimer Family Company caused W-D Delaware to breach its fiduciary duties as outlined above.

184.    As a result of Wertheimer and Dagmi's domination and control of their entities in order to perpetrate the wrongs above, SK Greenwich has been deprived of its membership interests in the Company, lost significant business opportunities and incurred other damages.

185.    Because Wertheimer and Dagmi ignored the corporate distinction between W-D Israel, W-D Delaware, the Wertheimer Family Company, and themselves, operating them as alter egos, Wertheimer, Dagmi, W-D Israel, W-D Delaware, and the Wertheimer Family Company are each separately and jointly liable for the acts of the other.

186.    As a result of the foregoing conduct, SK Greenwich has been damaged in an amount to be determined at trial, but in no event any less than $40,000,000.

**SECOND CLAIM**
**Aiding and Abetting a Breach of Fiduciary Duty**
**(Against Wertheimer, Dagmi, W-D Israel, and Wertheimer Family Company)**

187.    Plaintiffs repeat and reallege paragraphs 1 through 186 as though fully stated herein.

188.    Wertheimer, Dagmi, W-D Israel, and Wertheimer Family Company were all aware of the fiduciary duties W-D Delaware owed to SK Greenwich as a result of their intimate familiarity with the project and the relationships between the parties.

189.    Wertheimer, Dagmi, W-D Israel, and the Wertheimer Family Company were at all relevant times, aware of W-D Delaware's breaches of its fiduciary duties.

190.    Wertheimer, Dagmi, W-D Israel, and Wertheimer Family Company participated in W-D Delaware's breach of fiduciary duties by wrongfully breaching the promises to fund the project to completion, by wrongfully enforcing the Mezzanine Loan contrary to its terms and the Company's operating agreement, by refusing to engage in arms-length negotiations to renegotiate the debt or redeem the debt, conducting a sham auction, and by generally participating in the scheme to cut SK Greenwich out of the Company without compensation.

191.    W-D Delaware's breach of its fiduciary duties would not have been possible without the collusion of Wertheimer and Dagmi and their family and agents, and the acquiescence and assistance of W-D Israel, who owned the Mezzanine Loan and the Wertheimer Family Company, which negotiated with Anglo Irish Bank to purchase the senior debt of the Company.

192.    As a result of the foregoing acts, Plaintiffs have been harmed in an amount to be determined at trial, but in no event any less than $40,000,000.

### THIRD CLAIM
### Derivative Claim for Breach of Fiduciary Duty
### (Against All W-D Defendants)

193.    Plaintiffs repeat and reallege paragraphs 1 through 192 as though fully stated herein.

194.    W-D Delaware, as the holder of the majority membership interests and director of the Company, owed a fiduciary duty to the Company, including *inter alia*, the duties of care, loyalty, and utmost good faith and fair dealing.

195.    SK Greenwich continues to be an equitable holder of membership interests, as alleged herein.

196.    W-D Delaware breached its fiduciary duties to the Company by, among other

things:

     a.  refusing to renegotiate the terms of the mezzanine debt with W-D Israel, the mezzanine lender;

     b.  refusing to allow SK Greenwich to renegotiate the terms of the mezzanine debt with W-D Israel or to make offers of payment;

     c.  through its alter ego, W-D Israel, prematurely declaring default and/or forcing the Company to default;

     d.  failing to direct the Company to exercise the equitable right of redemption or allowing SK Greenwich to exercise the equitable right of redemption;

     e.  through its alter ego, W-D Israel, conducting a commercially unreasonable auction of pledged collateral;

     f.  refusing to consider, negotiate, or discuss financing opportunities presented to the Company by SK Greenwich;

     g.  refusing to fund the obligations to Amanresorts and Denniston International;

     h.  through its alter egos, W-D Israel and the Wertheimer Family Company, usurping business opportunities of the Company, such as the opportunity to exercise the equitable right of redemption with regard to the Mezzanine Loan, the opportunity to exercise the equitable right of redemption with regard to the Mortgage Loan, the opportunity to negotiate satisfaction or purchase of the Mezzanine Loan or Mortgage Loan, and the opportunity to develop and/or sell the 443 Property.

197.    It was futile for SK Greenwich to make demands on W-D Delaware to perform or

refrain from performing these acts because, as alleged herein, W-D Delaware is the holder of a

majority of the membership interests and is an interested party in each of these transactions, or is

controlled by an interested party in each of these transactions and because these transactions were

so egregious on their face that they could not have been the product of sound business judgment

of the directors.

37

198.    Wertheimer, Dagmi, W-D Israel, and the Wertheimer Family Company were all aware of W-D Delaware's fiduciary duties owed to the Company as a result of their intimate familiarity with the project and the relationships between the parties.

199.    Wertheimer and Dagmi dominated and controlled W-D Delaware, W-D Israel, and the Wertheimer Family Company, operating them as a single unit, in order to pursue their own interests rather than those of the distinct entities or of the Company.  Wertheimer and Dagmi, through their domination and control of W-D Delaware, W-D Israel, and Wertheimer Family Company caused W-D Delaware to breach its fiduciary duties as outlined above.

200.    As a result of Wertheimer and Dagmi's domination and control of their entities in order to perpetrate the wrongs above, the Company has been deprived of its Operations Member and has been deprived of business opportunities, such as obtaining construction financing, converting the 443 Property to an Amanresort hotel and condominiums, redeeming its debt, and renegotiating the terms of its debt.

201.    Because Wertheimer and Dagmi ignored the corporate distinction between W-D Israel, W-D Delaware, the Wertheimer Family Company, and themselves, operating them as alter egos, Wertheimer, Dagmi, W-D Israel, W-D Delaware, and the Wertheimer Family Company are each separately and jointly liable for the acts of the other.

202.    As a result of the W-D Defendants' foregoing breaches of fiduciary duty and other wrongful conduct, the Company has lost profits because it will sell, or realize substantially less profit from the sale of, the 443 property than it would have received had the Defendants attempted to pursue the opportunities above and the development of the project to completion.

203.    As a result of the foregoing conduct, the Company has been damaged in an amount to be determined at trial, but in no event any less than $200,000,000 plus attorneys' fees.

**FOURTH CLAIM**
**Breach of the Pledge and Security Agreement**
**(Against All W-D Defendants)**

204.    Plaintiffs repeat and reallege paragraphs 1 through 203 as though fully stated herein.

205.    SK Greenwich and W-D Delaware entered into the Pledge and Security Agreement with W-D Israel on September 7, 2006 for good and valuable consideration.

206.    SK Greenwich performed all its obligations under the Pledge and Security Agreement at all times prior to W-D Israel's breach of the Pledge and Security Agreement.

207.    W-D Israel owed SK Greenwich a duty of good faith and fair dealing in connection with the Pledge and Security Agreement.

208.    W-D Israel never demanded any payments under the Mezzanine Loan.

209.    The Pledge and Security Agreement granted a security interest in "one hundred (100%) percent of the membership interests" in the Company to W-D Israel, in connection with the Mezzanine Loan.

210.    The Pledge and Security Agreement also expressly incorporates the Subordination and Intercreditor Agreement.  Specifically, Section 26 provides, "The terms and provisions of this Agreement are expressly made subject to the terms and provisions of that certain Intercreditor Agreement, of even date herewith, among the Senior Lender, the Secured Party, and the Pledgor."

211.    The Subordination and Intercreditor Agreement is unequivocal.  It does not permit any payment to the Mezzanine Lender until all the obligations under the Mortgage Loan have been paid in full:

39

Until all of Borrower's obligations under the Anglo Senior Loan Documents have been paid and performed in full, no payment whatsoever shall be made to Mezzanine Lender by or on behalf of the Borrower, Mezzanine Borrower, or any Guarantor for or on account of any amount due under the Mezzanine Loan Documents.

212.    Thus, pursuant to the Subordination and Intercreditor Agreement, no payment may be made under the Mezzanine Loan until the obligations under the Mortgage Loan are satisfied in full.

213.    This limitation on payments under the Mezzanine Loan was a condition precedent to Anglo Irish Bank's consent to the loan, as stated in the Subordination and Intercreditor Agreement.

214.    The Mezzanine Agreement is also consistent with this requirement.

215.    The Mezzanine Agreement, signed contemporaneously with the Pledge and Security Agreement also expressly incorporates the Subordination and Intercreditor Agreement. Specifically, Section 4.27 of the Mezzanine Agreement provides, "The terms and provisions of the Note and this Agreement are expressly made subject to the terms and provisions of the Intercreditor Agreement."

216.    Section 3.1(a) of the Mezzanine Agreement defines "Event of default" as the occurrence of one of several events including:

the failure by the Borrower to pay any installment of principal, interest, or other payments required under the Note when due, provided however that at the time such payment is due (i) payments to the Lender are permitted under the Senior Loan Documents and (ii) there is Available Net Cash Flow or Capital Events Proceeds (as defined in the Operating Agreement).

217.    Under this section, before a failure to make any payment required under the Mezzanine Note can be an "Event of Default" under the Mezzanine Agreement, two conditions precedent must be satisfied.  First, the payments must be permitted under the Mortgage Loan

40

documents, including the Subordination and Intercreditor Agreement. Second, there must be Available Net Cash Flow or Capital Events Proceeds.

218. On September 30, 2010, W-D Israel sent a letter to SK Greenwich (the "Notice of Default") stating that the principal and interest on the Mezzanine Loan was due on October 1, 2009.

219. On October 1, 2009 (and at all relevant times thereafter) the Company had not satisfied in full all of its obligations under the Mortgage Loan. There were amounts due and owing under the Mortgage Loan.

220. As a result, on that date, no payments were permitted to the Mezzanine Lender under the terms of the Mezzanine Note, the Mezzanine Agreement, the Subordination and Intercreditor Agreement, or the Pledge and Security Agreement.

221. In addition, the Company did not have Available Net Cash Flow or Capital Event Proceeds sufficient to pay the Mortgage Loan obligations and make any payments under the Mezzanine Loan at any time from October 1, 2009 or thereafter.

222. In order to have such Available Net Cash Flows, the Company would have to issue a capital call or obtain additional financing.

223. At no time did W-D Delaware cause the Company to issue a capital call in order to fund payment of the note to W-D Israel.

224. As a result, the Notice of Default was improper and was made in breach of the Mezzanine Note, the Mezzanine Agreement, the Subordination and Intercreditor Agreement, or the Pledge and Security Agreement.

225. In addition, the subsequent Notice of Disposition of Collateral, as well as the auction, were improper and were done in breach of Mezzanine Note, the Mezzanine Agreement,

the Subordination and Intercreditor Agreement, or the Pledge and Security Agreement, and the

covenant of good faith and fair dealing owed under each of those agreements.

226.   As a result of the foregoing breaches, SK Greenwich has been wrongfully

deprived of its membership interests in the Company, and has been damaged in an amount to be

determined at trial, but in no event any less than $40,000,000.

**FIFTH CLAIM**
**Breach of Common Law Duty to Offer Equity of Redemption and**
**Conduct a Commercially Reasonable Sale**
**(Against All W-D Defendants)**

227.   Plaintiffs repeat and reallege paragraphs 1 through 226 as though fully stated

herein.

228.   As the lender and holder of secured property under the Pledge Agreement, and by

virtue of their control of the 443 Property, including the sole capability to provide funding

sufficient to complete the development of the 443 Property, and by virtue of the trust and

confidence placed in them, W-D Israel and the other W-D Defendants owed a duty directly to the

Company and to SK Greenwich, including, *inter alia*, the duties of care, loyalty, utmost good

faith, and fair dealing.

229.   The W-D Defendants had a duty to offer the equity of redemption and to dispose

of the pledged collateral by sale in good faith and in a commercially reasonable manner, and to

fund the project to completion.

230.   Wertheimer and Dagmi dominated and controlled W-D Delaware, W-D Israel,

and Wertheimer Family Company, operating them as a single unit, in order to pursue their own

interests rather than those of the distinct entities or of the Company.  Wertheimer and Dagmi,

through their domination and control of W-D Delaware, W-D Israel, and Wertheimer Family Company caused W-D Israel to breach its fiduciary duties.

231.    Wertheimer and Dagmi, through the assistance of their family members, agents, and the other W-D Defendants, who are its alter egos, conspired to breach these fiduciary duties and/or aided and abetted W-D Israel in breaching these fiduciary duties as described herein and more specifically as follows.

232.    The W-D Defendants refused to engage, discuss, or entertain numerous financing opportunities presented by SK Greenwich and Karmely.

233.    The pledged collateral under the Pledge Agreement included 100% of the ownership interests in the Company.  In other words, the pledged collateral included both SK Greenwich's 20% ownership interest in the Company and W-D Delaware's 80% ownership interest.

234.    W-D Israel could have placed 100% of the pledged collateral for sale at auction, but W-D Israel did not place all of the pledged collateral for sale at auction.

235.    W-D Israel placed only a 20% of the pledged collateral – SK Greenwich's ownership interests – for sale at auction, and failed to pay the Anglo Loan as required prior to any assertion of a default or a demand for payment.

236.    Twenty percent of the pledged collateral would sell at a severe discount against the pro rata value of those shares in an arms-length auction or sale of the entire pledged collateral.

237.    In other words, W-D Israel seized 80% of the ownership interests in the Company without affording SK Greenwich or anyone else the opportunity to bid for those interests and

depressed the value by not paying the Anglo Irish Bank mortgage debt as required under the Mezzanine Agreement.

238.   The W-D Defendants further depressed the value of the minority ownership interest in the Company, and the value of the Company in general, through their malicious and oppressive acts as holder of the majority membership interests and through their breaches of fiduciary duties to the Company and to the minority shareholder as alleged above.

239.   To further discourage participation in the auction, the W-D Defendants required any potential bidders to place a $750,000 deposit before they could be admitted at auction.

240.   As a result of W-D Israel's failure to include all the pledged collateral in the sale, its unreasonable deposit demands, and W-D Delaware's history of inequitable and oppressive conduct as holder of the majority membership interests, no bidders showed up for the auction. W-D Israel's representative was the only bidder present.

241.   The W-D Defendants made a $100,000 credit bid for the 20% ownership interests in the Company.

242.   The sale was not a good faith, arms length transaction.

243.   As a result of all these acts, the sale of SK Greenwich's ownership interests was not commercially reasonable.

244.   As a result of the foregoing actions, the Company and SK Greenwich have been damaged in an amount to be proved at trial, but no less than $40,000,000.

### SIXTH CLAIM
**Breach of Statutory Duty to Conduct a Commercially Reasonable Sale
(Against All W-D Defendants)**

245.   Plaintiffs repeat and reallege paragraphs 1 through 244 as though fully stated herein.

246.     In addition to the common law duties stated above, the W-D Defendants had a statutory duty under Section 9-610 of the New York Uniform Commercial Code to conduct a commercially reasonable sale.

247.     Wertheimer and Dagmi dominated and controlled W-D Delaware, W-D Israel, and Wertheimer Family Company, operating them as a single unit, in order to pursue their own interests rather than those of the distinct entities or of the Company.  Wertheimer and Dagmi, through their domination and control of W-D Delaware, W-D Israel, and Wertheimer Family Company caused W-D Israel to breach its fiduciary duties.

248.     W-D Israel and the other W-D Defendants, who are its alter egos, conspired to breach these fiduciary duties and/or aided and abetted W-D Israel in breaching these fiduciary duties as described herein and more specifically as follows.

249.     The W-D Defendants refused to engage, discuss, or entertain numerous financing opportunities presented by SK Greenwich and Karmely.

250.     The pledged collateral under the Pledge Agreement included 100% of the ownership interests in the Company.  In other words, the pledged collateral included both SK Greenwich's 20% ownership interest in the Company and W-D Delaware's 80% ownership interest.

251.     W-D Israel could have placed 100% of the pledged collateral for sale at auction, but W-D Israel did not place all of the pledged collateral for sale at auction.

252.     W-D Israel placed only 20% of the pledged collateral – SK Greenwich's ownership interests – for sale at auction, and failed to pay the Anglo Loan mortgage loan as required prior to any assertion of a default or a demand for payment.

253.     Twenty percent of the pledged collateral would sell at a severe discount against the pro rata value of those shares in an arms-length auction or sale of the entire pledged collateral.

254.     In other words, W-D Israel seized 80% of the ownership interests in the Company without affording SK Greenwich or anyone else the opportunity to bid for those interests and depressed the value by not paying the Anglo Irish Bank mortgage debt as required under the Mezzanine Agreement.

255.     The W-D Defendants further depressed the value of the minority ownership interest in the Company, and the value of the Company in general, through their malicious and oppressive acts as holder of the majority membership interests and through their breaches of fiduciary duties to the Company and to the minority shareholder as alleged above.

256.     To further discourage participation in the auction, the W-D Defendants required any potential bidders to place a $750,000 deposit before they could be admitted at auction.

257.     As a result of W-D Israel's failure to include all the pledged collateral in the sale, its unreasonable deposit demands, and W-D Delaware's history of inequitable and oppressive conduct as holder of the majority membership interests, no bidders showed up for the auction. W-D Israel's representative was the only bidder present.

258.     The W-D Defendants made a $100,000 credit bid for the 20% ownership interests in the Company.

259.     The sale was not a good faith, arms length transaction.

260.     As a result of all these acts, the sale of SK Greenwich's ownership interests was not commercially reasonable.

261.    As a result of the foregoing actions, the Company and SK Greenwich have been damaged in an amount to be proved at trial, but no less than $40,000,000.

## SEVENTH CLAIM
### Fraud
### (Against All W-D Defendants)

262.    Plaintiffs repeat and reallege paragraphs 1 through 261 as though fully stated herein.

263.    Wertheimer and Dagmi instructed and authorized Karmely to make approximately $1 billion in cash offers for real estate.

264.    Wertheimer and Dagmi, at various times, promised that they would indemnify Karmely for any personal guaranties he had to submit in support of the Company's debts.

265.    At a meeting with Anglo Irish Bank, Dagmi promised that Wertheimer would indemnify any payments made under personal guaranties.

266.    Wertheimer and Dagmi also promised, at various times, including in the presence of representatives of Anglo Irish Bank, that if the Company could not obtain construction financing elsewhere, Wertheimer and Dagmi would provide construction financing for the Company themselves or through their affiliates and finance the project through completion.

267.    Due to Wertheimer's great wealth, his repeated assurances, and Dagmi's 35 year relationship with Karmely, these promises were credible.

268.    Wertheimer and Dagmi knew these promises would be believed and intended Karmely to believe and rely upon them.

269.    In reliance upon the promises, Karmely worked for 4 years to identify, pursue, and develop properties in the United States and Southeast Asia, forewent opportunities to work with other real estate investors, continued working to develop the 443 Property, paid significant sums

to Anglo Irish Bank, incurred substantial costs, and signed personal guaranties to Anglo Irish
Bank.

271.    As a result, Karmely has been damaged in an amount to be determined at trial, but
in no event any less than $40,000,000.

**EIGHTH CLAIM**
**Breach of the Operating Agreement**
**(Against All W-D Defendants)**

271.    Plaintiffs repeat and reallege paragraphs 1 through 270 as though fully stated
herein.

272.    SK Greenwich and W-D Delaware agreed to the Company's Operations
Agreement on September 7, 2006.

273.    SK Greenwich has at all times performed its obligations under the Operations
Agreement.

274.    The W-D Defendants owed SK Greenwich a duty of good faith and fair dealing
under the Operating Agreement.

275.    The W-D Defendants have breached Sections 3.1(b), 3.3(d) and 6.1(c)(ii) of the
Operating Agreement as follows.

276.    During the course of its duties as Operations Member, SK Greenwich was
required to pay certain costs incurred.

277.    Pursuant to Section 3.1(b) SK Greenwich demanded reimbursement from the
Company and the non-contributing members for these necessary expenditures.

278.    W-D Delaware and its alter-ego, W-D Israel have failed to reimburse SK
Greenwich for their share of the contribution for those necessary expenditures – approximately
$800,000.

279.    A justifiable controversy exists between the parties in that SK Greenwich contends that, if it is not paid, then its contributions are converted to pro rata membership interests pursuant to Section 3.1(f) of the Operating Agreement. W-D Defendants also contend that SK Greenwich no longer owns any membership interests in the Company.

280.    W-D Delaware and its alter-egos have also breached Section 3.3(d) of the Operations Agreement, which requires Members, when seeking loans or investments for the Company to:

> "coordinate their efforts in connection therewith and cooperate with each other to the end that the most favorable terms for any financing required by the Company are obtained and dilution of the Members' interest in the Company is minimized. If a Member or one of their Affiliates (an **"Affiliated Investor"**) provides such financing or any part thereof, the Members will coordinate their efforts in connection therewith to the end that remedies, decision-making and veto rights, and **enforcement rights granted to such Affiliated Investor together with its affiliated Member shall be no greater than the rights and remedies of such affiliated Member by itself prior to such transaction, unless the same additional rights and remedies are granted to the other Members.**

(emphasis added).

281.    W-D Israel is an Affiliated Investor under Section 3.3(d) of the Operations Agreement.

282.    Under the terms of the Mezzanine Loan and the related documents, W-D Israel sought to enforce purported rights in an Event of Default that were greater than the enforcement rights of W-D Delaware prior to the Mezzanine Loan.

283.    Under the Mezzanine Loan, W-D Israel claims it had the right to take possession of SK Greenwich's membership interests only in an Event of Default.

284.    Under Section 3.1(d)(ii) of the Operations Agreement, in an Event of Default of a Member Loan, W-D Delaware only had the right to either collect payment on the debt from funds

otherwise distributable to SK Greenwich or to terminate the loan and dilute SK Greenwich's membership interests. In the event of termination, SK Greenwich would have 45 days to repay in full the Member Loan and have its interests restored.

285. Accordingly, the actions of W-D Delaware and W-D Israel are in breach of Section 3.1(d)(ii) of the Operations Agreement and in violation of the covenant of good faith and fair dealing inherent in every contract.

286. W-D Delaware and its alter-ego have also breached Section 6.1(c)(ii) of the Operations Agreement by purportedly removing SK Greenwich as Operations Member. Section 6.1(c)(ii) of the Operations Agreement provides that SK Greenwich shall continue as Operations Member of the Company until SK Greenwich is no longer controlled by Karmley, or SK Greenwich is removed for cause or is a defaulting member.

287. None of these conditions have been met. Therefore, the removal of SK Greenwich is inappropriate and in breach of the Operations Agreement.

288. Alternatively, even if the Court finds that SK Greenwich was properly removed as Operations Manager, SK Greenwich is entitled to receive a pro rata portion of the SK Greenwich Preferred Return as set forth in the Operating Agreement.

289. As a result of the foregoing breaches, SK Greenwich has been wrongfully deprived of its membership interests in the Company and of its position as Operations Member, and has been damaged in an amount to be determined at trial, but in no event any less than $40,000,000.

## NINTH CLAIM
### Breach of the Mezzanine Loan Documents
### (Against All W-D Defendants)

290.   Plaintiffs repeat and reallege paragraphs 1 through 289 as though fully stated herein.

291.   At the time they entered into the Mezzanine Loan Documents, the Company and SK Greenwich were entitled to and could not waive the equity of redemption.

292.   At the same time as entering the Mezzanine Loan, the W-D Defendants impermissibly clogged the equity of redemption.

293.   The W-D Defendants agreed that no payments could be made to satisfy the Mezzanine Loan until the Mortgage Loan was satisfied in full.

294.   W-D Defendants contend that the Mezzanine Loan Documents permit them to declare a default and foreclose the pledged collateral even when the Mortgage Loan had not been satisfied and no payment could be made to satisfy the Mezzanine Loan.

295.   If this is permitted under the Mezzanine Loan Documents, it constitutes impermissible clogging of the equity of redemption and is therefore unenforceable.

296.   W-D Defendants also contend that the Mezzanine Loan included a provision entitling them to foreclose on less than 100% of the pledged collateral.

297.   Any agreement permitting the W-D Defendants to foreclose on less than 100% of the pledged collateral constitutes impermissible clogging of the equity of redemption, and is therefore unenforceable.

298.   Although any provision purporting to allow the W-D Defendants to declare default while no payments could be made or retained under the Mezzanine Loan was unenforceable, and although any provision purporting to allow the W-D Defendants to foreclose

on less than 100% of the pledged collateral was unenforceable, the W-D Defendants declared

default while no payments could be made under the Mezzanine Loan and foreclosed on less than

100% of the pledged collateral.

299.    As a result of the foregoing breaches, Plaintiffs have been injured in an amount to

be determined at trial, but in no event any less than $40,000,000.

### TENTH CLAIM
### Declaratory Judgment
### (Against All Defendants)

300.    Plaintiffs repeat and reallege paragraphs 1 through 299 as though fully stated

herein.

301.    Relying on the W-D Defendants' false promises, SK Greenwich and Karmely

executed certain personal guaranties, including the Amended and Restated Limited Repayment

Guaranty, an Amended and Restated Debt Service and Operating Expenses Shortfall Guaranty,

an Amended and Restated Non-Recourse Carveout Guaranty, and an Amended and Restated

Guaranty of Capex Obligations, and other personal guaranties (together, the "Guaranties").

302.    On multiple occasions, the W-D Defendants have threatened to enforce these

Guaranties if Karmely does not comply with their demands.

303.    By their aforementioned willful misconduct and/or gross negligence, the W-D

Defendants have repudiated the Guaranties.

304.    By reason of their aforementioned breaches of the Mezzanine Loan Documents

and the Operating Agreement, the W-D Defendants cannot in equity and in good conscience

insist upon the Plaintiffs' performance of any of their obligations under any of the Guaranties.

305.    Alternatively, because the W-D Defendants have obtained, through the

foreclosure and auction, ownership of the entire Company and, thereby, its asset, the 443

Property, and all loans on the 443 Property, and because the 443 Property's value substantially exceeds the value of the Mortgage Loan, thereby making the W-D Defendants whole, the W-D Defendants should be precluded from any action to recover on the Guaranties that were obtained in connection with the Mortgage Loan and that were primarily made to ensure that the Mortgage Loan was satisfied, and not to award any windfall profit.

306.    W-D Defendants have received offers to purchase the 443 Property exceeding $130 million.

307.    Plaintiffs are entitled to a declaration that each of the Guaranties are terminated with respect to each of the Plaintiffs.

### ELEVENTH CLAIM
**Account Stated**
**(Against All Defendants)**

308.    Plaintiffs repeat and reallege paragraphs 1 through 307 as though fully stated herein.

309.    Between September 2006 and October 2010, SK Greenwich and Karmely rendered services to the Company and the W-D Defendants and incurred costs of approximately $800,000 on behalf of the Company and the W-D Defendants and for the Company's and the W-D Defendants accounts pursuant to the Operating Agreement between the parties.

310.    After providing those services, SK Greenwich issued invoices and statements to the Company and the W-D Defendants for the services rendered, with accompanying detail. *See, e.g.,* Exhibit 1.

311.    When the Company and the W-D Defendants accepted the invoices and statements of account and did not object to them within a reasonable period of time, the W-D Defendants agreed to the correctness of the account.

312.    Accordingly, an account was stated between SK Greenwich and the W-D Defendants in the amount of the balance due as shown on the invoices and statements, which amounts the W-D Defendants promised and agreed to pay.

313.    Despite repeated requests, W-D Defendants failed to pay the balance due under the agreement for services rendered and costs incurred.

314.    As a result of the foregoing, the W-D Defendants are bound by the account owed and owe SK Greenwich the sum of approximately $800,000, plus additional late fees, attorneys' fees and other costs and the expenses of collection.

## TWELFTH CLAIM
### Quantum Meruit
### (Against All Defendants)

315.    Plaintiffs repeat and reallege paragraphs 1 through 314 as though fully stated herein.

316.    Karmely and SK Greenwich contributed years of efforts to the purchase and development of the 443 Property, including researching and identifying the property; retaining legal, architectural, engineering, and business consultants to assist in the development of the 443 Property and meeting with those professionals on a weekly basis over the course of several years; developing architectural plans; negotiating with and obtaining approval from community boards for the development of the property; obtaining zoning and building permits from the Department of Buildings; procuring a unique and exclusive hotel management agreement with Amanresorts; and other good and valuable services.

317.    Karmely and SK Greenwich provided these services in good faith reliance upon the promises and assurances of the W-D Defendants that they would fund the development of the

443 Property to completion and back any guaranties made by Karmely and SK Greenwich, and that Karmely would be compensated as part of the sale of the 443 Property.

318.     Karmely and SK Greenwich also contributed money and property for the use and benefit of 443 Partners and 443 Greenwich.

319.     The Defendants accepted the money, property, and services provided by Karmely and SK Greenwich.

320.     As a result of the money, property, and services provided by Karmely and SK Greenwich, the Defendants have received value believed to exceed $40 million.

321.     The Defendants have not compensated Karmely and SK Greenwich for the money, property, and services provided.

322.     As a result, Karmely and SK Greenwich have been injured in an amount to be determined at trial, but in no event any less than $40,000,000.

**THIRTEENTH CAUSE OF ACTION**
**Unjust Enrichment**
**(Against All Defendants)**

323.     Plaintiffs repeat and reallege paragraphs 1 through 322 as though fully stated herein.

324.     As alleged above, throughout the course of SK Greenwich and Karmely's business relationship with the Defendants, SK Greenwich and Karmely provided money, services, and property to the Defendants.

325.     Karmely and SK Greenwich contributed the money, property, and services outlined above in anticipation and expectation of additional contributions and funding from the W-D Defendants and payment upon the development and sale of the 443 Property, including but not limited to a 40% of the profits from the completed project.

326.    The Defendants have failed to live up to their promises, and have failed make restitution for the money, services, and property received from SK Greenwich and Karmely.

327.    The Defendants have a legal and equitable obligation to compensate SK Greenwich and Karmely for the money, services, and property received.

328.    The value of the money, services, and property received by the Defendants is believed to exceed $40,000,000.

329.    As a result of the foregoing conduct, Karmely and SK Greenwich have been injured in an amount to be proved at trial, but in no event any less than $40,000,000.

### FOURTEENTH CLAIM
#### Promissory Estoppel
#### (Against All Defendants)

330.    Plaintiffs repeat and reallege paragraphs 1 through 329 as though fully stated herein.

331.    On multiple occasions, the W-D Defendants promised and represented to SK Greenwich and Karmely that they would back his guarantees with their own funding and that they would fund the development of the 443 Property with their own money through completion if necessary.

332.    The W-D Defendants made the foregoing promises and representations knowing and intending that SK Greenwich and Karmely would rely on those promises and representations.

333.    SK Greenwich and Karmely relied on those promises and representations to their detriment by, among other things, investing millions of dollars in the purchase and development of the 443 Property through 443 Greenwich and 443 Greenwich Partners, dedicating years of professional services to the development of the property, contributing valuable resources – including the use of valuable property – for the use and benefit of 443 Partners and 443

Greenwich, and signing personal guaranties, without compensation other than the promised funding of the project to completion of development of the 443 Property and the promised participation in the profits received in connection with the 443 Property development.

334.    The W-D Defendants breached and did not fulfill their promises.

335.    As a result, SK Greenwich and Karmely have been injured in an amount to be proven at trial, but in no event any less than $40,000,000.

WHEREFORE, Plaintiffs pray for a judgment granting the following relief:

a)    on the First Claim for breach of fiduciary duty, (i) awarding damages in an amount to be determined at trial but no less than $40,000,000 and (ii) reinstituting SK Greenwich's membership interests, together with punitive damages, interest, attorneys fees, costs and disbursements;

b)    on the Second Claim for aiding and abetting breach of fiduciary duty, awarding damages in an amount to be determined at trial but no less than $40,000,000 together with punitive damages, interest, attorneys fees, costs and disbursements;

c)    On the Third Claim for a derivative claim for breach of fiduciary duty, an order reinstituting SK Greenwich as the managing member, damages to be determined at trial, but believed to exceed $200,000,000, together with punitive damages, interest, attorneys fees, costs and disbursements to SK Greenwich;

d)    On the Fourth Claim against the W-D Defendants for breach of the Pledge and Security Agreement, an order awarding damages in an amount to be determined at trial but no less than $40,000,000, together with punitive damages, interest, attorneys fees, costs and disbursements;

e)    On the Fifth Claim against the W-D Defendants, granting (i) declaratory relief holding that the October 20, 2010 auction sale is void and setting aside the sale because it was not commercially reasonable, (ii) injunctive relief requiring the W-D Defendants to (A) conduct a commercially reasonable sale of all of the pledged collateral and (B) extend to SK Greenwich the equitable right of redemption at any time prior to completion of the sale of such collateral, together with punitive damages, interest, attorneys fees, costs and disbursements to SK Greenwich.

f)    On the Sixth Claim against the W-D Defendants, granting (i) declaratory relief holding that the October 20, 2010 auction sale is void and setting it aside because it was not commercially reasonable, (ii) injunctive relief requiring the W-D Defendants to (A) conduct a commercially reasonable sale of all of the pledged collateral and (B) extend to SK Greenwich the equitable right of redemption at

any time prior to completion of the sale of such collateral, together with punitive damages, interest, attorneys fees, costs and disbursements to SK Greenwich.

g)     On the Seventh Claim against the W-D Defendants for Fraud, awarding damages in an amount to be determined at trial but no less than $40,000,000, together with punitive damages, interest, attorneys fees, costs and disbursements;

h)     On the Eighth Claim against the W-D Defendants for Breach of the Operating Agreement, awarding damages in an amount to be determined at trial but no less than $40,000,000, together with punitive damages, interest, attorneys fees, costs and disbursements;

i)     On the Ninth Claim against the W-D Defendants for Breach of the Mezzanine Loan, (i) awarding damages in an amount to be determined at trial but no less than $40,000,000, together with punitive damages, interest, attorneys fees, costs and disbursements, and (ii) reinstituting the membership interests of SK Greenwich;

j)     On the Tenth Claim against all Defendants for Declaratory Judgment, declaring that the Guaranties are terminated with respect to each of the Plaintiffs;

k)     On the Eleventh Claim against all Defendants for Accounts Stated, awarding $800,000 in damages;

l)     On the Twelfth Claim against all Defendants for Quantum Meruit, awarding $40,000,000 in damages;

m)     On the Thirteenth Claim against all Defendants for Unjust Enrichment awarding $40,000,000 in damages;

n)     On the Fourteenth Claim against all Defendants for Promissory Estoppel awarding $40,000,000 in damages; and

o)     On all causes of action, interest, costs, attorneys' fees, and disbursements and such other further relief as the Court may deem just and proper.

Dated:     New York, New York        TANNENBAUM HELPERN SYRACUSE &
April 26, 2011              HIRSCHTRITT LLP

By: _____
        David A. Pellegrino, Esq.
        *Attorneys for Plaintiffs*
        *Shahab Karmely and SK Greenwich LLC*
        900 Third Avenue
        New York, New York 10022
        (212) 508-6722

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury as to all issues so triable.

Dated:    New York, New York
          April 26, 2011

                                TANNENBAUM HELPERN
                                SYRACUSE & HIRSCHTRITT LLP

                                By: _____
                                    David A. Pellegrino, Esq.
                                    Carl D. LeSueur, Esq.
                                900 Third Avenue
                                New York, New York 10022
                                Telephone: (212) 508-6700

                                *Attorneys for Plaintiffs*

EXHIBIT 1

GREENWICH
OVHD ALLOCATION
To-Date April 2010

### *ACTUAL vs BILLED / CHARGED TO GW:*

*OFFICE:*

| | | | |
|---|---|---|---|
| OFFICE SPACE | 5000 sq/ft * $35 pst | $ | 175,000 |
| OFFICE PERSONNEL (see below ***) | | $ | 173,000 |
| OTHER: *schedule below* | | $ | 110,000 |
| | | $ | 458,000 |

| | | |
|---|---|---|
| **YEAR '2006 (4-months)** | 61,067 | *@ 40% allocation* |
| **YEAR '2007** | 366,400 | *@ 80% allocation* |
| **YEAR '2008** | 366,400 | *@ 80% allocation* |
| **YEAR '2009** | 229,000 | *@ 50% allocation* |
| **YEAR '2010 (4-months)** | 61,067 | *@ 40% allocation* |
| Total | 1,083,933 | |

| | |
|---|---|
| PROPOSED OFFICE ALLOCATION LENGTH OF PROJECT | 1,084,000 |
| ACTUAL TO-DATE APRIL, 2010 | 337,210 |
| REIMBURSEMENT SHORTFALL | 746,790 |

| | Yearly Base Costs | | *** | Office Personnel | Salary Markup |
|---|---|---|---|---|---|
| Expenses | | | Receptionist | P. Mattes | 45,241 |
| Auto Expenses | 3,000 | | | | |
| Office Expenses | 25,000 | | Exec. Assistant | M. Tainan | 76,461 |
| Insurance-Business | 4,000 | | | | |
| Expressage | 6,000 | | Office Helper | C. Collado | 51,896 |
| Office Maintenance & S | 12,000 | | | | |
| Messenger Service | 2,500 | | | | 173,598 |
| Accountig Fees | 20,000 | | | | |
| Postage | 750 | | | | |
| Licenses & Fees | 1,500 | | | | |
| Rent-Equipment | 5,000 | | | | |
| Telephone | 15,000 | | | | |
| Cellular Telephone | 13,000 | | | | |
| Security | 2,000 | | | | |
| Total Expenses | 109,750 | | | | |
| **USE** | **110,000** | | | | |