UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

SHAHAB KARMELY and SK GREENWICH LLC, :

                  Plaintiffs,        :   Case No. 11-cv-0541 (RPP)

        vs.                   :

EITAN WERTHEIMER, EZRA DAGMI, 443   :
GREENWICH LLC, 443 GREENWICH      :
PARTNERS LLC, W. FAMILY 1 LTD., W-D   :
GROUP (2006) LP, W-D GROUP NY1, LLC, and  :
JOHN DOES 4-10,               :

                Defendants.    :

**AMENDED COMPLAINT
AND JURY DEMAND**

-------------------------------------------------------------- x

RECEIVED
AUG 19 2011
U.S.D.C. S.D. N.Y.
CASHIERS

## NATURE OF THIS ACTION

1.    Plaintiffs and Defendants were partners in a real estate development venture. Defendants provided not only an equity contribution, but maneuvered to provide mezzanine financing as well. Armed with both equity and debt positions, Defendants abused their leverage, wrongly declared a breach of the mezzanine loan documents, and used that purported breach as a device to seize Plaintiffs' partnership interests. Plaintiffs seek redress from this Court for breach of contract, tortious interference, and related wrongs.

## PARTIES

2.    Plaintiff Shahab Karmely ("Karmely") is an individual residing in New York County.

3.    Plaintiff SK Greenwich LLC ("SK Greenwich") is a Delaware Limited Liability Company. Karmely is its sole member.

4.      Defendant Eitan Wertheimer ("Wertheimer") is, upon information and belief, an individual and a citizen of Israel, a member of one of Israel's wealthiest families, maintains a residence in New York County, and is one of the ultimate beneficial owners of Defendants the Wertheimer Family Company, W-D Partner and W-D Lender.

5.      Defendant Ezra Dagmi ("Dagmi") is, upon information and belief, an individual who is a dual citizen of Israel and the United Kingdom, maintains a residence in New York County, and is one of the ultimate beneficial owners of W-D Partner and W-D Lender.

6.      Defendant 443 Greenwich LLC ("Greenwich Owner") is a Delaware Limited Liability Company and the owner of a property located at 443-53 Greenwich Street, New York, New York 10013 (the "443 Property"). Defendant 443 Greenwich Partners is the sole member of Greenwich Owner.

7.      Defendant 443 Greenwich Partners LLC (together with Greenwich Owner, the "Company") is a Delaware Limited Liability Company. The Company was formed for the express purpose of purchasing, renovating and developing a building on the 443 Property. Upon formation, Karmely owned a 20% interest in the Company, and W-D Partner owned the balance.

8.      Defendant W. Family 1 Ltd. (the "Wertheimer Family Company") is, upon information and belief, a privately-held Israeli corporation whose beneficial owners are Eitan Wertheimer and his family members.

9.      Defendant W-D Group (2006) LP ("W-D Lender") is, upon information and belief, a limited partnership organized in Israel. W-D Lender is the sole member of W-D Partner and is controlled, directly or indirectly, by Wertheimer and Dagmi.

10.     Defendant W-D Group NY1 LLC ("W-D Partner") is a Delaware Limited Liability Company whose sole member is W-D Group (2006) LP. W-D Partner is controlled, directly or indirectly, by Defendants Wertheimer and Dagmi.

11.     John Does 4 through 10 are affiliates of the Wertheimer Family Company, W-D Partner, W-D Lender, and other entities owned or controlled by Wertheimer and Dagmi, whose names and identities at present are unknown to plaintiffs, that played a role in their scheme (together, these entities, Wertheimer, Dagmi, the Wertheimer Family Company, W-D Partner, and W-D Lender, are the "W-D Defendants").

## JURISDICTION AND VENUE

12.     Plaintiffs commenced this action in the Supreme Court of the State of New York, New York County, by filing a summons with notice dated January 14, 2011.

13.     Defendants removed this action to this Court, pursuant to 28 U.S.C. §§1411(a), 1441(d) and 1446, by notice dated January 26, 2011.

14.     This Court has jurisdiction over the subject matter of this action based upon the parties' diversity of citizenship, and because the amount in controversy exceeds $75,000.   28 U.S.C. §1332.

15.     Venue is proper in this District because the property at the center of this dispute is located in New York County, and New York County is where the transactions at issue took place.

## BACKGROUND FACTS

### WERTHEIMER AND DAGMI PROPOSE A MULTI-BILLION DOLLAR REAL ESTATE VENTURE

16.    For more than 35 years, Dagmi and his family have had a close, personal relationship with Shahab Karmely and his family.  Dagmi repeatedly referred to his and his family's relationship with Karmely and Karmely's family as a "family relationship of trust," and to Karmely as his "son" and the "brother" that Dagmi's daughter never had.

17.    Dagmi and Wertheimer are close friends and partners in real estate ventures. Dagmi has described himself as Wertheimer's "brother." On multiple occasions, Wertheimer stated to Karmely (and to others in Karmely's presence) that Dagmi's word binds Wertheimer, and that Karmely may rely on Dagmi's word as binding Wertheimer.

18.    Dagmi knew that Karmely was an experienced New York real estate developer and that he had important real estate contacts in New York and elsewhere.

19.    In 2005, Wertheimer and Dagmi approached Karmely to solicit his involvement in developing a multi-billion dollar real estate portfolio.  Because Wertheimer and Dagmi's planned portfolio was so extensive, they proposed, and Karmely agreed, that (a) Karmely would act as the developer or managing member for this venture, (b) he would work exclusively for this venture, and (c) instead of a customary development fee, he would accept a percentage of the profits on each development as compensation for his development services.

20.    During the ensuing years, Karmely and Wertheimer developed a relationship of mutual trust.  Wertheimer relied upon Karmely to assist him in acquiring personal residences in New York for himself and his family, and to supervise the renovations to those residences.  He relied upon Karmely to negotiate on his behalf to attempt to acquire properties in the United States and in Asia.  Karmely advanced hundreds of thousands of dollars to purchase jewelry for

4

Wertheimer, confident that Wertheimer would reimburse him for the money despite the absence of any documentation.

### THE 443 PROPERTY AGREEMENTS

21.     On September 7, 2006, Wertheimer, Dagmi, and Karmely formed the Company (the "Purchase Date") and entered into many related agreements to enable their purchase and development of the 443 Property, including –

> a. The Limited Liability Company Operating Agreement of 443 Greenwich Partners LLC (the "Operating Agreement"), between its members, W-D Partner and SK Greenwich.   The Operating Agreement named SK Greenwich as Operations Member of the Company;

> b. The Anglo Senior Loan Documents, including a promissory note due October 1, 2008, a mortgage and security agreement, a loan agreement and related documents between Anglo Irish Bank Corp. and the Company (collectively, the "Anglo Senior Loan"); and

> c. The "Mezzanine Loan Documents," including a promissory note due October 1, 2009 (a full year after the Anglo Senior Loan was due), a mezzanine loan agreement, and a pledge and security agreement between W-D Lender, as lender, and W-D Partner and SK Greenwich, as borrower.

22.     In addition, on the Purchase Date, Anglo Irish Bank and W-D Lender entered into a Subordination and Intercreditor Agreement (the "Intercreditor Agreement").   Pursuant to the express language of the Intercreditor Agreement, the Mezzanine Loan was entirely subordinate to the Anglo Senior Loan.  In particular –

   a.   "Unless and until the Anglo Senior Loan is paid and performed in full,
. . . Mezzanine Lender shall have no right to receive any payment with respect
to the Mezzanine Loan, or to exercise any rights or remedies with respect to the
Mezzanine Loan." (Page 1, ¶ E.)

   b.   "Until all of Borrower's obligations under the Anglo Senior Loan
Documents have been paid and performed in full, no payment whatsoever shall
be made to Mezzanine Lender by or on behalf of Borrower [or others]. . . for or
on account of any amount due under the Mezzanine Loan Documents." (¶ 4[d])

23.   Although the Company was not a party to the Intercreditor Agreement, the
Mezzanine Loan Documents that both W-D Lender and W-D Partner executed were "expressly
made subject to the terms and provisions of [the] Intercreditor Agreement" (Mezzanine Pledge
and Security Agreement, ¶ 26; and Mezzanine Loan Agreement, ¶ 4.27).

24.   The subordination of the Mezzanine Loan to the Anglo Senior Loan was
important not only to Anglo Irish Bank, which thereby protected its first position in the project,
but also to SK Greenwich and Karmely. Because the Mezzanine Loan Documents gave rights to
W-D Lender specifically as against SK Greenwich, the subordination of the Mezzanine Loan
prevented W-D Lender and the other W-D Defendants from taking unfair advantage of these
rights.

25.   The Mezzanine Loan Documents themselves gave Plaintiffs important
protections. Among the most important was Section 3.1(a) of the Mezzanine Loan Agreement,
which provides that there could be no event of default under the Mezzanine Loan – and thus no
foreclosure upon SK Greenwich's interests in the Company – for failure to make any payment
due under the Mezzanine Loan Documents unless (i) the Company had satisfied all of its

obligations under the Anglo Senior Loan *and* (ii) had available cash flow or proceeds to make payment.

## THE PURCHASE AND DEVELOPMENT OF THE 443 PROPERTY

26.     The Company purchased the 443 Property on the Purchase Date for $113 million, plus closing costs and additional escrow payments.  The purchase price was comprised of –

    a.  Funds from the $85 million Anglo Senior Loan;

    b.  Funds from the $20 million W-D Lender mezzanine loan (the "Mezzanine Loan"); and

    c.  The balance from the Company, which balance was funded through equity contributions by W-D Partner (80%) and SK Greenwich (20%).

## THE W-D DEFENDANTS' CONFLICT OF INTEREST & SK GREENWICH'S PROTECTIONS

27.     Prior to the Purchase Date, Plaintiffs negotiated terms with Deutsche Bank for a mezzanine loan in connection with the acquisition of the 443 Property.  Anglo Irish Bank reviewed the terms and approved the proposed Deutsche Bank mezzanine loan.

28.     However, Wertheimer and Dagmi decided there was no need to pay any interest to a third-party mezzanine lender because Wertheimer and Dagmi could cover the finances through their own resources and wanted to obtain, for themselves, the benefits of interest as an additional premium on their investment.

29.     The Mezzanine Loan created an inherent conflict of interest between Wertheimer and Dagmi's position as the principals of W-D Partner, which owned a majority of the Company's equity, and their position as the principals of W-D Lender, which owned all of the Mezzanine Debt.  That conflict was exacerbated by the Pledge and Security Agreement, under

which, upon an event of Default, W-D Lender was given the right to foreclose upon SK Greenwich's interests in the Company, without foreclosing upon those of W-D Partner.

30.   Absent certain other protections in the agreements, if W-D Lender could, at some point, fabricate a default under the Mezzanine Loan, and prevent SK Greenwich or anyone else from bidding on the membership interests in the ensuing auction, the W-D Defendants could simply take the whole Company for themselves without making any payment or having to fulfill commitments to SK Greenwich, as the Operations Manager, or otherwise.

31.   And that is exactly what the W-D Defendants have tried to do.


**SK GREENWICH'S EFFORTS**

32.   The plan for developing the 443 Property anticipated seven penthouse apartments, 42 condo units, and 57 hotel units.  The plan also anticipated a luxury spa, swimming pool, and retail components.

33.   But, before the 443 Property could be developed, the Company needed to remove tenants, develop architectural and design plans, determine appropriate branding and partnership opportunities, obtain clearance from the Landmarks Preservation Commission, the Department of City Planning, Department of Buildings and various community boards, and secure zoning permits, construction permits, and perhaps most significantly, construction financing.

34.   Toward these ends, SK Greenwich – as the Company's Operations Member under the Operating Agreement – fashioned a development budget of approximately $100 million that the parties approved.  SK Greenwich then proceeded to achieve milestones ahead of schedule and under budget.

35.     The efforts of SK Greenwich transformed the 443 Property into a turnkey project ready for development, vastly increasing its value.

36.     By May 5, 2008, SK Greenwich had obtained a loan term sheet for construction loan financing from Pacific National Bank.

37.     Dagmi, on behalf of the W-D Defendants, directed SK Greenwich not to pursue the proposed Pacific National Bank construction loan.  Instead, Wertheimer and Dagmi told Karmely to explore construction financing with Wertheimer's personal contacts at UBS. However, those contacts were not in the real estate or commercial lending divisions of UBS, but rather in the *private wealth management* group, and they were not in New York, but rather in *Geneva*.

38.     When UBS finally offered terms, in June 2008, they were less favorable than the terms that Pacific National Bank had offered in early May.

39.     Notwithstanding Wertheimer's contacts at the upper reaches of UBS, the W-D Defendants summarily rejected UBS's terms; they declined even to negotiate with UBS.

40.     By then, however, the financing contemplated by Pacific National Bank with respect to the 443 Project had expired.  However, the W-D Defendants repeatedly told Plaintiffs, Anglo Irish Bank, and others, that they would provide all necessary funds to develop the 443 Property.

41.     In furtherance of the development, the Company made agreements with a leading luxury hotel chain, and its preferred designer.  Those contracts, all of which Dagmi either or approved, obligated the Company to develop the project, further evidencing the W-D Defendants' commitment to fund the project to completion.

## THE ANGLO SENIOR LOAN IS EXTENDED.

42.     Early in the Summer of 2008, just a few months before the Anglo Senior Loan was to mature, the Company was preparing to expend more than $500,000 in furtherance of developing the 443 Property.

43.     Before releasing such payments, Karmely sought assurance that the W-D Defendants would, in fact, be financing the development. He received such assurances both from Dagmi, and Dagmi's daughter, Desiree Dagmi (who was one of W-D Partner's designees to the Company's Board of Managers). Dagmi and Desiree each assured Karmely in separate phone calls, and in person, that they had spoken to, and met with, Wertheimer, that Wertheimer was funding 100% of the 443 Property development, and that Karmely should deliver the payments without delay.

44.     In reliance upon these promises, SK Greenwich sent the payments and ceased discussions with other institutional lenders about the possibility of providing institutional construction financing.

45.     The Anglo Senior Loan was scheduled to mature on October 1, 2008. Starting in August, the Company began negotiating with Anglo Irish Bank to extend the term. Karmely and Dagmi were the principal participants in those negotiations on behalf of the Company.

46.     Ultimately, Anglo Irish Bank agreed to extend its loan until December 31, 2009. However, as a condition of this extension, Anglo Irish Bank required the Company's principals to (a) pre-pay an interest and carry reserve of several million dollars; (b) provide $20 million in personal security for the loan; and (c) give a $10 million personal completion guaranty.

47.     Karmely, who lacked the personal resources to pay for completion of a development project of this magnitude, as the bank well-knew, was not willing to sign such a

10

guaranty unless the W-D Defendants were committed to fund the project to completion without punitively diluting Plaintiffs as allowed in the Operating Agreement. Dagmi, on behalf of Wertheimer and the W-D Defendants, assured Karmely, in the presence of Anglo Irish Bank on September 9, 2008, that the W-D Defendants would in fact fund the project to completion. He repeated this assurance to Karmely several times later in September at Karmely's office on Madison Avenue, and at Dagmi's apartment at the Museum Tower, and he reaffirmed that the W-D Defendants would not punitively dilute Plaintiffs.

48.     The W-D Defendants' commitments to fund construction were later confirmed on October 4, 2008, when Wertheimer's attorney in Israel, Yaron Mehulal, acknowledged by email, that "we undertake to perform at least $10M of capex work by July 2009, according to an agreed plan. I understand that this will be financed from our own sources."

49.     In reliance upon these promises and assurances, SK Greenwich posted $4.3 million in cash, representing its share of the additional capital contribution required by the bank, and Karmely signed the completion and other guaranties (the "Personal Guaranties") on November 19 and 21, 2008. The maturity of the Anglo Senior Loan was thus extended to December 31, 2009, a date that was ninety days *after* the stated maturity of the Mezzanine Loan.

50.     Absent these repeated and specific assurances to Karmely that the W-D Defendants would fund the project to completion, and would back-stop Karmely's personal guaranties, and would not punitively dilute Plaintiffs, Karmely would never have agreed to provide these personal guaranties or to post the money.

51.     W-D Lender, as the Mezzanine Lender, expressly consented to this extension of the Anglo Senior Loan. However, there was no discussion at this time, or indeed at any other time, about extending the Mezzanine Loan. The parties had agreed that the Mezzanine Loan was

subordinate to the Anglo Senior Loan, and so there was no need to document an extension of the Mezzanine Loan.

52.     On December 9, 2008, after the closing of the extension of the Anglo Senior Loan, Wertheimer reaffirmed to Karmely Dagmi and Desiree's prior representations regarding the funding of the project by the W-D Defendants.  This reaffirmation took place during meetings at Wertheimer's apartment at The Olympic Tower and at Karmely's office on Madison Avenue. In these meetings, Wertheimer assured Karmely that the W-D Defendants would fund the project to completion; however, for the first time, he raised the possibility that he might invoke the punitive dilution provisions of the Operating Agreement.

53.     Thereafter, on December 24, 2008, Dagmi confirmed the further financing by the W-D Defendants, instructing Karmely to tell Anglo Irish Bank "that in 2009 we intend to spend approximately 20 mm and the rest in 2010/11."

**PLAINTIFFS CONTINUE TO ADVANCE THE PROJECT IN 2009**

54.     In 2009, Karmely and SK Greenwich continued their efforts to develop the 443 Property.

55.     Specifically, Karmely worked with the prominent designer for the luxury hotel chain on the planned development of a hotel on the premises, he worked directly with the architects to fine-tune the architectural plans, and met with general contractors to discuss the construction and development of the 443 Property and to solicit their bids for the project.

56.     In 2009, Karmely also put in place a Site Safety Plan for the 443 Property, which was approved by the Department of Buildings, and met with potential lenders and investors.

57.     The time and attention that Plaintiffs dedicated to the development of the 443 Property directly benefitted the project.

### THE ANGLO SENIOR LOAN IS EXTENDED AGAIN

58.     The extended Anglo Senior Loan was due to mature at the end of 2009, and the Company entered into negotiations with Anglo Irish Bank to extend it further. Those discussions continued into 2010, and ultimately produced an agreement in July.

59.     One of the Bank's conditions for extending the maturity was that the Company pay $1.2 million as an interest and carry reserve, of which SK Greenwich paid approximately a quarter-million dollars. Karmely also restated his Personal Guaranties as part of this transaction.

60.     On or about July 30, 2010, the parties to the Anglo Senior Loan extended its maturity date from December 31, 2009 to December 31, 2010 (with the possibility of a further extension until December 31, 2011).

61.     W-D Lender, as the Mezzanine Lender, expressly consented to this extension of the Anglo Senior Loan maturity date to a date that was, at a minimum, fifteen months after the stated maturity date of the Mezzanine Loan.

62.     Again, there was no discussion about extending the maturity of the Mezzanine Loan. The parties had agreed that the Mezzanine Loan was subordinate to the Anglo Senior Loan, and so there was no need to document an extension of the Mezzanine Loan.

### THE W-D DEFENDANTS SEIZE THE COMPANY

63.     Just two months later, on September 30, 2010, even though W-D Lender had never demanded any payments under the Mezzanine Loan, and even though no such payments under that loan were actually due, W-D Lender sent a letter to SK Greenwich (the "Default

Notice") stating that principal and interest on the Mezzanine Loan had been due *a year earlier*, on October 1, 2009.

64.     In reality, no such payments were due under the Mezzanine Loan Documents because those documents were made subject to the Intercreditor Agreement; the Intercreditor Agreement prohibited payment under the Mezzanine Loan until after the Anglo Senior Loan was fully satisfied; and the parties had extended the maturity date of the Anglo Senior Loan to December 31, 2010, which was three months *after* W-D Lender sent the Default Notice. Moreover, not only had the Company failed to satisfy all of its obligations under the Anglo Senior Loan, but it did not have Available Net Cash Flow or Capital Event Proceeds sufficient to pay the Anglo Senior Loan. Under the Mezzanine Loan Documents, all of these were required before any payments were due under the Mezzanine Loan.

65.     W-D Lender proceeded to auction SK Greenwich's membership interests in the Company.

66.     On October 4, 2010, W-D Lender sent a letter entitled "Notification of Disposition of Collateral," stating that W-D Lender intended to "sell the twenty percent (20%) membership interest owned by SK Greenwich" in the Company. W-D Lender did not offer to sell any of the eighty percent (80%) membership interest owned by W-D Partner in the Company.

67.     W-D Lender took various steps to discourage bidders. It gave bidders only ten days' notice before the auction, it required them to attend in person, and to post a $750,000 advance deposit.

68.     W-D Lender's representative was the only attendant at the auction. The auctioneer reported: "As there were no other registered bidders present, there was no competitive or spirited bidding that ensued."

69.     W-D Lender did not even bother to bid the $750,000 minimum it required for others even to attend the auction. Instead, it credit bid $100,000 for the Plaintiffs' entire interest in the Company.

70.     W-D Partner then notified SK Greenwich that it was removing SK Greenwich as Operations Member of the Company, and retaining the $250,000 that SK Greenwich had posted for the extension obtained shortly beforehand from Anglo Irish Bank.

71.     Upon information and belief, the reason the W-D Defendants refused to speak with SK Greenwich or Karmely about resolving the supposed default under the Mezzanine Loan, or to auction anything more than SK Greenwich's portion of the collateral, was that the W-D Defendants did not care about receiving value for the Mezzanine Loan: they merely sought, out of malice, to cut SK Greenwich out of the business.

72.     On January 4, 2011, Anglo Irish Bank sent a letter stating that the Company had not made the payment due on the maturity of the Anglo Senior Loan, and declaring the Company in default (the "Mortgage Default Letter"). Upon information and belief, the W-D Defendants procured Anglo Irish Bank's Mortgage Default Letter as part of the W-D Defendants' strategic plan.

73.     Just days after the Mortgage Default Letter, the Wertheimer Family Company purchased the mortgage loan from Anglo Irish Bank.

74.     The excision of SK Greenwich was now complete. The W-D Defendants had acquired all the debt and all the equity in the 443 Project.

75.     From 2005 through 2010, Karmely worked for the W-D Defendants in connection with the 443 Property, as well as other projects, to the exclusion of all other work. He identified the 443 Property, and many others in the United States and Asia for their benefit, conducted due

diligence with respect to many of those properties, entered into negotiations for the purchase of many of those properties and physically examined many of the properties that the W-D Defendants were considering purchasing.

76.   As to the 443 Property, he developed architectural and design plans, orchestrated the purchase and financing, organized the removal or buyout of tenants, secured approvals and permits for construction, and secured a prominent hotel sponsor for the project.  Moreover, he caused SK Greenwich to make $9.5 million in capital contributions to this project, he delivered the Personal Guaranties, and he advanced more than $800,000 to the Company in the form of imputed allocations of overhead.

77.   In just a few months, Wertheimer, Dagmi, and the other W-D Defendants appropriated all of SK Greenwich's ownership interests in the Company and the value created by Karmely's time and skilled efforts, without paying Karmely or SK Greenwich a single dollar of consideration or compensation.

78.   Upon information and belief, the fair market value of the 443 Property today is at least $140 million.

### FIRST CLAIM
### Breach of the Mezzanine Loan Documents
### (Against All W-D Defendants)

79.   Plaintiffs repeat and reallege all prior allegations.

80.   The W-D Defendants' issuance of the Default Notice, and their foreclosure upon SK Greenwich's interests in the Company, violated the provisions of the Mezzanine Note, the Mezzanine Loan Agreement, and the Pledge and Security Agreement, all of which "were expressly made subject to the terms and conditions" of the Intercreditor Agreement.

81.     Under those documents, no payments were due to W-D Lender until, among other conditions, the Anglo Senior Loan was repaid in full, and that loan had not yet been paid.

82.     Consequently, W-D Lender breached the Mezzanine Loan Documents, wrongfully depriving SK Greenwich of its membership interests and other rights in the Company, and damaging SK Greenwich in an amount to be proved.

83.     Plaintiffs have no adequate remedy at law.

## SECOND CLAIM
### Tortious Interference
### (Against All Defendants of than W-D Lender)

84.     Plaintiffs repeat and reallege all prior allegations.

85.     All Defendants other than W-D Lender were aware of the contractual and other relationships between SK Greenwich and W-D Lender.

86.     Defendants induced W-D Lender to breach those contractual relationships.

87.     Defendants acted with malice and for the purpose of injuring SK Greenwich.

88.     As a result of the foregoing, SK Greenwich has been damaged in an amount to be proved, and in addition, is entitled to punitive damages.

## THIRD CLAIM
### Breach of the Operating Agreement
### (Against W-D Partner and the Company)

89.     Plaintiffs repeat and reallege all prior allegations.

90.     W-D Partner has, without justification, removed SK Greenwich as Operations Member of the Company, and denuded SK Greenwich of its entitlement to receive some or all of the SK Greenwich Preferred Return, as set forth in the Operating Agreement.

91.     In the course of SK Greenwich's duties as Operations Member of the Company, SK Greenwich paid costs incurred in connection with the development of the 443 Property, for which SK Greenwich demanded reimbursement from the Company and W-D Partner pursuant to the Operating Agreement, but no such reimbursement has been paid.

92.     As a result of the foregoing, SK Greenwich has been damaged in an amount to be proved.   In addition, SK Greenwich is entitled to a declaration of its entitlement to the SK Greenwich Preferred Return as set forth in the Operating Agreement.

### FOURTH CLAIM
**Account Stated**
**(Against The Company)**

93.     Plaintiffs repeat and reallege all prior allegations.

94.     Between September 2006 and October 2010, SK Greenwich incurred costs of approximately $800,000 in the form of an imputed allocation of overhead on behalf of the Company, and for the Company's accounts, pursuant to the Operating Agreement.

95.     SK Greenwich demanded that the Company pay these amounts, to no avail.

96.     The Company accepted the statements of amounts due and did not object to them within a reasonable period of time.  The Company thus agreed to the correctness of the amounts.

97.     Accordingly, an account was stated between SK Greenwich and the Company in the amounts demanded, which amounts the Company promised and agreed to pay.

98.     Despite due demand, the Company failed to pay the amounts due.

99.     As a result of the foregoing, the Company is bound by the account and owes SK Greenwich an amount to be proved.

### FIFTH CLAIM
### Breach of Fiduciary Duty
### (Against The W-D Defendants)

100.    Plaintiffs repeat and reallege all prior allegations.

101.    As a result of the foregoing, W-D Partner's affirmative actions, together with the active and knowing assistance of the other W-D Defendants, breached fiduciary obligations owing to SK Greenwich, thus damaging SK Greenwich in an amount to be proved.

### SIXTH CLAIM
### Promissory Estoppel
### (Against The W-D Defendants)

102.    Plaintiffs repeat and reallege all prior allegations.

103.    In reliance upon the foregoing promises of the W-D Defendants that they would finance the 443 Project, Karmely signed the Personal Guaranties.

104.    These guaranties subject Karmely to potentially massive liability, the imposition of which would be unconscionable under the circumstances.

105.    Karmely has no adequate remedy at law.

106.    As a result of the foregoing, the W-D Defendants should be enjoined from taking any action to enforce any of the Personal Guaranties, or in the alternative, if any third-party were to take any action to enforce them, the W-D Defendants should be required to indemnify Karmely from and against any liability, cost or expense, including attorneys' fees, on any of them.

WHEREFORE, Plaintiffs pray for a judgment awarding them SK Greenwich's membership interest in the Company, as well as money damages in an amount to be proved, plus punitive damages, declaratory and injunctive relief, interest, costs and such other relief as is just and proper.

Dated: New York, New York
      August 18, 2011

TANNENBAUM HELPERN SYRACUSE &
HIRSCHTRITT LLP

By: _____
     Jamie B.W. Stecher
     (Stecher@thsh.com)
     David J. Kanfer
     (Kanfer@thsh.com)

900 Third Avenue
New York, New York 10022
(212) 508-6700
*Attorneys for Plaintiffs*
*Shahab Karmely and SK Greenwich LLC*

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all issues so triable.

Dated:     New York, New York
           August 18, 2011

                         TANNENBAUM HELPERN SYRACUSE &
                         HIRSCHTRITT LLP

                         By: _____
                             Jamie B.W. Stecher
                             (Stecher@thsh.com)
                             David J. Kanfer
                             (Kanfer@thsh.com)

                         900 Third Avenue
                         New York, New York 10022
                         (212) 508-6700
                         *Attorneys for Plaintiffs*
                         *Shahab Karmely and SK Greenwich LLC*

21

## AFFIDAVIT OF SERVICE BY ELECTRONIC MAIL

STATE OF NEW YORK       )
                        ) ss.:
COUNTY OF NEW YORK      )

**Gail Burwa**, being duly sworn, deposes and says:

I am not a party to this action, am over eighteen years of age, and reside in Whiting, New Jersey.

On August 18, 2011, I served via email true & correct copies of the within **AMENDED COMPLAINT AND JURY DEMAND dated 8/18/11**, addressed to

Bradley Reid Wilson
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street New York, NY 10019
Email: brwilson@wlrk.com
ATTORNEY TO BE NOTICED

Stephen R. DiPrima
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
Email: srdiprima@wlrk.com
ATTORNEY TO BE NOTICED

Dated: New York, New York
August 18, 2011

Gail Burwa, License Number 1148062
Tannenbaum Helpern Syracuse Hirschtritt LLP
900 Third Avenue
New York, New York 10022
(212) 508-6772

Sworn to before me this
18th day of August, 2011.

Notary Public

Matthew J. Sinkman
Notary Public, State of New York
No. 02SI6230263
Qualified in New York County
Commission Expires November 11, 2014