UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

SHAHAB KARMELY and SK GREENWICH LLC,  :
                                      :

            Plaintiffs,             :

                                     :  Case No. 11-cv-0541 (RPP)

      v.                       :

                                     :  ECF Case

EITAN WERTHEIMER, EZRA DAGMI, 443    :
GREENWICH LLC, 443 GREENWICH         :  Oral Argument Requested
PARTNERS LLC, W. FAMILY 1 LTD., W-D  :
GROUP (2006) LP, W-D GROUP NY1, LLC, and  :
JOHN DOES 4-10,                   :

                                     :

             Defendants.       :

                                     :

------------------------------------------------------------- X

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York  10019
(212) 403-1000

Dated:  October 3, 2011             *Attorneys for Defendants*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF THE CASE................................................................................................... 2

ARGUMENT ............................................................................................................................. 7

I.   PLAINTIFFS HAVE NOT STATED A CLAIM FOR BREACH OF THE
     MEZZANINE LOAN DOCUMENTS (CLAIM ONE) ..................................................... 7

     A.   SK Greenwich defaulted on the Mezzanine Loan .................................................. 8

          1.   Nothing in the Subordination and Intercreditor Agreement
               relieved SK Greenwich of its obligation to repay the
               Mezzanine Loan on the Maturity Date ....................................................... 9

          2.   Section 3.1(a) of the Mezzanine Loan Agreement did not
               relieve SK Greenwich of its obligation to repay the
               Mezzanine Loan on the Maturity Date ..................................................... 12

     B.   The governing agreements authorized W-D Lender to foreclose on
          SK Greenwich's membership interest ................................................................. 14

II.  PLAINTIFFS HAVE NOT STATED A CLAIM FOR TORTIOUS
     INTERFERENCE WITH CONTRACT (CLAIM TWO) ................................................. 16

III. PLAINTIFFS HAVE NOT STATED A CLAIM FOR BREACH OF THE
     OPERATING AGREEMENT (CLAIM THREE)............................................................. 19

IV.  PLAINTIFFS HAVE NOT STATED A CLAIM FOR AN ACCOUNT STATED
     (CLAIM FOUR) .............................................................................................................. 20

V.   PLAINTIFFS HAVE NOT STATED A CLAIM FOR BREACH OF FIDUCIARY
     DUTY (CLAIM FIVE)..................................................................................................... 21

VI.  PLAINTIFFS HAVE NOT STATED A CLAIM FOR PROMISSORY ESTOPPEL
     (CLAIM SIX).................................................................................................................... 24

     A.   The alleged promises were not sufficiently clear and unambiguous ................... 25

     B.   Plaintiffs could not reasonably have relied on the alleged promises ................... 25

     C.   Plaintiffs have not pleaded unconscionable injury .............................................. 27

CONCLUSION........................................................................................................................ 29

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

Abbott, Duncan & Weiner v. Ragusa,
    625 N.Y.S.2d 178 (N.Y. App. Div. 1995) ............................................................... 20

Ashcroft v. Iqbal, __ U.S. __,
    129 S. Ct. 1937 (2009) ...................................................................................................... 7

Ashland Inc. v. Morgan Stanley & Co.,
    700 F. Supp. 2d 453 (S.D.N.Y. 2010) ........................................................................ 25

Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC,
    2009 WL 1124451 (Del. Ch. Apr. 20, 2009) ............................................................. 21

Beard Research, Inc. v. Kates,
    8 A.3d 573 (Del. Ch. 2010) .......................................................................................... 21

Bell Atl. Corp. v. Twombly,
    550 U.S. 544 (2007) .......................................................................................... 7, 17 n.5, 20

Brinsights, LLC v. Charming Shoppes of Del., Inc.,
    2008 WL 216969 (S.D.N.Y. Jan. 16, 2008) ......................................................... 26, 27

Capital Trust, Inc. v. Lembi,
    2009 WL 2997493 (N.D. Cal. Sept. 16, 2009) ......................................................... 11

Cyberchron Corp. v. Calldata Sys. Dev, Inc.,
    47 F.3d 39 (2d Cir. 1995) .............................................................................................. 24

Fisk Ventures, LLC v. Segal,
    2008 WL 1961156 (Del. Ch. May 7, 2008) ......................................................... 22, 23

Gary Powell, Inc. v. Mendel/Borg Group, Inc.,
    655 N.Y.S.2d 558 (N.Y. App. Div. 1997) ................................................................. 28

Grimm v. Marine Midland Bank, N.A.,
    498 N.Y.S.2d 591 (N.Y. App. Div. 1986) ................................................................. 27

In re Hydrogen, L.L.C.,
    431 B.R. 337 (Bankr. S.D.N.Y. 2010) ....................................................................... 21

India.com, Inc. v. Dalal,
    412 F.3d 315 (2d Cir. 2002) .......................................................................................... 12

James v. W. N.Y. Computing Sys., Inc.,
    710 N.Y.S.2d 740 (N.Y. App. Div. 2000) ................................................................. 25

Kahn v. Icahn,
      1998 WL 832629 (Del. Ch. Nov. 12, 1998) ............................................................ 22

Kassover v. Prism Venture Partners, LLC,
      862 N.Y.S.2d 493 (N.Y. App. Div. 2008) ............................................................. 18

Koret, Inc. v. Christian Dior, S.A.,
      554 N.Y.S.2d 867 (N.Y. App. Div. 1990) ............................................................. 18

Kramer v. Time Warner, Inc.,
      937 F.2d 767 (2d Cir. 1991) ............................................................................ 2 n.1

Lama Holding Co. v. Smith Barney Inc.,
      668 N.E.2d 1370 (N.Y. 1996).............................................................................. 16

L & L Wings, Inc. v. Marco-Destin Inc.,
      756 F. Supp. 2d 359 (S.D.N.Y. 2010) ............................................................ 17 n.5

M.K.D. Capital Corp. v. Miller,
      652 N.Y.S.2d 919 (N.Y. Sup. Ct. 1996) ............................................................... 27

Maniolos v. United States,
      741 F. Supp. 2d 555 (S.D.N.Y. 2010) ................................................................... 7

Marine Midland Bank, N.A. v. Cafferty,
      571 N.Y.S.2d 628 (N.Y. App. Div. 1991) ............................................................. 27

Marks v. Smith,
      885 N.Y.S.2d 463 (N.Y. App. Div. 2009) ............................................................. 16

Masefield AG v. Colonial Oil Indus.,
      2006 WL 346178 (S.D.N.Y. Feb. 15, 2006)........................................................... 17

Merex A.G. v. Fairchild Weston Sys., Inc.,
      29 F.3d 821 (2d Cir. 1994) ............................................................................ 24, 27

Multi-Juice S.A. v. Snapple Beverage Corp.,
      2003 WL 1961636 (S.D.N.Y. Apr. 25, 2003) ....................................................... 18

NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc.,
      664 N.E.2d 492 (N.Y. 1996)................................................................................. 16

NCC Sunday Inserts, Inc. v. World Color Press, Inc.,
      759 F. Supp. 1004 (S.D.N.Y. 1991) ............................................................... 24 n.10

Nepco Forged Prods., Inc. v. Consol. Edison Co. of N.Y., Inc.,
      470 N.Y.S.2d 680 (N.Y. App. Div. 1984) ............................................................. 12

<u>Nordic Bank PLC</u> v. <u>Trend Group, Ltd.</u>,
  619 F. Supp. 542 (S.D.N.Y. 1985) ............................................................................ 17

<u>Page Mill Asset Mgmt.</u> v. <u>Credit Suisse First Boston Corp.</u>,
  2000 WL 335557 (S.D.N.Y. Mar. 30, 2000) ...................................................... 17–18

<u>Primetime 24 Joint Venture</u> v. <u>Echostar Comm'cns Corp.</u>,
  2002 WL 44133 (S.D.N.Y. Jan. 11, 2002) ............................................................... 17

<u>Related Westpac LLC</u> v. <u>JER Snowmass LLC</u>,
  2010 WL 2929708 (Del. Ch. July 23, 2010) ................................................... 22 & n.8

<u>Royal Palm Senior Investors, LLC</u> v. <u>Carbon Capital II, Inc.</u>,
  2009 WL 1941862 (S.D.N.Y. July 7, 2009) ...................................................... 15 n.4

<u>Smith</u> v. <u>Ameriquest Mortg. Co.</u>,
  2006 WL 6400722 (N.Y. Sup. Ct. Sept. 18, 2006)................................................... 28

<u>Stein</u> v. <u>Gelfand</u>,
  476 F. Supp. 2d 427 (S.D.N.Y. 2007) ..................................................................... 25

<u>Tribeca Lending Corp.</u> v. <u>Bartlett</u>,
  923 N.Y.S.2d 451 (N.Y. App. Div. 2011) ............................................................... 27

<u>Walton</u> v. <u>Morgan Stanley & Co.</u>,
  623 F.2d 796 (2d Cir. 1980) .................................................................................... 21

<u>World Wide Comm'cns, Inc.</u> v. <u>Rozar</u>,
  1997 WL 795750 (S.D.N.Y. Dec. 30, 1997) ........................................................... 17

## **<u>Rules and Statutes</u>**

6 Del. C. § 18-1101 ...................................................................................................... 21

N.Y. Gen. Oblig. § 5-703 ............................................................................................. 27

N.Y. U.C.C. § 9-609 ............................................................................................... 15 n.4

N.Y. U.C.C. § 9-610 ............................................................................................... 15 n.4

Defendants respectfully submit this memorandum of law in support of their motion to dismiss all of the claims in the Amended Complaint with prejudice.

## PRELIMINARY STATEMENT

This dispute arises out of a failed effort to develop a real estate project in the Tribeca neighborhood.  Two of the parties to this action were previously before the Court last October, when plaintiff SK Greenwich LLC moved for a preliminary injunction against the planned foreclosure sale of its membership interest in the venture.  In that proceeding, SK Greenwich argued that the mezzanine lender, defendant W-D Group (2006) LP, had wrongfully declared a default under the governing mezzanine loan documents after the borrowers had failed to pay any of the principal or interest on the loan as of the maturity date.  Based on its review of the governing contracts, the Court denied SK Greenwich's motion and allowed the foreclosure sale to proceed.  The Court rejected SK Greenwich's claim that it had not defaulted on the loan, reasoning that it was "clear that [the Mezzanine Loan Agreement] contemplated the eventual payment of the Debt by the borrower," and that therefore "the provisions of the Mezzanine Agreement, Note, and Pledge Agreement clearly establish the Defendant's right to sell the Plaintiff's interest in the Property."

SK Greenwich and its principal, plaintiff Shahab Karmely, have now commenced this damages action, which concerns the same failed venture and involves the same governing agreements.  Their Amended Complaint mainly rehashes contract-based claims and arguments that the Court considered and rejected last year.  At the same time, plaintiffs have tacked on common law tortious interference and breach of fiduciary duty claims that are based on the same underlying events and conduct.  But these claims are likewise subject to dismissal in light of the unambiguous provisions of the agreements, which, as the Court previously recognized, expressly authorized the lender to declare a default and foreclose on SK Greenwich's membership interest. And to the extent that plaintiffs have attempted to plead claims that arise from different factual allegations, they, too, are subject to dismissal for the reasons discussed below.

By their own admission, plaintiffs are sophisticated parties and experienced real estate investors.  They have not pleaded any cognizable reason for why they should be relieved of the results dictated by the terms of the comprehensive agreements that the parties negotiated at arm's length.  The Amended Complaint should be dismissed.

## STATEMENT OF THE CASE

In September 2006, at the height of the New York City commercial real estate market, plaintiff SK Greenwich LLC ("SK Greenwich") and defendant W-D Group NY1, LLC ("W-D Partner") formed 443 Greenwich Partners LLC, a Delaware limited liability company (together with its subsidiaries, "Greenwich Partners"), to purchase and redevelop a building located at 443-453 Greenwich Street in New York City (the "Property").  Am. Compl. ¶¶ 1, 21. SK Greenwich is a Delaware limited liability company controlled by plaintiff Shahab Karmely, a New York real estate investor, id. ¶ 2–3, and W-D Partner is a Delaware limited liability company controlled by defendants Eitan Wertheimer and Ezra Dagmi, both Israeli investors.  Id. ¶¶ 4–5, 10.  The original plan was to redevelop the Property as a luxury hotel and residential condominium.  Id. ¶ 32.

Greenwich Partners purchased the Property for $113 million plus closing costs. Id. ¶ 26.  To fund the purchase, Greenwich Partners secured an $85 million mortgage loan from Anglo Irish Bank Corporation PLC ("AIB").  Id.  In addition, Greenwich Partners contributed approximately $24.9 million of the purchase price, with W-D Partner funding approximately $19.9 million of that amount and SK Greenwich funding the other $5 million through equity investments in Greenwich Partners.  Id.; see Ex. 1 (Operating Agreement) sched. 1.1(b).[1]

---

[1]     In assessing a motion to dismiss under Rule 12(b)(6), a district court may consider, in addition to the allegations in the complaint, "documents attached to the complaint as exhibits or incorporated in the complaint by reference."  Kramer v. Time Warner, Inc., 937 F.2d 767, 773 (2d Cir. 1991).  All such materials cited in this memorandum are included as exhibits to the accompanying Declaration of Bradley R. Wilson, dated today, and abbreviated herein as "Ex. __."

Defendant W-D Group (2006) LP ("W-D Lender"), an Israeli limited partnership and the sole member of W-D Partner, funded the balance of the purchase price and the related acquisition and development expenses through a $20 million mezzanine loan (the "Mezzanine Loan") to SK Greenwich and W-D Partner.  Am. Compl. ¶¶ 9, 26.  The Mezzanine Loan was subordinate to the AIB mortgage, see Ex. 2 (Subordination and Intercreditor Agreement) ¶ 4(d), but senior to the equity investments of SK Greenwich and W-D Partner.  See Ex. 1 (Operating Agreement) § 5.1(c).

The terms of the Mezzanine loan and the remedies available to W-D Lender in the event of a default by the borrowers were established by a Mezzanine Loan Agreement, Ex. 3, a Promissory Note, Ex. 4, and a Pledge and Security Agreement, Ex. 5 (collectively, the "Mezzanine Loan Documents").  In the Mezzanine Loan Documents, W-D Partner and SK Greenwich each pledged 100% of their ownership interests in Greenwich Partners as collateral for the loan.  See Ex. 4 (Promissory Note) ¶ 8; Ex. 5 (Pledge and Security Agreement) ¶ 1; Am. Compl. ¶ 29.  Thus, upon an event of default under the Mezzanine Loan Documents, SK Greenwich and W-D Partner were jointly and severally liable for the entire balance of the Mezzanine Loan, Ex. 4 (Promissory Note) at 1; Ex. 3 (Mezzanine Loan Agreement) § 4.26(h), and W-D Lender had the right to foreclose on 100% of either or both borrowers' equity interest in Greenwich Partners.  Ex. 5 (Pledge and Security Agreement) ¶ 6(a); Am. Compl. ¶ 29.

Under the Mezzanine Loan Agreement, an "Event of Default" occurred if, inter alia, the mezzanine borrowers failed "to observe or perform any agreement, covenant or obligation of it contained in [the Mezzanine Loan Documents]."  Ex. 3 § 3.1(c).  The Promissory Note stated that the Mezzanine Loan matured on October 1, 2009 — i.e., the "Maturity Date" — at which time "the balance of principal, and the accrued and unpaid interest then remaining unpaid" became "due and payable."  Ex. 4 at 1.  In addition, under the Pledge and Security Agreement, the mezzanine borrowers expressly covenanted that they would "pay or satisfy all of the Obligations," with "Obligations" defined to include "the punctual payment of the full amount of the Note when due (whether at stated maturity, by acceleration or otherwise)."  Ex. 5 ¶¶ 1, 4.

-3-

W-D Lender also entered into a Subordination and Intercreditor Agreement with AIB, which defined the rights of W-D Lender vis-à-vis AIB, the senior creditor.  Ex. 2.  The agreement provided that AIB had the right to be paid first, and if W-D Lender received any payments from the mezzanine borrowers before the AIB mortgage had been repaid in full, then W-D Lender was required to turn such payments over to AIB promptly.  Id. ¶ 4(d).

The mezzanine borrowers were not parties to, or third-party beneficiaries of, the Subordination and Intercreditor Agreement.  Id. ¶ 22.  Nor did that agreement purport to alter or extend the Maturity Date for the Mezzanine Loan or otherwise prevent or excuse an event of default if the mezzanine borrowers failed to repay their obligations as of that date.  To the contrary, the Subordination and Intercreditor Agreement provided:

> The foregoing provisions are solely for the purpose of defining the relative rights of the holder or holders of the Mezzanine Loan and the holder or holders of the Anglo Senior Loan, and nothing herein shall  impair, as between the Mezzanine Borrower and Mezzanine Lender, the obligation of the Mezzanine Borrower, which is unconditional and absolute, to pay the Mezzanine Loan in accordance with its terms, nor shall anything herein prevent Mezzanine Lender from exercising all remedies otherwise permitted by applicable law or under the Mezzanine Note, Mezzanine Pledge or other Mezzanine Loan Documents, subject to the provisions of this Agreement.

Id. ¶ 8 (emphasis added).  The Subordination and Intercreditor Agreement further provided that, "upon the occurrence of an event of default under the Mezzanine Loan Documents," W-D Lender was free to commence an "Enforcement Action" in order to "enforce the Mezzanine Pledge or conduct a sale of the Ownership Interests pursuant to the Mezzanine Pledge."  Id. ¶ 7(b).

The Operating Agreement for Greenwich Partners governed the management and operation of the project.  Ex. 1; Am. Compl. ¶ 21.  The Operating Agreement provided that SK Greenwich would act as the Operations Member responsible for the day-to-day operations of the project, Ex. 1 § 6.1(c)(i); Am. Compl. ¶ 34, and in that role SK Greenwich stood to receive additional fees if the project succeeded.  Id. § 5.1(c)(v).

In the midst of the "dramatic downturn in the United States real estate market," Ex. 6 (10/13/10 SK Greenwich Complaint) ¶ 6, Greenwich Partners failed to develop the Property according to its original business plan.  Am. Compl. ¶ 35.  Greenwich Partners was unsuccessful in securing a construction loan to pay off the Mezzanine Loan and begin renovations on the Property, id. ¶¶ 36–40, and therefore the venture did not generate any revenue.  Id. ¶ 64.  Thus, as plaintiff SK Greenwich alleged in the complaint it filed in connection with its motion for a preliminary injunction — a complaint that plaintiff Karmely personally verified — as of October 2010, "the Real Property owned by [Greenwich Partners], is under water and the membership interests of [SK Greenwich] and [W-D Partner] have no or little value."  Ex. 6 ¶ 6.

On October 1, 2010, the full principal balance of the Mezzanine Loan, plus accrued and unpaid interest, remained outstanding — despite the fact that the Maturity Date had passed a year earlier.  Am. Compl. ¶ 63.  Thus, on that date, W-D Lender sent a default notice to both SK Greenwich and W-D Partner.  Ex. 7; Am. Compl. ¶ 63.  Three days later, W-D Lender sent written notice to SK Greenwich that it intended to sell SK Greenwich's collateral at a U.C.C. foreclosure sale that was scheduled for October 20, 2010.  Ex. 8; Am. Compl. ¶ 66.

On or about October 13, 2010, SK Greenwich commenced an action against W-D Lender in New York state court seeking to enjoin the foreclosure sale, and W-D Lender promptly removed the action to this Court.  Ex. 9 (10/21/10 Opinion and Order) at 3–4.  The parties briefed a preliminary injunction motion, and the Court heard oral argument on October 19.  Id. at 4.  On the morning of October 20, the Court entered a summary order denying SK Greenwich's motion for a preliminary injunction.  Ex. 10.  That same morning, the Court denied SK Greenwich's request for a temporary stay of the foreclosure sale to allow SK Greenwich to apply for emergency relief in the Second Circuit.  See Ex. 11 (10/20/10 Endorsed Letter).

In an Opinion and Order entered the next day, the Court determined that SK Greenwich had "not raised significant questions on the merits" based on a finding that "the provisions of the Mezzanine Agreement, Note, and Pledge Agreement clearly establish the

Defendant's right to sell the Plaintiff's interest in the Property."  Ex. 9 at 10.  The Court recognized that while the loan agreements were designed to give the borrowers three years of "breathing room" in which to begin development, it was "clear that [the Mezzanine Loan Agreement] contemplated the eventual payment of the Debt by the borrower, even in the event that the Property did not generate Available Net Cash Flow or the Senior Loan remained to be paid."  Id.[2]

The foreclosure sale occurred on October 20, 2010, as planned.  Am. Compl. ¶¶ 68–69.  W-D Lender was the only bidder in the auction.  Id. ¶ 68.  It submitted the winning bid, a $100,000 credit bid, and acquired SK Greenwich's membership interest in Greenwich Partners.  Id. ¶ 69.  As a consequence of the sale of its membership interest, SK Greenwich ceased to be the Operations Member of Greenwich Partners.  Id. ¶ 70.

Plaintiffs commenced this action in New York state court on January 14, 2011, by filing a Summons With Notice, Ex. 13, and defendants promptly removed this action to this Court.  Plaintiffs filed their initial complaint on April 26, 2011.  Defendants moved to dismiss that complaint on July 14, 2011.

Rather than oppose defendants' motion, plaintiffs amended their complaint on August 18, 2011.  Plaintiffs' Amended Complaint jettisons many of the 14 claims and related allegations in plaintiffs' original pleading; most notably, plaintiffs have abandoned their claim that defendants committed fraud and their allegation that defendants reneged on oral promises they supposedly made at the beginning of the venture to fund the project's construction. Plaintiffs' central remaining allegation is that W-D Lender breached the Mezzanine Loan

---

[2]      SK Greenwich filed an appeal from the Court's order denying its motion for a preliminary injunction and, at the same time, sought an "emergency stay" from the Second Circuit that would have prevented W-D Lender from selling the Property during the pendency of the appeal.  After the parties submitted papers on the issue, the Second Circuit denied SK Greenwich's stay application on November 22, 2010.  Ex. 12.  The parties later stipulated to a voluntary dismissal of SK Greenwich's appeal.  SK Greenwich never took at steps to prosecute the earlier action; indeed, it never served the complaint on W-D Lender.

Documents by wrongly declaring a default and foreclosing on SK Greenwich's membership interest, e.g., Am. Compl. ¶¶ 79–83 — the same claim rejected by this Court in the preliminary injunction proceedings last year.

### ARGUMENT

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, __ U.S. __, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  While a court must generally credit the allegations in the complaint at the pleading stage, it is "not bound to accept as true a legal conclusion couched as a factual allegation." Iqbal, 129 S. Ct. at 1949–50 (quoting Twombly, 550 U.S. at 555).  Dismissal is required if the plaintiffs have failed to allege sufficient facts to "nudge[] their claims across the line from conceivable to plausible." Twombly, 550 U.S. at 570.

As shown below, the Amended Complaint fails to state a plausible claim for relief, and it is therefore subject to dismissal.

### I.     PLAINTIFFS HAVE NOT STATED A CLAIM FOR BREACH OF THE MEZZANINE LOAN DOCUMENTS (CLAIM ONE).

Plaintiffs allege that in declaring the Mezzanine Loan in default and foreclosing on and selling SK Greenwich's membership interest, defendants breached certain provisions of the Mezzanine Loan Documents.  See, e.g., Am. Compl. ¶¶ 79–83.  As shown below, however, all of defendants' actions were expressly authorized by the clear and unambiguous terms of these agreements, as the Court properly recognized last October when it considered many of the same contract provisions implicated here.  Accordingly, plaintiffs' contract claims cannot survive a motion to dismiss. E.g., Maniolos v. United States, 741 F. Supp. 2d 555, 567 (S.D.N.Y. 2010) ("Where a contract's language is clear and unambiguous, a court may dismiss a breach of contract claim on a Rule 12(b)(6) motion to dismiss.").

A.      **SK Greenwich defaulted on the Mezzanine Loan.**

The core allegation underlying plaintiffs' claim for breach of the Mezzanine Loan Documents is that defendants "fabricate[d]" a default on the Mezzanine Loan and wrongly deprived SK Greenwich of its membership interest.  E.g., Am. Compl. ¶ 30.  Yet plaintiffs never dispute the fact that the Maturity Date for the Mezzanine Loan came and went without SK Greenwich having repaid a nickel of principal or interest.  See id. ¶ 63.

Indeed, contrary to any suggestion that SK Greenwich's default was somehow manufactured by defendants, it is clear that SK Greenwich defaulted under each of the Mezzanine Loan Documents:

▪      The Promissory Note.  The Promissory Note states unequivocally that on the Maturity Date — October 1, 2009 — "the balance of principal, and the accrued and unpaid interest then remaining unpaid shall become due and payable."  Ex. 4 at 1.

▪      The Pledge and Security Agreement.  The Pledge and Security Agreement expressly requires the "repayment of the principal sum evidenced by [the Promissory Note] on or before October 1, 2009 . . . together with the payments required under said Promissory Note."  Ex. 5 at 1.  Moreover, the Pledge and Security Agreement includes among the "Covenants of the Pledgor" an express commitment "to pay or satisfy all of the Obligations," id. ¶ 4(a), which "Obligations" include an agreement by the borrower to make "punctual payment of the full amount of the Note when due."  Id. ¶ 1.

▪      The Mezzanine Loan Agreement.  The Mezzanine Loan Agreement lists 11 independent bases for triggering an "Event of Default."  See Ex. 3 §§ 3.1(a)–(k).  Section 3.1(c) provides that "the failure by the Borrower . . . to observe or perform any agreement, covenant or obligation" contained in "any Loan Document other than [the Mezzanine Loan Agreement]" constitutes an Event of Default.  Id. § 3.1(c).  The other "Loan Documents" referenced in section 3.1(c) of the Mezzanine Loan Agreement include the Promissory Note and the Pledge and Security Agreement.  See id. § 1.2.  Accordingly, by failing to pay back any principal or interest on the loan by the Maturity Date, SK Greenwich breached its clear "agreement, covenant

or obligation" under both the Promissory Note and the Pledge and Security Agreement, which, in turn, triggered an Event of Default under section 3.1(c) of the Mezzanine Loan Agreement.  Id. § 3.1(c).

        In an effort to avoid SK Greenwich's clear default, plaintiffs recycle arguments that SK Greenwich presented in connection with its motion for a preliminary injunction and allege that, at the time when W-D Lender declared the Mezzanine Loan in default, no payments were due on the Mezzanine Loan.  First, plaintiffs allege that the Subordination and Intercreditor Agreement — an agreement to which SK Greenwich was not a party — excused SK Greenwich's obligation to repay the Mezzanine Loan until the senior mortgage loan was retired. Second, plaintiffs allege that section 3.1(a) of the Mezzanine Loan Agreement relieved SK Greenwich of any obligation to repay the Mezzanine Loan until certain conditions had been satisfied.  These arguments fare no better now than they did last October.

> **1.    Nothing in the Subordination and Intercreditor Agreement relieved SK Greenwich of its obligation to repay the Mezzanine Loan on the Maturity Date.**

        Plaintiffs allege that certain provisions in the Subordination and Intercreditor Agreement — an agreement between AIB and W-D Lender that governed the priority of payment between them as the senior and subordinated creditors — somehow excused SK Greenwich's default under the Mezzanine Loan Documents.  See Am. Compl. ¶ 22. According to plaintiffs, these provisions silently overrode the stated Maturity Date for the Mezzanine Loan and established that no payments would be due on the Mezzanine Loan prior to the date on which the AIB mortgage was fully repaid.  Id. ¶ 81.  This is the same argument that

SK Greenwich asserted and then withdrew in the preliminary injunction proceeding, and it is demonstrably wrong.[3]

By its express terms, the Subordination and Intercreditor Agreement did not purport to govern or affect whether a default had occurred under the Mezzanine Loan Documents.  Paragraph 8(h) of the agreement clearly states that "nothing herein shall impair . . . the obligation of the Mezzanine Borrower . . . to pay the Mezzanine Loan in accordance with its terms," and goes on to describe that obligation as "unconditional and absolute."  Ex. 2 (Subordination and Intercreditor Agreement) ¶ 8.  Nor did the Subordination and Intercreditor Agreement prohibit W-D Lender from enforcing its security interest by conducting a foreclosure sale.  On the contrary, paragraph 7(b) of the agreement expressly permitted W-D Lender to commence an "Enforcement Action" in the event of a default in order to "enforce the Mezzanine Pledge or conduct a sale of the Ownership Interests pursuant to the Mezzanine Pledge."  Id. ¶ 7(b).

The Amended Complaint fails to mention either of these critical provisions in the Subordination and Intercreditor Agreement.  Instead, in support of their proposed interpretation, plaintiffs attempt to rely on a selectively edited excerpt of Recital E(c) and an isolated sentence in paragraph 4(d) of the agreement.  Am. Compl. ¶ 22.  Plaintiffs' arguments about these provisions do not withstand scrutiny.

To begin with, the Amended Complaint's deceptive use of an ellipsis in quoting the language of Recital E(c) of the Subordination and Intercreditor Agreement fundamentally changes the meaning of that provision.  Quoted in full, Recital E(c) provides (with the language omitted by plaintiffs underlined):  "unless and until the Anglo Senior Loan is paid and performed

---

[3]      At the preliminary injunction hearing, counsel for SK Greenwich advised the Court that "plaintiff in no way is trying to enforce rights under the intercreditor agreement."  Ex. 14 (10/19/10 Transcript) at 6.  A subsequent exchange between W-D Lender's counsel and the Court — following which SK Greenwich's counsel raised no objection — confirmed that SK Greenwich had withdrawn the argument.  Id. at 30 (Counsel:  "I think what I hear plaintiff saying is that they're no longer relying on the . . . subordination and intercreditor agreement."; the Court:  "I think they withdrew that argument.").

in full, <u>except as otherwise expressly permitted hereunder</u>, Mezzanine Lender shall have no right to receive any payment with respect to the Mezzanine Loan or to exercise any rights or remedies with respect to the Mezzanine Loan." Ex. 2 (Subordination and Intercreditor Agreement) at 2, ¶ E(c).  Recital E(c) is thus fully consistent with paragraph 7(b) of the Subordination and Intercreditor Agreement, which, as discussed above, expressly authorized W-D Lender to foreclose on and sell SK Greenwich's membership interest in Greenwich Partners once SK Greenwich defaulted on the Mezzanine Loan — irrespective of whether the AIB mortgage had been repaid.

Paragraph 4(d) of the Subordination and Intercreditor Agreement does not support plaintiffs' position either.  That paragraph — like the agreement as whole — merely regulated priority of payment and established that W-D Lender, as the mezzanine lender, would be "subordinate in right of payment" to AIB, the senior lender.  <u>Id.</u> ¶ 4(d).  The sentence quoted by plaintiffs states that "no payment whatsoever shall be made to Mezzanine Lender" until the obligations on the mortgage had been paid in full.  <u>Id.</u>  But that did not mean that payment of the Promissory Note was not due on the Maturity Date or that no default occurred if the Maturity Date passed without payment; rather, it simply meant that AIB had to be repaid in full on the mortgage before W-D Lender was entitled to retain any payments made to it by the mezzanine borrowers.  Accordingly, paragraph 4(d) elsewhere made clear that in the event W-D Lender did receive any such payments, it "shall hold the same in trust for Anglo Senior Lender and promptly pay and deliver same to Anglo Senior Lender for the benefit of Anglo Senior Lender."  <u>Id.</u> ¶ 4(d).

At bottom, in relying on the Subordination and Intercreditor Agreement, plaintiffs are seeking to enforce an agreement to which they are not a party.  And plaintiffs cannot claim to be third-party beneficiaries of that agreement, which clearly provides that it is "for the sole benefit of Anglo Senior Lender, Mezzanine Lender and their respective successors and permitted assigns."  <u>Id.</u> ¶ 22.  Plaintiffs therefore have no standing to raise defenses based on the Subordination and Intercreditor Agreement.  <u>See</u> <u>Capital Trust, Inc.</u> v. <u>Lembi</u>, 2009 WL 2997493, at *2 (N.D. Cal. Sept. 16, 2009) ("Section 8.3 of the Loan Agreements between Capital

Trust and the Defendants expressly provide that the Defendants are not intended to be third-party beneficiaries of the Intercreditor Agreement.  Thus, that document cannot provide them with a defense to Capital Trust's claim against them.").  As a matter of law, the negation of third-party rights in the Subordination and Intercreditor Agreement is "decisive," "dispositive," and "controlling" and bars plaintiffs' attempt to rely on that agreement.  India.com, Inc. v. Dalal, 412 F.3d 315, 321–22 (2d Cir. 2002) ("[T]he effectiveness of a negating clause to preclude third-party beneficiary status is well-established:  'where a provision exists in an agreement expressly negating an intent to permit enforcement by third parties, . . . that provision is decisive.'") (quoting Nepco Forged Prods., Inc. v. Consol. Edison Co. of N.Y., Inc., 470 N.Y.S.2d 680, 681 (N.Y. App. Div. 1984)).

For all of these reasons, plaintiffs' reliance on the Subordination and Intercreditor Agreement is misplaced.  That agreement did not relieve SK Greenwich of its obligation to repay the Mezzanine Loan on the maturity date, or otherwise excuse SK Greenwich's clear default.

> **2.      Section 3.1(a) of the Mezzanine Loan Agreement did not relieve SK Greenwich of its obligation to repay the Mezzanine Loan on the Maturity Date.**

Plaintiffs also attempt to rely on section 3.1(a) of the Mezzanine Loan Agreement, e.g., Am. Compl. ¶ 25, which provides that one of several potential Events of Default under that agreement is a failure to pay "any installment of principal, interest, or other payments required under the Note."  Ex. 3 § 3.1(a).  Plaintiffs are correct that the failure to make such an "installment" payment would only give rise to an Event of Default under section 3.1(a) if there were available cash flow from the project and payments were "permitted under the Senior Loan Documents."  Id.  But section 3.1(a) is irrelevant here.  W-D Lender has never claimed that an Event of Default occurred under that section by virtue of SK Greenwich's failure to make an interim "installment" payment; rather, as shown above, SK Greenwich defaulted under section 3.1(c) when it failed to repay the Mezzanine Loan (plus interest) on the Maturity Date.

See id. § 3.1 (providing that an "Event of Default" is "the occurrence of any one or more of the following") (emphasis added).

   The broad interpretation of section 3.1(a) that plaintiffs propose — under which the Maturity Date on the loan could be extended perpetually so long as the project never delivered a return — is inconsistent with the plain language of the Mezzanine Loan Documents. To begin with, section 3.1(a) of the Mezzanine Loan Agreement by its terms applies only to "installment" payments.  Ex. 3 § 3.1(a).  Webster's defines "installment" as "one of the parts into which a debt is divided when payment is made at intervals."  The balance of all principal and interest at the maturity of a loan, by definition, is not an "installment" payment and thus section 3.1(a) does not operate to negate the Maturity Date.

   In addition, plaintiffs' proposed interpretation of section 3.1(a) cannot be squared with the Promissory Note, which makes clear that repayment of the Mezzanine Loan was due on the Maturity Date — without condition.  Specifically, the Promissory Note states on page 1 that the loan principal "with interest accruing thereon at the rate of twelve percent (12%) per annum, which interest shall accrue, if not paid, subject to the provisions of the Loan Agreement . . . and to be paid commencing January 1, 2007 . . . until October 1, 2009 (the 'Maturity Date') when the balance of principal, and the accrued and unpaid interest then remaining unpaid shall become due and payable."  Ex. 4 at 1.  The Promissory Note thus recognized that installment payments of interest could be deferred and accrue during the term of the loan, while at the same time it reaffirmed that all outstanding principal and interest was due on the Maturity Date.

   Section 4.26 of the Mezzanine Loan Agreement further confirms that section 3.1(a) of the Mezzanine Loan Agreement did not somehow override the clear Maturity Date established by the Promissory Note.  As the Court previously noted, see Ex. 9 (10/21/10 Opinion and Order) at 9, that section states that "[n]othing in this Agreement or in the Note shall affect the obligation of the Borrower to pay the Debt in the manner and place therein respectively expressed."  Ex. 3 (Mezzanine Loan Agreement) § 4.26(c).  The "Debt" refers to the "outstanding

-13-

principal balance due on [the] Note," Ex. 4 (Promissory Note) ¶ 1(A), which, according to the express terms of the Promissory Note, was due and payable on the Maturity Date.  Id. at 1.

As the Court properly recognized in its opinion last October, the net effect of these provisions was to give the parties "breathing room" to get the project off the ground.  Ex. 9 (10/21/10 Opinion and Order) at 10.  The agreements "limit[ed] that breathing room to three years from the date of the Note," however, and thus "contemplated the eventual payment of the Debt by the borrower" at the end of that period, "even in the event that the Property did not generate Available Net Cash Flow or the Senior Loan remained to be paid."  Id.

Accordingly, the Mezzanine Loan matured by its terms on October 1, 2009 — the Maturity Date — and by failing timely to repay the principal (plus interest) on that date, SK Greenwich defaulted on the Mezzanine Loan.

**B.      The governing agreements authorized W-D Lender to foreclose on SK Greenwich's membership interest.**

Plaintiffs do not appear to dispute that the Mezzanine Loan Documents authorized W-D Lender to foreclose on SK Greenwich's membership interest once it defaulted on the Mezzanine Loan.  See Am. Compl. ¶¶ 30–31.  Nor could they.  Paragraph 6(a) of the Pledge and Security Agreement provides that in the event of default, W-D Lender:

> shall have the right from time to time, upon ten (10) business days' written notice by ordinary mail to the Pledgor as provided for herein to designate the time and place of any private sale (or public sale if same shall be required by applicable statute which cannot be waived) at its option to sell, re-sell, assign, transfer and deliver any of the Collateral, in such order and at such price and on such terms, as the Secured Party, in its sole discretion shall determine, for cash, on credit or for future delivery, in the County and State where the applicable Property is situated.

-14-

Ex. 5 ¶ 6(a).  Moreover, that agreement expressly authorized W-D Lender to proceed with a non-judicial foreclosure in accordance with the provisions of the U.C.C.  See id. ¶¶ 6(b), (c).[4]

The Pledge and Security Agreement states that the borrowers' agreement to pledge their equity interests in Greenwich Partners as collateral was "an inducement to make the [Mezzanine] Loan" and was designed to "secure payment of the [Promissory] Note."  Ex. 5 at 1.  Indeed, SK Greenwich expressly acknowledged the importance to W-D Lender of its bargained-for rights under the Pledge and Security Agreement:

> Reliance.  The Pledgor acknowledges that the Loan would not have been made to the Pledgor if the Collateral had not been pledged to the Secured Party pursuant to this Agreement, and that the Secured Party is making the Loan to the Pledgor in reliance upon this Agreement.

Id. ¶ 14.

The consequences of a default — and W-D Lender's rights in the event of a default — were thus well known to SK Greenwich when it accepted the Mezzanine Loan.  As described in the Pledge and Security Agreement, "[i]n order to confirm and perfect [W-D Group's] security interest," SK Greenwich executed, delivered, and filed a U.C.C. financing statement that named W-D Lender as the secured party and that described in detail the collateral being pledged as security for the Mezzanine Loan.  Ex. 5 ¶ 2.  The Pledge and Security Agreement also made clear that, "upon the occurrence and during the continuance of an Event of Default," W-D Lender would have the right to step in as "lawful attorney-in-fact" and exercise "full irrevocable power and authority . . . to take any and all action . . . to realize upon the Collateral."  Id. ¶ 8.

---

[4]     The U.C.C. permits a secured creditor, upon default, to take possession of the collateral provided as security and sell it without judicial process.  See N.Y. U.C.C. §§ 9-609; 9-610(a).  Contract provisions adopting this U.C.C. framework of non-judicial foreclosure and sale are valid under New York law and routinely enforced by the courts.  See, e.g., Royal Palm Senior Investors, LLC v. Carbon Capital II, Inc., 2009 WL 1941862 (S.D.N.Y. July 7, 2009).

In sum, in light of SK Greenwich's clear default on the Mezzanine Loan, all of W-D Lender's actions to enforce its rights — including the steps taken by W-D Lender to foreclose on SK Greenwich's interest in Greenwich Partners and sell that collateral in a public auction — were entirely consistent with the terms of the Mezzanine Loan Documents.

## II.   PLAINTIFFS HAVE NOT STATED A CLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACT (CLAIM TWO)

Plaintiffs allege in conclusory fashion that the defendants other than W-D Lender somehow "induced W-D Lender" to breach the Mezzanine Loan Documents and are therefore liable for tortious interference with those contracts. Am. Compl. ¶¶ 84–88. To maintain this claim under New York law, a plaintiff must allege "the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom." Lama Holding Co. v. Smith Barney Inc., 668 N.E.2d 1370, 1375 (N.Y. 1996). Plaintiffs here have not done so.

The Amended Complaint fails to state a claim for tortious interference with contract for three independent reasons:

First, plaintiffs have not pleaded an actual breach of any agreement, which is "an essential element of a tortious interference claim." Marks v. Smith, 885 N.Y.S.2d 463, 467 (N.Y. App. Div. 2009); see also, e.g., NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc., 664 N.E.2d 492, 495 (N.Y. 1996) ("Ever since tortious interference with contractual relations made its first cautious appearance in the New York Reports . . . our Court has repeatedly linked availability of the remedy with a breach of contract."). As shown above, in light of SK Greenwich's clear default on the Mezzanine Loan, W-D Lender was expressly authorized to foreclose on SK Greenwich's membership interest and sell it at a public auction. Accordingly, there was no breach of any of the Mezzanine Loan Documents, and plaintiffs' tortious interference claim should be dismissed at the threshold for this reason alone.

Second, the allegations in the Amended Complaint are far too vague to state a claim for tortious interference with contract against any of the defendants.  Courts in this district "require[] some factual specificity in pleading tortious interference"; "merely conclusory language" will not suffice.  E.g., World Wide Comm'cns, Inc. v. Rozar, 1997 WL 795750, at *7–8 (S.D.N.Y. Dec. 30, 1997) (citing cases).  In particular, to survive a motion to dismiss, a plaintiff must allege "specific action on the part of [each defendant] to cause" the breach of contract.  Masefield AG v. Colonial Oil Indus., 2006 WL 346178, at *4 (S.D.N.Y. Feb. 15, 2006); accord Nordic Bank PLC v. Trend Group, Ltd., 619 F. Supp. 542, 561 (S.D.N.Y. 1985) (dismissing tortious interference claim where plaintiff failed to allege "how any of the named defendants procured a breach" of the contract at issue).

Here, however, the Amended Complaint contains only the boilerplate allegation that an undifferentiated group of defendants supposedly "induced W-D Lender to breach [the] contractual relationships" between SK Greenwich and W-D Partner.  Am. Compl. ¶ 86.  There is no allegation as to what each defendant supposedly did to cause the alleged breach.  This does not come close to providing the "factual specificity" that is required at the pleading stage, and for this additional reason as well, plaintiffs' tortious interference claim is subject to dismissal.[5]

Third, it is settled law in New York that "only a 'stranger' to a contract, such a third party, can be liable for tortious interference with [that] contract," Primetime 24 Joint Venture v. Echostar Comm'cns Corp., 2002 WL 44133, at *8 (S.D.N.Y. Jan. 11, 2002); see also, e.g., Kassover v. Prism Venture Partners, LLC, 862 N.Y.S.2d 493, 498 (N.Y. App. Div. 2008); Page Mill Asset Mgmt. v. Credit Suisse First Boston Corp., 2000 WL 335557, at *10 (S.D.N.

---

[5]     Moreover, plaintiffs' allegation that defendants supposedly "acted with malice and for the purpose of injuring SK Greenwich," Am. Compl. ¶ 87, is far too conclusory to support a claim for tortious interference.  See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  Nor can this empty allegation support plaintiffs' frivolous request for punitive damages, which may only be awarded "where a defendant's conduct has constituted gross, wanton, or willful fraud or other morally culpable conduct to an extreme degree."  L & L Wings, Inc. v. Marco-Destin Inc., 756 F. Supp. 2d 359, 367–68 (S.D.N.Y. 2010).

Mar. 30, 2000), and none of the defendants that are alleged to have induced W-D Lender's supposed breach of the Mezzanine Loan Documents were "strangers" to those contracts.[6]

To begin with, because W-D Partner was a party to the Mezzanine Loan Documents as a co-borrower, it was plainly not a stranger to those agreements. Multi-Juice, S.A. v. Snapple Beverage Corp., 2003 WL 1961636, at *5 (S.D.N.Y. Apr. 25, 2003) ("a party cannot tortiously interfere with its own contract"). Defendants Wertheimer and Dagmi, meanwhile, were the ultimate owners and principals of both W-D Lender and W-D Partner, and Mr. Dagmi executed the Mezzanine Loan Documents on behalf of those entities. Ex. 3 (Mezzanine Loan Agreement) at 34; Ex. 4 (Promissory Note) at 5; Ex. 5 (Pledge and Security Agreement) at 14. Under these circumstances, a tortious interference claim against Messrs. Wertheimer and Dagmi does not lie as a matter of law. See Kassover, 862 N.Y.S.2d at 495, 498 (dismissing claim that the principal owner of a closely-held real estate company had tortiously interfered with a merger agreement to which the company was a party); Koret, Inc. v. Christian Dior, S.A., 554 N.Y.S.2d 867, 869 (N.Y. App. Div. 1990) (holding that a corporation was not a stranger to its subsidiary's joint venture agreement where an employee of both entities "played a role in negotiation of the joint venture agreement, and executed same").[7]

---

[6]     The lone exception is W. Family 1 Ltd. But the only substantive allegation in the Amended Complaint that concerns W. Family 1 Ltd. is paragraph 73, in which plaintiffs allege that W. Family 1 Ltd. purchased the senior mortgage loan from AIB in January 2011, i.e., months after the foreclosure sale. There is thus no conceivable basis for any tortious interference claim against W. Family 1 Ltd.

[7]     Finally, because defendants 443 Greenwich Partners LLC and 443 Greenwich LLC were co-owned by the two borrowers on the Mezzanine Loan, those defendants were not strangers to the Mezzanine Loan Documents.

### III.   PLAINTIFFS HAVE NOT STATED A CLAIM FOR BREACH OF THE OPERATING AGREEMENT (CLAIM THREE)

Plaintiffs also contend that certain defendants breached the Operating Agreement by replacing SK Greenwich as the "Operations Member" of Greenwich Partners — that is, the member with "primary responsibility for overseeing the management and day-to-day operations of the Property," Ex. 1 (Operating Agreement) § 6.1(c)(i) — following the foreclosure and sale of SK Greenwich's membership interest.  Am. Compl. ¶¶ 89–92.

This claim fails as a matter of law.  Contrary to plaintiffs' allegation that SK Greenwich was removed as the Operations Member "without justification," Am. Compl. ¶ 90, the replacement of SK Greenwich as the Operations Member was a necessary consequence of the foreclosure and sale of its membership interest in response to SK Greenwich's default on the Mezzanine Loan.  The Pledge and Security Agreement expressly provides that, as collateral for the Mezzanine Loan, SK Greenwich pledged "all of [its] right, title and interest in . . . voting and rights to make decisions on behalf of the Company and the right to be named as a member on the books and records of the Company."  Ex. 5 ¶ 1(h).  SK Greenwich was thus stripped of any right to continue as the Operations Member — along with all of its other rights as a member of Greenwich Partners — when its membership interest was sold in the foreclosure sale.

Plaintiffs' allegation that SK Greenwich was wrongfully "denuded . . . of its entitlement to receive some or all of the SK Greenwich Preferred Return" is misplaced for similar reasons.  See Am. Compl. ¶ 90.  Under the Operating Agreement, if the venture had generated profits — which it indisputably did not — SK Greenwich would have been entitled to receive the "SK Greenwich Preferred Return" as "compensation for acting as the Operations Member."  Ex. 1 (Operating Agreement) § 6.1(c)(ii).  But, once again, SK Greenwich forfeited the right to claim any portion of the SK Greenwich Preferred Return when it defaulted on the Mezzanine Loan and consequently lost its membership interest in Greenwich Partners.  See Ex. 5 (Pledge and Security Agreement) ¶ 1(g) (reflecting SK Greenwich's pledge of the right "to receive any distributions or other payments of any kind whatsoever from or in respect of the

Company").  Plaintiffs' claim for breach of the Operating Agreement should therefore be dismissed.

## IV.   PLAINTIFFS HAVE NOT STATED A CLAIM FOR AN ACCOUNT STATED (CLAIM FOUR).

Plaintiffs also attempt to plead a claim against Greenwich Partners for an account stated in favor of SK Greenwich.  See Am. Compl. ¶¶ 93–99.  "An account stated is an account, balanced and rendered, with an assent to the balance either express or implied."  Abbott, Duncan & Weiner v. Ragusa, 625 N.Y.S.2d 178, 178 (N.Y. App. Div. 1995).  Essential to such a claim is an allegation that an account was actually "presented" for payment.  Id.

The Amended Complaint contains virtually no factual detail in support of this claim.  Among other shortcomings, plaintiffs do not specify when the costs incurred by SK Greenwich were supposedly invoiced to Greenwich Partners, the amounts of the individual invoices, or even the number of invoices at issue.  Nor do plaintiffs explain the nature of the costs at issue (beyond their hopelessly vague reference to "imputed allocation of overhead," see Am. Compl. ¶ 94) or allege why SK Greenwich was entitled to have such costs reimbursed to it under the Operating Agreement.  Plaintiffs have thus failed to "nudge[] their [account stated] claim[] across the line from conceivable to plausible."  Twombly, 550 U.S. at 570.

But even putting aside these substantial pleading deficiencies, which standing alone warrant dismissal, plaintiffs' account stated claim nevertheless fails as a matter of law. The Pledge and Security Agreement makes clear that the collateral SK Greenwich pledged as security for the Mezzanine Loan included, among other rights, "all of [SK Greenwich's] right, title and interest in . . . (f) general intangibles for money due or to become due . . . from [Greenwich Partners]."  Ex. 5 (Pledge and Security Agreement) ¶ 1.  Accordingly, when W-D Lender foreclosed on SK Greenwich's membership interest in Greenwich Partners, SK Greenwich forfeited the right to pursue claims against Greenwich Partners for monies due, and SK Greenwich thus no longer has an account stated claim against Greenwich Partners (if it ever did).

V.     **PLAINTIFFS HAVE NOT STATED A CLAIM FOR BREACH OF
       FIDUCIARY DUTY (CLAIM FIVE).**

      Plaintiffs next allege that defendants Wertheimer, Dagmi, W-D Partner, W-D

Lender, and W. Family 1 Ltd. — a group referred to in the Amended Complaint as the "W-D

Defendants" — breached fiduciary duties supposedly owed to SK Greenwich.  Am. Compl.

¶¶ 100–01.  This claim is badly pleaded and, in any event, is completely baseless.

      Because Greenwich Partners is a Delaware limited liability company, Delaware

substantive law applies to plaintiffs' breach of fiduciary duty claim.  See, e.g., Walton v. Morgan

Stanley & Co., 623 F.2d 796, 798 & n.3 (2d Cir. 1980).  To state a claim for breach of fiduciary

duty under Delaware law, a plaintiff must allege "(1) that a fiduciary duty existed and (2) that the

defendant breached that duty."  Beard Research, Inc. v. Kates, 8 A.3d 573, 601 (Del. Ch. 2010).

But the Amended Complaint does not even attempt to plead the required factual basis for this

claim — plaintiffs do not allege, for example, why each of the W-D Defendants supposedly

owed a fiduciary duty to SK Greenwich — and it should be dismissed on that basis alone.  See

In re Hydrogen, L.L.C., 431 B.R. 337, 348 (Bankr. S.D.N.Y. 2010) ("In light of the general

absence of supporting facts set forth in the Amended Complaint, the Court finds the breach-of-

fiduciary-duty claim to be 'speculative' under Twombly.").  Nevertheless, in anticipation of an

attempt by plaintiffs to salvage their ill-formed pleading in their opposition papers, defendants

will address a few additional points related this claim below.

      The only defendant that even arguably owed fiduciary duties to SK Greenwich

was W-D Partner.  Importantly, however, while majority members of Delaware limited liability

companies (such as W-D Partner) sometimes owe fiduciary duties to their fellow members,

Delaware law "gives members of an LLC wide latitude . . . to limit or eliminate fiduciary duties"

by contract.  E.g., Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC, 2009 WL

1124451, at *8 (Del. Ch. Apr. 20, 2009) ; see 6 Del. C. § 18-1101(c) ("the member's . . .

[fiduciary] duties may be expanded or restricted or eliminated by provisions in the limited

liability company agreement").  This power springs from the basic principle of Delaware law

that "[c]ontractual language defines the scope, structure, and personality of limited liability companies."  Fisk Ventures, LLC v. Segal, 2008 WL 1961156, at *1 (Del. Ch. May 7, 2008); see 6 Del. C. § 18-1101(b) ("It is the policy of this chapter to give the maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements.").  Thus, "[w]hen a fiduciary duty claim is plainly inconsistent with the contractual bargain struck by parties to an LLC," "the fiduciary duty claim must fall."  Related Westpac LLC v. JER Snowmass LLC, 2010 WL 2929708, at *8 (Del. Ch. July 23, 2010).

Nowhere in the Amended Complaint do plaintiffs explain how W-D Partner supposedly breached a fiduciary duty to SK Greenwich.  While plaintiffs allege that the relationship between W-D Lender and W-D Partner "created an inherent conflict of interest" in connection with the Mezzanine Loan, Am. Compl. ¶ 29, by their own admission, plaintiffs were aware of this relationship when they executed the Mezzanine Loan Documents.  See id. ¶¶ 28–30.  Having voluntarily entered into this business venture with a full and fair opportunity to negotiate all of the governing terms at arm's length, plaintiffs cannot now be heard to complain that the deal they made was somehow tainted by an impermissible conflict.  See Kahn v. Icahn, 1998 WL 832629, at *3 (Del. Ch. Nov. 12, 1998) (dismissing usurpation of partnership opportunity claim where the partnership agreement expressly authorized the partners to compete with the partnership; "Put simply, since Plaintiffs knew that the [ ] Defendants were authorized to compete . . . they cannot now claim derivatively that [the partnership] had a legally sufficient expectation of 100% involvement.").[8]

---

[8]     Plaintiffs' allegation that Deutsche Bank was considered and rejected as the provider of mezzanine financing is entirely beside the point. Am. Compl. ¶ 27.  The fact that a different potential mezzanine lender was at one point discussed plainly has no effect on the parties' rights under the final Mezzanine Loan Documents, as negotiating points that the parties "relinquished" "[a]t the bargaining table" are irrelevant as a matter of law.  Related Westpac LLC v. JER Snowmass LLC, 2010 WL 2929708, at *6 (Del. Ch. July 23, 2010) ("Delaware law respects the freedom of parties in commerce to strike bargains and honors and enforces those bargains as plainly written.").

Moreover, to the extent plaintiffs are attempting to suggest that W-D Partner somehow had a fiduciary duty to stand in the way of W-D Lender's foreclosure of SK Greenwich's membership interest, the Operating Agreement expressly eliminated any such obligation.  Section 6.3(a)(ii) provided:

> No Member nor any of its officers, directors, managers, members, trustees, partners, employees or agents, shall be liable, in damages or otherwise, to the Company or to any of the Members, for . . . (ii) such Member's failure or refusal to perform any act, except those required by the terms of this Agreement . . . .

Ex. 1 (Operating Agreement) § 6.3(a)(ii).  By incorporating this language into their agreement, the members of Greenwich Partners clearly established that the only duties they owed to each other were those grounded in the Operating Agreement itself — to the exclusion of any otherwise applicable fiduciary duties.  See Fisk Ventures, 2008 WL 1961156, at *9, *11 (construing LLC agreement providing that "No Member shall have any duty to any Member of the Company except as expressly set forth herein or in other written agreements" and concluding that the members had "eliminate[d] fiduciary duties to the maximum extent permitted by law by flatly stating that members have no duties other than those expressly articulated in the Agreement").

Accordingly, any claim that W-D Partner breached a fiduciary duty to SK Greenwich would fail as a matter of law.  For this additional reason as well, plaintiffs' breach of fiduciary duty claim should be dismissed.[9]

---

[9]     To the extent plaintiffs are alleging that the inability of Greenwich Partners to obtain a construction loan was somehow attributable to a breach of fiduciary duty by W-D Partner, the complaint does not state a claim on that ground either.  Plaintiffs' own allegations make clear that the failure to secure construction financing from Pacific National Bank was caused not by any breach of fiduciary duty, but rather Pacific National Bank's change of heart during the period when the parties were seeking more favorable terms from UBS.  See Am. Compl. ¶¶ 36–40.  Any suggestion that W-D Partner had a fiduciary obligation to accept without negotiation the first construction loan presented to Greenwich Partners finds no support in law or logic.

## VI.  PLAINTIFFS HAVE NOT STATED A CLAIM FOR PROMISSORY ESTOPPEL (CLAIM SIX).

Finally, plaintiffs attempt to plead a promissory estoppel claim based on alleged oral promises supposedly made by defendants to provide the construction financing to develop the project.  Am. Compl. ¶¶ 102–06.  While in their original complaint plaintiffs alleged that defendants made these supposed promises to induce SK Greenwich to enter into the venture in the first place, e.g., Compl. ¶ 41, plaintiffs have completely abandoned any such allegation in the Amended Complaint.  Instead, plaintiffs now limit their promissory estoppel claim to an allegation that, years into the venture, plaintiff Karmely was induced by defendants' supposed promises to provide certain personal guarantees demanded by AIB in exchange for extending the maturity date of the AIB mortgage.  E.g., Am. Compl. ¶¶ 47–50.

"In New York, promissory estoppel has three elements:  a clear and unambiguous promise, a reasonable and foreseeable reliance by the party to whom the promise is made, and an injury sustained by the party asserting the estoppel by reason of the reliance."  Cyberchron Corp. v. Calldata Sys. Dev., Inc., 47 F.3d 39, 44 (2d Cir. 1995).  In addition, where the statute of frauds would otherwise bar proof of the alleged promise, a plaintiff must demonstrate that it suffered "unconscionable injury" as a result of the promisor's failure to perform.  E.g., Merex A.G. v. Fairchild Weston Sys., Inc., 29 F.3d 821, 825–26 (2d Cir. 1994).[10]

Plaintiffs fail to state a claim for promissory estoppel for three independent reasons.  First, the alleged promises lacked any detail whatsoever regarding the key terms of the financing that was contemplated and were thus insufficiently clear and unambiguous to support a claim for promissory estoppel.  Second, any reliance by plaintiffs on promises to provide construction financing would have been unreasonable as a matter of law in light of the provisions of the Operating Agreement.  Third, because New York's statute of frauds applies to agreements

---

[10]      Under New York choice-of-law rules, the substantive law of the place of the alleged detrimental reliance — here, New York — governs promissory estoppel claims.  NCC Sunday Inserts, Inc. v. World Color Press, Inc., 759 F. Supp. 1004, 1011 n.11 (S.D.N.Y. 1991).

to provide construction financing, plaintiffs' failure to plead unconscionable injury arising from defendants' supposed failure to honor the alleged oral promises is fatal to plaintiffs' claim.

### A.     The alleged promises were not sufficiently clear and unambiguous.

None of the promissory statements alleged in the Amended Complaint contained any of the key terms for the construction financing that was supposedly contemplated.  The alleged promises did not refer to a principal amount, interest rate, payment schedule, or maturity date for the loan, nor did they begin to explain how the new loan would be incorporated into the existing financing structure (namely, the AIB mortgage and the Mezzanine Loan) — all issues that would have been critical to "an experienced New York real estate developer."  Am. Compl. ¶ 18; see Stein v. Gelfand, 476 F. Supp. 2d 427, 436 (S.D.N.Y. 2007) ("[Plaintiff] could not reasonably have relied upon [defendant's promise] in light of the fact that it left for future resolution so many key terms.").

Thus, as a matter of law, the alleged promises were "not sufficiently clear and unambiguous to support . . . a cause of action" for promissory estoppel.  James v. W. N.Y. Computing Sys., Inc., 710 N.Y.S.2d 740, 742–43 (N.Y. App. Div. 2000) (dismissing claim based on oral promise to provide stock-based compensation; promise was "unclear concerning the duration of plaintiff's employment" and "the specifics of the plan in which plaintiff is to participate"); see Ashland Inc. v. Morgan Stanley & Co., 700 F. Supp. 2d 453, 472 (S.D.N.Y. 2010) (dismissing claim based on statement that defendant "guaranteed liquidity" for defendant's investment; "any promise to act was so vague and indefinite that reliance upon that promise . . . cannot be said to be reasonable").

### B.     Plaintiffs could not reasonably have relied on the alleged promises.

Plaintiffs allege that they relied to their detriment on promises supposedly made by defendants beginning in September 2008, Am. Compl. ¶ 47, i.e., two years after the parties executed the Operating Agreement.

But two separate provisions in the Operation Agreement made clear that neither W-D Partner nor SK Greenwich would be under any obligation to provide financing to Greenwich Partners during the course of the venture.  Section 3.2 of the agreement provided that "no Member shall have any obligation . . . to lend any amount to the Company or any Subsidiary," while section 3.3 provided that "[n]o Member shall be obligated to make a loan to the Company."  Ex. 1 (Operation Agreement) §§ 3.2, 3.3.  This clear language in the Operating Agreement cannot be squared with any supposed oral promise by defendants to provide the construction financing, and therefore any reliance by plaintiffs on such promises would have been unreasonable as a matter of law.  E.g., Brinsights, LLC v. Charming Shoppes of Del., Inc., 2008 WL 216969, at *6 (S.D.N.Y. Jan. 16, 2008) ("In the face of [] specific written language acknowledged and accepted by plaintiff, reliance upon oral representations that flatly contradict the written agreement is unreasonable as a matter of law.").

Nor can plaintiffs contend that the promises supposedly made by defendants in 2008 somehow overrode these provisions in the Operating Agreement:  by its express terms, that agreement could only be amended in writing.  Ex. 1 (Operating Agreement) § 12.6.  Accordingly, promissory statements by defendants made subsequent to the execution of the Operating Agreement could not effect its terms — including sections 3.2 and 3.3 and their clear repudiation of any obligation on the part of W-D Partner to provide construction financing.

To the extent that plaintiffs are also attempting to plead a promissory estoppel claim on the basis of alleged promises to "back-stop" plaintiff Karmely's personal guarantees in favor of AIB, Am. Compl. ¶ 50, that claim, too, would be foreclosed by the express terms of the Operating Agreement.  Section 3.3(e) of that agreement made clear that any personal guarantees that were required to be executed in connection with the project — including, but not limited to, any "construction completion" guarantees — would come from SK Greenwich or an affiliate of SK Greenwich and not W-D Partner or any of its affiliates.  See Ex. 1 (Operating Agreement) § 3.3(e).  Any supposed promise by defendants to back-stop plaintiff Karmely's personal guarantees would thus conflict with that provision of the parties' written agreement, and

therefore any alleged reliance by plaintiffs on such a promise would have been unreasonable as a matter of law.  See <u>Brinsights</u>, 2008 WL 216969, at *6.

More fundamentally, however, section 3.3(e) of the Operating Agreement directly belies plaintiffs' allegation that "Karmely signed the completion and other guarantees" because of supposed "promises and assurances" by defendants.  Am. Compl. ¶ 49.  In truth, as that provision conclusively shows, plaintiff Karmely provided the guarantees at issue because he was contractually obligated to do so — and not because of any promises supposedly made to him years into the venture.  See Ex. 1 (Operating Agreement) § 3.3(e).

**C.    Plaintiffs have not pleaded unconscionable injury.**

An agreement to create a mortgage is subject to New York's statute of frauds, which provides that an "interest in real property . . . cannot be created, granted, assigned, surrendered or declared, unless by act or operation of law, or by a deed or conveyance in writing, subscribed by the person creating, granting, assigning, surrendering or declaring the same." N.Y. Gen. Oblig. § 5-703(1); <u>see</u>, <u>e.g.</u>, <u>Tribeca Lending Corp.</u> v. <u>Bartlett</u>, 923 N.Y.S.2d 451, 452 (N.Y. App. Div. 2011); <u>Marine Midland Bank, N.A.</u> v. <u>Cafferty</u>, 571 N.Y.S.2d 628, 632 (N.Y. App. Div. 1991).  The statute of frauds also applies to construction loans, which, like traditional mortgages, are secured by an interest in the underlying property.  <u>See</u> <u>Grimm</u> v. <u>Marine Midland Bank, N.A.</u>, 498 N.Y.S.2d 591, 592 (N.Y. App. Div. 1986) (applying statute of frauds to alleged oral agreement to underwrite a construction loan for a shopping mall).

Plaintiffs attempt to invoke the doctrine of promissory estoppel to avoid application of the statute of frauds to their claim that certain defendants orally promised to provide construction financing for the venture.  But this approach is only available to plaintiffs if they can allege "unconscionable injury," <u>i.e.</u>, "injury beyond that which flows naturally from the non-performance of the unenforceable agreement."  <u>M.K.D. Capital Corp.</u> v. <u>Miller</u>, 652 N.Y.S.2d 919, 921–22 (N.Y. Sup. Ct. 1996) (citing, <u>e.g.</u>, <u>Merex</u>, 29 F.3d 821).

Plaintiffs have made no such allegation here.  To the contrary, the Amended Complaint does not allege that plaintiff Karmely has been obligated to make a single payment in satisfaction of any of the guarantees that he was supposedly "induced" to provide — not one penny.

The only "injury" described in the complaint that is arguably traceable to defendants' supposed oral promises to provide construction financing is the allegation that, in reliance on such promises, plaintiffs continued to honor their contractual obligations related to the venture (such as, for example, by posting additional capital required by AIB and providing necessary guarantees as contemplated in the Operating Agreement).  See Am. Compl. ¶ 49–50. But a party's "continued performance of its contractual obligations" is not unconscionable injury as a matter of law.  Gary Powell, Inc. v. Mendel/Borg Group, Inc., 655 N.Y.S.2d 558, 559 (N.Y. App. Div. 1997).  Cf. Smith v. Ameriquest Mortg. Co., 2006 WL 6400722, at *1, *4 (N.Y. Sup. Ct. Sept. 18, 2006) (denying summary judgment on claim based on oral promises allegedly made in connection with mortgage refinancing; plaintiff's "loss of her residential property could be considered an unconscionable injury").  For this additional reason as well, plaintiffs have not stated a claim for promissory estoppel.

**CONCLUSION**

For all of these reasons, plaintiffs' Amended Complaint should be dismissed in its entirety and without leave to amend.


Dated:   New York, New York
         October 3, 2011

                                        Respectfully submitted,

                                        WACHTELL, LIPTON, ROSEN & KATZ

                                        By: /s/  Stephen R. DiPrima
                                            Stephen R. DiPrima
                                            Bradley R. Wilson

                                        51 West 52nd Street
                                        New York, NY  10019
                                        Telephone:  (212) 403-1000
                                        Facsimile:   (212) 403-2000

                                        *Attorneys for Defendants*