UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X

SHAHAB KARMELY and SK
GREENWICH LLC,

       Plaintiffs,

    - against -

EITAN WERTHEIMER, EZRA DAGMI, 443
GREENWICH LLC, 443 GREENWICH
PARTNERS LLC, W. FAMILY 1 LTD., W-D
GROUP (2006) LP, W-D GROUP NY1, LLC,
And JOHN DOES 4-10,

       Defendants.
----------------------------------------------------------X

11 Cv. 541 (RPP)

**OPINION & ORDER**

**ROBERT P. PATTERSON, JR., U.S.D.J.**

## I.  BACKGROUND

**A. Procedural History**[1]

  On August 19, 2011, Plaintiffs Shahab Karmely and SK Greenwich LLC (collectively,

"Plaintiffs") filed an amended complaint (the "Amended Complaint") against Defendants Eitan

Wertheimer, Ezra Dagmi, 443 Greenwich LLC, 443 Greenwich Partners, LLC, W. Family 1

Ltd., W-D Group (2006) LP, W-D Group NY1, LLC, and John Does 4-10 (collectively,

"Defendants"). (Am. Compl. ¶¶ 2-11.)  The Amended Complaint seeks monetary damages for

claims of (1) breach of the Mezzanine Loan documents, (id. ¶¶ 79-83); (2) tortious interference

with contract, (id. ¶¶ 84-88); (3) breach of the Operating Agreement, (id. ¶¶ 89-92); (4) account

---

[1] On October 21, 2010, the Court issued an order in Case No. 10 Cv. 7846 (RPP), denying Plaintiff SK Greenwich
LLC's  motion for a temporary restraining order and preliminary injunction to stay the sale of SK Greenwich, LLC's
membership in 443 Greenwich Partners, LLC, and to enjoin Defendant W-D Group (2006) LP from selling or
otherwise disposing of SK Greenwich LLC's membership interest.  See SK Greenwich LLC v. W-D Group (2006)
LP, No. 10 Cv. 7846 (RPP), 2010 WL 4140445 (S.D.N.Y. Oct. 21, 2010).

stated, (<u>id.</u> ¶¶ 93-99); (5) breach of fiduciary duty, (<u>id.</u> ¶¶ 100-01); and (6) promissory estoppel, (<u>id.</u> ¶¶ 102-106).

On October 3, 2011, Defendants filed a motion to dismiss the Amended Complaint for failure to state a claim for which relief can be granted pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(b)(6).  On November 11, 2011, Plaintiffs filed a memorandum of law opposing Defendants' motion to dismiss, and on December 19, 2011, Defendants filed a reply memorandum of law in further support of their motion to dismiss.  Oral argument in this matter was heard on February 10, 2012 at 9:30 a.m.

**B.      Facts Alleged in the Amended Complaint**

Plaintiff SK Greenwich LLC (hereinafter "SKG") is a Delaware limited liability company controlled by its principal and sole owner, Shahab Karmely ("Karmely"), a New York City real estate developer. (Am. Compl. ¶¶ 2, 3, 18.)  Defendant W-D Group (2006) LP (hereinafter "W-D Lender") is a Delaware limited liability company controlled by Eitan Wertheimer ("Wertheimer") and Ezra Dagmi ("Dagmi"), Israeli investors. (<u>Id.</u> ¶¶ 4-5, 10.)

In 2005, Wertheimer and Dagmi approached Karmely to solicit his involvement in developing a multi-billion dollar real estate portfolio. (<u>Id.</u> ¶ 19.)  Wertheimer and Dagmi envisioned that Karmely would act as the developer or managing member of the venture, and that instead of being paid a customary development fee, SKG would receive a certain percentage of the profits on each development as compensation for its development services. (<u>Id.</u>)  In September 2006, SKG agreed with W-D Group NY1, LLC (hereinafter "W-D Partner"), whose sole member is W-D Lender, to form 443 Greenwich Partners, LLC (hereinafter "443 Partners" or the "Company"), a Delaware limited liability company formed for the express purpose of purchasing, renovating, and redeveloping a building at 443-53 Greenwich Street, New York, NY

10013 ("the Property"). (Id. ¶¶ 7, 9.)  Specifically, 443 Partners sought to purchase and develop

the Property for the purpose of converting it into luxury condominiums, retail components, and a

hotel. (Id. ¶¶  9, 21, 32.)

     **1.**     **The Purchase of 443-53 Greenwich Street**

     On September 7, 2006, 443 Partners purchased the Property for $113 million plus

closing costs. (Id. ¶ 26.)  In order to fund the purchase and redevelopment of the Property, 443

Partners obtained an $85 million mortgage loan from Anglo Irish Bank Corporation PLC

("Anglo Irish Bank") (the "Anglo Senior Loan"), which was to reach maturity on October 1,

2008, and a $20 million Mezzanine Loan from W-D Lender, which was to reach maturity on

October 1, 2009. (Id. ¶¶ 21(b), 26.)  As stated in the Operating Agreement of 443 Partners ("the

Operating Agreement"), 443 Partners initially received capital contributions of  $24.9 million of

the purchase price, with W-D Partner funding approximately $19.9 million of this amount, and

SKG supplying the other $5.0 million. (Id. ¶ 26; Decl. of Bradley R. Wilson dated October 3,

2011 ("Wilson Decl."), Ex. 1 (Operating Agreement) Schedule 1.1(b).)  In exchange for W-D

Partner's capital contribution, W-D Partner obtained an 80% membership interest in 443

Partners, and in exchange for SKG's contribution, SKG obtained a 20% membership interest in

443 Partners. (Wilson Decl., Ex. 1 Schedule 1.1(b).)

     **2.**     **Relevant Documents**

          **a.**     **The Operating Agreement**

     On September 7, 2006, SKG and W-D Partner entered into the Operating Agreement of

443 Partners which, inter alia, governed the management and operation of the project, and

provided for a three-person board of managers. (Am. Compl. ¶ 21; Wilson Decl., Ex. 1 § 6.1(a).)

W-D Partner, as the 80% interest holder, had the right to appoint two of the three board

members, and SKG, as the 20% interest holder, had the right to appoint the third. (Wilson Decl.,

Ex. 1 § 6.1(a).)  The Operating Agreement also provided that SKG would act as the Operations

Member of 443 Partners, responsible for the day-to-day operations of the Property. (Id., Ex. 1 §

6.1(c).)  The Operating Agreement provided that SKG, as Operations Member, would perform

"all phases of the development of the Property consistent with the intent of the Members and the

Budget."[2] (Id.)  In that role, SKG stood to receive additional fees if the project succeeded,

subject to the restrictions imposed by a lender and the rights of W-D Lender under the

Mezzanine Loan Documents.[3] (Id., Ex. 1 § 6.1(c)(ii).)

> **b.      The Mezzanine Loan Agreement**

On or about September 7, 2006, the members of 443 Partners (SKG and W-D Partner),

also entered into a Mezzanine Loan Agreement with W-D Lender dated September 7, 2006,

pursuant to which W-D Lender loaned $20 million to SKG and W-D Partner (collectively, the

"Borrower") (the "Mezzanine Loan"). (Am. Compl. ¶¶ 21, 26.)  The Mezzanine Loan was

subordinate to the Anglo Senior Loan, (Wilson Decl., Ex. 2 (The Subordination and Intercreditor

Agreement) ¶ 4(d)), but senior to the equity investments of SKG and W-D Partner (id., Ex. 1 §

5.1(c)(i)).  The terms of the Mezzanine Loan and the remedies available to W-D Lender in the

event of default by the Borrower were established by the Mezzanine Loan Promissory Note (the

---

[2] SKG's responsibilities as Operations Member included: (1) proposing strategy for developing the Property; (2) analyzing market data related to potential sales/rentals; (3) obtaining zoning and regulatory permits; and (4) identifying, supervising, and retaining third party suppliers (i.e. financing, design, planning, architecture, construction, marketing, and sales teams). (See Wilson Decl., Ex. 1 § 6.1(c).)

[3] As outlined in Section 5.1(c) of the Operating Agreement: Subject to any restrictions imposed by a Lender under the Loan Documents, Available Net Cash Flow, if any, shall be distributed at such times as the Board of Managers may determine, but not less frequently than quarterly, and any Capital Event Proceeds shall be distributed promptly after the receipt thereof, in the following order of priority: (i) First, to the Members in payment of that certain mezzanine loan made by [W-D Lender] to the Members in the amount of Twenty Million ($20,000,000) Dollars including the interest due thereon, until fully paid.  The Members hereby irrevocably and unconditionally instruct the Company to transfer and distributions under [this section] directly to [W-D Lender]. (Wilson Decl., Ex. 1 § 5.1(c)(i).)

"Note") dated September 7, 2006, (id., Ex. 4 (Promissory Note)), and the Pledge and Security

Agreement also dated September 7, 2006, (id., Ex. 5 (Pledge and Security Agreement))

(Collectively, the "Mezzanine Loan Documents").  Under the terms of the Mezzanine Loan

Documents, W-D Partner and SKG each pledged 100% of their ownership interests in 443

Partners as collateral for the Mezzanine Loan. (Id., Ex. 4 at 1, Ex. 4 ¶ 8, Ex. 3 ¶ 1.2.)  Upon an

"Event of Default," SKG and W-D Partner (collectively, as the  "Borrower") were jointly and

severally liable for the entire balance of the Mezzanine Loan, (id., Ex. 3 ¶ 4.26(h)), and W-D

Lender would have the right to foreclose on 100% of either or both SKG's and W-D Partner's

equity interests in 443 Partners, (id., Ex. 5 ¶ 6(a), Ex. 2 ¶ 7(b); Am. Compl. ¶ 29).  The

Promissory Note states that interest of twelve percent per annum shall accrue quarterly until

October 1, 2009 (the "maturity date"), when "the balance of principal, and the accrued and

unpaid interest then remaining unpaid shall become due and payable." (Wilson Decl., Ex. 4 at 1;

Am Compl. ¶ 21.)  Furthermore, under the terms of the Pledge and Security Agreement, the

Borrower covenanted to "pay or satisfy all of the Obligations" which were defined to include

"the punctual payment of the full amount of the Note when due (whether at stated maturity, by

acceleration or otherwise) and all interest thereon . . . ." (Wilson Decl., Ex. 5 ¶¶ 1, 4.)

       **c.**      **The Intercreditor Agreement**

W-D Lender and Anglo Irish Bank also entered into a Subordination and Intercreditor

Agreement ("Intercreditor Agreement") dated September 7, 2006 which expressly defined the

rights of both parties. (Id., Ex. 2 ¶ 4(d).)  The Intercreditor Agreement provided that Anglo Irish

Bank's rights were superior to those of the Mezzanine Lender, W-D Lender.  Specifically, the

Intercreditor Agreement stated that

> [u]ntil all of Borrower's obligations under the Anglo Senior Loan Documents
> have been paid and performed in full, no payment whatsoever shall be made to
> Mezzanine Lender by or on behalf of Borrower, Mezzanine Borrower, or any
> Guarantor for or on account of any amount due under the Mezzanine Loan
> Documents.

(Id.)  Furthermore, any payments received by W-D Lender from the Mezzanine Loan Borrower

prior to full satisfaction of the Anglo Senior Loan, were required to be held in trust and remitted

to Anglo Irish Bank. (Id.)

### 3.    443 Partners' Efforts to Develop the Property and the Extensions of the Anglo Senior Loan

The Amended Complaint alleges that prior to the redevelopment of the Property, 443

Partners needed to remove existing tenants, develop architectural and design plans, determine

appropriate branding and partnership opportunities, obtain clearance from various New York

City agencies and community boards, secure zoning and construction permits, and secure

construction financing. (Am. Compl.  ¶ 33.)  As the Operations Member of 443 Partners, SKG

was responsible for the completion of these tasks, and to that end, prepared a development

budget of approximately $100 million that 443 Partners approved. (Id. ¶ 34.)

The Amended Complaint alleges that by May 5, 2008, SKG had obtained a loan term

sheet for construction loan financing from Pacific National Bank. (Id. ¶ 36.)  The Amended

Complaint further alleges that Dagmi, on behalf of W-D Partner, directed SKG not to pursue the

Pacific National Bank loan, but rather to explore construction financing with UBS, a bank at

which Wertheimer had many personal contacts. (Id. ¶ 37.)  In June 2008, UBS offered

construction loan financing terms which were less favorable than those offered by Pacific

National Bank. (Id. ¶ 38.)  The Amended Complaint further alleges that "notwithstanding

Wertheimer's contacts at the upper reaches of UBS, the W-D Defendants summarily rejected

6

UBS's terms" and declined further negotiation with the bank. (Id. ¶ 39.)  By this time, however, the Pacific National Bank loan term sheet had expired, and the Property was still without construction financing.  Nonetheless, the Amended Complaint alleges that W-D Partner and W-D Lender "repeatedly told Plaintiffs, Anglo Irish Bank, and others, that they would provide all necessary funds to develop the 443 Property." (Id. ¶ 40.)

The Amended Complaint also alleges that early in the summer of 2008, a few months prior to the Anglo Senior Loan maturity date of October 1, 2008, 443 Partners was preparing to spend more than $500,000 in furtherance of redeveloping the Property. (Id. ¶ 42.)  Prior to releasing the payments, Karmely sought and received assurances from both Dagmi and Dagmi's daughter[4] that "they had spoken to, and met with, Wertheimer, and that Wertheimer was funding 100% of the 443 Property development" and that Karmely should "deliver the payments without delay." (Id. ¶ 43.)  In reliance on these promises, SKG sent the payments to further redevelop the property, and ceased discussions with other institutional lenders about the possibility of providing construction financing. (Id. ¶ 44.)

443 Partners, by Karmely and Dagmi, entered into negotiations to extend the Anglo Senior Loan, which was scheduled to mature on October 1, 2008. (Id. ¶ 45.)  The Anglo Senior Loan was ultimately extended to December 31, 2009. (Id. ¶ 49.)  In consideration of this extension, Anglo Irish Bank insisted that the principals of 443 Partners (1) pre-pay an interest and carry reserve of several million dollars; (2) provide $20 million in personal security for the loan; and (3) give a $10 million personal completion guaranty. (Id. ¶ 46.)  The Amended Complaint alleges that Plaintiffs would not have agreed to these terms were it not for their reliance on Dagmi's affirmative statements that the W-D Defendants would fund the

---

[4] Desiree Dagmi was one of W-D Partner's designees to the Company's Board of Managers. (Am. Compl. ¶ 43.)

construction to completion without "punitively diluting Plaintiffs as allowed in the Operating

Agreement." (<u>Id.</u> ¶ 47.)  On November 19 and 21, 2008, in reliance on the W-D Defendants'

promises and assurances, SKG posted $4.3 million in cash, "representing its share of the

additional capital contribution required by the bank, and Karmely signed the completion and

other guarantees" required by Anglo Irish Bank to extend the Anglo Senior Loan maturity date to

December 31, 2009. (<u>Id.</u> ¶ 49.)  Although W-D Lender, as the Mezzanine Loan Lender,

expressly agreed to the Anglo Senior Loan maturity date extension, there was no "discussion at

this time, or indeed any time," about extending the Mezzanine Loan maturity date past October

1, 2009. (<u>Id.</u> ¶ 51.)

  In a meeting on December 9, 2008, after the Anglo Senior Loan was extended, the W-D

Defendants once again reaffirmed Dagmi's affirmative statements to fund the project to

completion. (<u>Id.</u> ¶ 52.)  At this meeting, however, Plaintiff alleges that "the [W-D Defendants]

raised the possibility that [the W-D Defendants] might invoke the punitive dilution provisions of

the Operating Agreement." (<u>Id.</u>)  On December 24, 2008, Dagmi, on behalf of the W-D

Defendants confirmed the continued funding of the redevelopment of the project by instructing

Karmely to inform Anglo Irish Bank "that in 2009 we intend to spend approximately 20 [million

dollars] and the rest in 2010/11." (<u>Id.</u> ¶ 53.)

  The Amended Complaint alleges that throughout 2009, Karmely and SKG continued

their efforts to redevelop the 443 property by meeting with hotel designers, architects, and

contractors.[5] (<u>Id.</u> ¶ 55.)  Karmely and SKG also put in place a "Site Safety Plan" for the property

and met with potential lenders and investors. (<u>Id.</u> ¶ 56.)

---

[5] The Amended Complaint alleges that SKG continued in its efforts to further develop the Property throughout 2009 by meeting with architects to fine-tune architectural plans, as well as with general contractors to solicit bids for the development of the Property. (<u>Id.</u> ¶ 54.)

Towards the end of 2009, 443 Partners once again entered into negotiations to further extend the $85 million Anglo Senior Loan. (Id. ¶ 58.)  On or about July 30, 2010, 443 Partners and Anglo Irish Bank reached an agreement extending the maturity date to December 31, 2010, with the possibility of a further extension until December 31, 2011. (Id. ¶ 60.)  One of Anglo Irish Bank's conditions for granting this extension of the maturity date was for 443 Partners to pay $1.2 million as an interest and carry reserve, of which SKG paid approximately $250,000. (Id. ¶ 59.)  Karmely also restated his Personal Guarantees as part of the extension of the Anglo Senior Loan maturity date. (Id.)  Throughout these negotiations, there were no discussions about extending the maturity date of the $20 million Mezzanine Loan, which had matured on October 1, 2009. (Id. ¶¶ 51, 62.)

### 4. The Default and Sale of SKG's Interests

On September 30, 2010, W-D Lender sent a letter to SKG and W-D Partner, stating in pertinent part that "[t]he maturity date of the [Mezzanine] Loan was October 1, 2009, (the "Maturity Date") and the principal amount of the [Mezzanine] Loan in the amount of $20,000,000, plus accrued interest in the amount of $7,459,999 was due on the Maturity Date and was not paid by the Borrower . . . [t]herefore, you are hereby notified that a default has occurred and is continuing under the Note, and that an Event of Default has occurred and is continuing under the [Mezzanine] Loan Agreement and Pledge Agreement." (Id. ¶ 63; Wilson Decl., Ex. 7.)  On October 4, 2010, W-D Lender sent a letter to SKG informing SKG of its intent to sell the SKG 20% membership interest in 443 Partners at a public auction to be held on October 20, 2010. (Id. ¶ 66; Wilson Decl., Ex. 8.)  W-D Lender also ran advertisements in the NEW YORK TIMES on October 10, 13, and 15, 2010, and in the WALL STREET JOURNAL on

October 13, 2010, announcing the date and time of the sale. See SK Greenwich LLC v. W-D Group (2006) LP, No. 10 Cv. 7846, 2010 WL 4140445, at *2 (S.D.N.Y. Oct. 21, 2010).

On October 12, 2010, SKG filed a complaint in New York State Supreme Court seeking: (1) a declaratory judgment that SKG was not in default of its obligations under the Mezzanine Loan Agreement, Promissory Note, or Pledge Agreement, and that pursuant to the agreements, there was no Event of Default and no money was due under the Note until (a) payments to WD-Lender were permitted under the Anglo Senior Loan documents, and (b) there was Available Net Cash Flow or Capital Events Proceeds, as defined in the Operating Agreement; and (2) an order barring W-D Lender from selling SKG's membership interest. Id., at *3-4. That complaint, personally verified by Karmely, also stated that "the real property owned by 443 Partners, is under water and the membership interests of SKG and [W-D Partner] have no or little value." (Wilson Decl., Ex. 6 ¶ 6.)

On October 14, 2010, Defendants removed the case to this Court. SK Greenwich, 2010 WL 4140445, at *2. On October 15, 2010, Plaintiffs filed an Order to Show Cause in this Court as to why a preliminary injunction and temporary restraining order should not be entered in its favor. Id. Defendants countered that due to 443 Partners inability to finance the project, the property was vacant, not generating any income, and that SKG had obstructed their efforts to sell the property since 2009. Id., at *6. Oral Argument on the matter was held on October 19, 2010 at 9:45 a.m. On October 20, 2010 at 9:35 a.m., the Court denied Plaintiffs' motion for a temporary restraining order and preliminary injunction stating that an Opinion would be forthcoming. (Wilson Decl., Ex. 10.) On October 21, 2010, the Court issued an Opinion stating that "[w]hile Plaintiff might be able to demonstrate that it would suffer irreparable harm resulting from the sale of its interest in a commercial real estate property, it has failed to show that it has a

10

likelihood of succeeding on the merits, or that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in the movant's favor." Id., at *6.

On October 20, 2010, W-D Lender auctioned Plaintiffs' interest in 443 Partners. (Am. Compl. ¶ 69.)  W-D Lender's representative was the only attendant at the auction and acquired SKG's membership interest for $100,000. (Id. ¶ 68-69.)  On January 4, 2011, Anglo Irish Bank declared 443 Partners in default for failure to pay the Anglo Senior Loan on its maturity date of December 31, 2010.  Days later, the Wertheimer family, through W. Family 1 Ltd., purchased the Anglo Senior Loan from Anglo Irish Bank. (Am. Compl. ¶¶ 72-73.)  The Amended Complaint, filed on August 19, 2011, alleges on information and belief that the current fair market value of the Property today is thought to be at least $140 million. (Id. ¶ 78.)  Plaintiffs also allege that Defendants have not compensated them for their efforts to redevelop the property, for the $9.5 million in capital contributions they made toward the Property's redevelopment, or for the $800,000 they incurred in overhead expenses. (Id. ¶¶ 75-78.)

## II.     LEGAL STANDARD

Pursuant to Fed. R. Civ. P. 12(b)(6), a defendant may move to dismiss a claim if the plaintiff fails to state a claim upon which relief may be granted.  A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of a complaint.  In coming to its decision, the court must accept as true all of the allegations in the complaint and draw all reasonable inferences in favor of the plaintiff.  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).  A claim will survive a motion to dismiss only if it has "facial plausibility" – meaning that "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  On a motion to dismiss, the court may consider "the facts stated on the

11

face of the Complaint and in documents appended to the Complaint or incorporated in the

Complaint by reference, as well as [] matters of which judicial notice may be taken." <u>Hertz</u>

<u>Corp. v. City of New York</u>, 1 F.3d 121, 125 (2d Cir. 1994).

"Although for the purposes of a motion to dismiss [the court] must take all of the factual

allegations in the complaint as true, [it is] not bound to accept as true a legal conclusion couched

as a factual allegation." <u>Iqbal</u>, 129 S. Ct. at 1949-50 (citations omitted).  "[W]here the well-

pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the

complaint . . . has not 'show[n]' – 'that the pleader is entitled to relief.'" <u>Id.</u> at 1950 (quoting

Fed. R. Civ. P. 8(a)(2)).  "Determining whether a complaint states a plausible claim for relief

will . . . be a context-specific task that requires the reviewing court to draw on its judicial

experience and common sense." <u>Id.</u>

### III.     DISCUSSION

Defendants argue that the Amended Complaint fails to state a plausible claim for relief,

and is thus subject to dismissal.  Specifically, Defendants argue that under the terms of the

Mezzanine Loan Documents, W-D Lender was authorized to foreclose on SKG's interest in 443

Partners. (Defs.' Mem. in Supp. of Mot. to Dismiss ("Defs.' Mem.") at 7 ("defendants actions

were expressly authorized by the clear and unambiguous terms of the [Mezzanine Loan

Documents] . . . Accordingly, plaintiffs' contract claims cannot survive a motion to dismiss.").)

Plaintiffs argue that Defendants "fabricate[d] a default on the Mezzanine Loan and

wrongly deprived [SKG] of its membership interest . . . [to] simply take the whole Company for

themselves without making any payment .  .  . to [SKG]." (Am. Compl. ¶ 30.)  In support of this

allegation, Plaintiffs assert three distinct arguments: (1) SKG was not in default because the

Intercreditor Agreement was incorporated by reference into the Mezzanine Loan Agreement, and

12

thus no payments were due on the Mezzanine Loan until the Anglo Senior Loan had been satisfied in full, (Pls.' Mem. in Opp. to Defs.' Mot. to Dismiss ("Pls.' Mem.") at 9-14); (2) Defendants' argument that non-payment of the Mezzanine Loan constituted a default under Section 3.1(c) of Mezzanine Loan Agreement lacks credible support because such an interpretation of Section 3.1(c) would render Section 3.1(a) of the Agreement extraneous, a contract construction not permitted under New York law, (id. at 15-17); and (3) Defendants' argument that the Mezzanine Loan was due on the original maturity date is tautological, (id. at 17-18).

In interpreting a contract under New York law, the Court must consider all the provisions to determine the intent of the parties, and "words and phrases . . . should be given their plain meaning." LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 206 (2d Cir. 2005). If the language of the contract is clear and unambiguous, the Court may dismiss a breach of contract claim on a Rule 12(b)(6) motion. See, e.g., Advanced Mktg. Group, Inc. v. Bus. Payment Sys., LLC, 300 F. App'x 48, 49 (2d Cir. 2008); Maniolos v. United States, 741 F. Supp. 2d 555, 567 (S.D.N.Y. 2010).

**A.      Plaintiffs Fail to State a Claim for Breach of the Mezzanine Loan Documents**

**1.      The Language of the Mezzanine Loan Agreement Is Clear and Unambiguous**

The Mezzanine Loan Agreement clearly states that "the Borrower will pay the Debt as provided in the Note," (Wilson Decl., Ex. 3 § 2.1), and that "[n]othing in this Agreement or in the Note shall affect the obligation of the Borrower to pay the Debt in the manner and place therein respectively expressed," (Id. § 4.26(c)). The Note states that on the maturity date of October 1, 2009, "the balance of principal, and the accrued and unpaid interest then remaining unpaid shall become due and payable." (Id., Ex. 4 at 1.)

13

As noted <u>supra</u>, by letter dated September 30, 2010, Defendant W-D Lender sent notice to SKG and W-D Partner which stated that they were in default under the terms of the Mezzanine Loan Agreement.  Defendants point out that their notice to Plaintiffs made clear that an Event of Default had occurred under Section 3.1(c) of the Mezzanine Loan Agreement since SKG and W-D Partner, the principals of 443 Partners, (collectively, as the "Borrower"), failed to pay the balance of the principal and interest on the Mezzanine Loan when it became due on the maturity date (October 1, 2009) as provided in the Mezzanine Loan Documents.  Section 3.1(c) of the Mezzanine Loan Agreement defines an Event of Default as follows:

> the failure by Borrower or any other party to any Loan Document other than this Agreement to observe or perform any agreement, covenant or obligation of it contained in such Loan Document, which failure continues beyond the expiration of any applicable notice and cure period if one is provided

(<u>Id.</u>, Ex. 3 § 3.1(c).) The language of Section 3.1(c) is clear and unambiguous and Plaintiffs make no claim to the contrary.  Thus, an Event of Default had occurred under the Mezzanine Loan Note and Pledge and Security Agreement.

### 2.      Nothing in the Intercreditor Agreement Relieved the Mezzanine Borrower's Obligation to Pay the Mezzanine Loan

Plaintiffs' principal argument is that the terms and conditions of the Intercreditor Agreement were incorporated by reference into the Mezzanine Loan Agreement and, as such, the two documents must be read in conjunction. (Pls.' Mem. at 10.)  However, the Intercreditor Agreement, an agreement solely between Anglo Irish Bank and W-D Lender,[6] contains an

---

[6] The Intercreditor Agreement explicitly states that:

> This agreement is for the sole benefit of the Anglo Senior Lender, Mezzanine Lender and their respective successors and assigns.  Nothing herein shall be deemed to modify, limit, or in any way affect the rights and obligations of Borrower or any Guarantor under the Anglo Senior Loan Documents or the Mezzanine Loan Documents, except as otherwise expressly set forth herein.  Neither Borrower nor any Guarantor is or shall be deemed to be a third-party beneficiary hereunder.

express provision that none of its terms shall prohibit W-D Lender, the Mezzanine Lender, from exercising all remedies permitted pursuant to the Mezzanine Loan Documents[7]:

> The foregoing provisions are solely for the purpose of defining the relative rights of the holder or holders of the Mezzanine Loan and the holder or holders of the Anglo Senior Loan, and <u>nothing herein shall impair, as between the Mezzanine Borrower and Mezzanine Lender, the obligation of the Mezzanine Borrower, which is unconditional and absolute, to pay the Mezzanine Loan in accordance with its terms, nor shall anything herein prevent Mezzanine Lender from exercising all remedies otherwise permitted by applicable law or under the Mezzanine Note, Mezzanine Pledge or other Mezzanine Loan Documents, subject to the provisions of this Agreement.</u>

(Wilson Decl., Ex. 2 ¶ 8(h)(i) (emphasis added).)

Furthermore, Paragraph 7(b) of the Intercreditor Agreement, entitled "Remedies of the Mezzanine Lender," expressly permitted W-D Lender to initiate an enforcement action:

> <u>Notwithstanding the foregoing</u>, Anglo Senior Lender hereby acknowledges and agrees that no consent shall be required for Mezzanine Lender to institute or pursue an Enforcement Action . . . or to acquire, or cause a nominee wholly owned by Mezzanine Lender reasonably approved by Anglo Senior Lender . . . <u>to acquire, the Ownership interests as a result of an Enforcement Action upon the occurrence of an event of default under the Mezzanine Loan Documents</u> . . . .

(<u>Id.</u>, Ex. 2 ¶ 7(b)(emphasis added).)

Paragraph 4(c) of the Intercreditor Agreement also contemplates a default of the Mezzanine Loan, and provides express authorization for the Mezzanine Lender to take action by stating that "the foregoing shall not prohibit Mezzanine Lender from exercising its rights under the Mezzanine Pledge [and Security Agreement] . . . including the right to accelerate the Mezzanine Loan and pursue an Enforcement Action." (<u>Id.</u>, Ex. 2 ¶ 4(c).)

---

(Wilson Decl., Ex. 2 ¶ 22.)

[7] The Mezzanine Note and the Mezzanine Pledge and Security Agreement are collectively referred to as the "Mezzanine Loan Documents" in the Intercreditor Agreement. (<u>See</u> Wilson Decl., Ex. 2 Recital C.)

Furthermore, as Defendants correctly note, the Intercreditor Agreement does not include any provision permitting an extension of the maturity date of the Mezzanine Loan, nor does the Amended Complaint allege that Plaintiffs ever applied for, or took any steps to obtain, an extension of the maturity date. (Defs.' Mem. at 11-12.)  Moreover, as discussed infra, the Mezzanine Loan Agreement, and Pledge and Security Agreement contain provisions that cannot be changed or modified except in a writing signed by the parties, (Wilson Decl., Ex. 3 § 4.26(a) and (d), Ex. 5 § 10), and the Note contains the provision that it "may not be changed or terminated orally," (id., Ex. 4 ¶ 10).  Accordingly, the Amended Complaint's suggestion that extensions of the Anglo Senior Loan maturity date also extended the maturity date of the Mezzanine Note and Pledge and Security Agreement is not supported by any provision of the Mezzanine Loan Documents.

Plaintiffs argue that no payments of the principal of the Mezzanine Loan was due under the "express terms" of the Intercreditor Agreement. (Pls.' Mem. at 11.)  The Amended Complaint quotes the language in the Intercreditor Agreement as follows: "unless and until the Anglo Senior Loan is paid and performed in full . . . Mezzanine Lender shall have no right to receive any payment with respect to the Mezzanine Loan, or to exercise any rights or remedies with respect to the Mezzanine Loan." (Am. Compl. ¶ 22(a) (quoting Wilson Decl., Ex. 2 Recital E).)  However, the ellipsis in the above quotation replaces the phrase "except as otherwise expressly permitted hereunder." (See Wilson Decl., Ex. 2 Recital E.)  Tellingly, Plaintiffs make no reference to paragraphs 4(c), 7(b), and 8(h)(i) of the Intercreditor Agreement.  Furthermore, the Amended Complaint's transcription of paragraph 4(d) of the Intercreditor Agreement is somewhat misleading, as it omits a pertinent section that deals with the event that W-D Lender did receive payments from 443 Partners or SKG and W-D Partner (collectively, the "Borrower").

The full language of paragraph 4(d) makes clear that while "no payment whatsoever shall be made to the Mezzanine Lender," in the event that W-D Lender <u>did</u> receive payments from the Borrower, it was bound to hold such payments in trust for the Anglo Senior Lender and "promptly pay and deliver the same to Anglo Senior Lender for the benefit on Anglo Senior Lender." (<u>Id.</u>, Ex. 2 ¶ 4(d).)  Thus, the terms of the Intercreditor Agreement contemplated that W-D Lender might receive payments from the Borrower, and outlined W-D Lender's obligations if such a situation came to pass.  In any event, Plaintiffs have no right to enforce the provisions of the Intercreditor Agreement as neither Karmely, SKG, or 443 Partners were parties to the Intercreditor Agreement, or third party beneficiaries of that agreement.[8]

### 3. Plaintiffs' Other Arguments

Plaintiffs argue that "Defendants' contention that non-payment of the Mezzanine Loan constituted a default under Section 3.1(c) would render Section 3.1(a) extraneous, a construction not permitted under New York law." (Pls.' Mem. at 15 (citing <u>Bailey v. Fish & Neave</u>, 8 N.Y.3d 523, 528 (2007) ("courts may not by construction add or excise terms")).)  Section 3.1 of the Mezzanine Loan Agreement defines "Event of Default" as the "occurrence of any one or more of the following events," and then lists a series of events.  (Wilson Decl., Ex. 3 § 3.1.)  Section 3.1(a) defines "Event of Default" as:

---

[8] The Intercreditor Agreement provides that:

> This Agreement is for the sole benefit of Anglo Senior Lender, Mezzanine Lender and their respective successors and permitted assigns. Nothing herein shall be deemed to modify, limit, or in any way affect the rights and obligations of Borrower or any Guarantor under the Anglo Senior Loan Documents or the Mezzanine Loan Documents, except as otherwise expressly set forth herein.  Neither Borrower nor any Guarantor is or shall be deemed to be a third-party beneficiary hereunder.

(Wilson Decl., Ex. 2 ¶ 22.)

the failure by the Borrower to pay any installment of principal, interest, or other payments required under the Note when due, provided however that at the time such payment is due (i) payments to the Lender are permitted under the Senior Loan Documents, and (ii) there is Available Net Cash Flow or Capital Events Proceeds (as defined in the Operating Agreement of 443 Partners).

(Id., Ex. 3 § 3.1(a).)[9]  As noted supra, Section 3.1(c) defines "Event of Default" as:

the failure by the Borrower or any other party to any Loan Document other than this Agreement to observe or perform any agreement, covenant or obligation of it contained in such Loan Document, which failure continues beyond the expiration of any applicable notice and cure period if one is provided;

(Id., Ex. 3 § 3.1(c).)

Plaintiffs contend that Section 3.1(a) of the Mezzanine Loan Agreement should be interpreted to encompass the payment of principal and interest on the maturity date – not limited to installments of principal – and includes any payment of "principal, interest, or other payments required under the Note when due." (Tr. of Feb. 10, 2012 Oral Arg. ("Tr.") at 46.)  Accordingly, Plaintiffs maintain that Section 3.1(c) is rendered extraneous.  Section 3.1(a) of the Mezzanine Loan Agreement, however, by its terms applies only to installment of principal payments, not to the full payment of the Note upon its maturity date, and thus by the plain language of the "Event of Default" section of the Mezzanine Loan Agreement, the provisions of Section 3.1(a) and Section 3.1(c) do not conflict with each other.

The drafters of the Mezzanine Loan Documents elected to define default under Section 3.1(a) of the Mezzanine Loan Agreement as "the failure by the Borrower to pay any installment

---

[9] Plaintiffs argue that, "even if a payment were late, the Borrower would not be in default if such payments were prohibited under the Anglo Senior Loan documents or if [443 Partners] lacked available cash flow or proceeds from the sale of partnership property to pay the Mezzanine Loan." (Pls.' Mem. at 16.)  As the Intercreditor Agreement of the same date makes clear in paragraphs 8(h)(i), 7(b), and 4(c), however, W-D Lender maintained the right to foreclose on the membership interests of Plaintiffs in 443 Partners in the Event of Default under the Mezzanine Loan Documents. (See supra pp. 14-17.)

of principal, interest, or other payments required under the Note when due . . . ." (Wilson Decl., Ex. 2 § 3.1(a) (emphasis added).)  Black's Law Dictionary defines "installment" as "a periodic partial payment of a debt." Black's Law Dictionary 868 (9th ed. 2009.)  The language of Section 3.1(a) thus limits the effect of this default to the failure to make payments of installments of principal, not failure to pay the principal upon the Maturity Date.[10]  Interpreting Section 3.1(a) of the Mezzanine Loan Agreement as Plaintiffs do, namely, as applying to non-payment of the principal and interest on the maturity date of the Note, could lead to the perpetual non-payment of the principal balance of the Mezzanine Loan if the project foundered or did not generate revenue.  It is not the practice of parties sophisticated in the development of real estate, as were the parties here, to enter into an agreement allowing perpetual non-payment of a loan.  The parties evidently intended that defaults under Section 3.1(a) be limited to payment of installments of principal and interest in order to give the Borrower approximately three years of "breathing room" to obtain construction financing and to further develop the project.

Additionally, Plaintiffs argue that payment was not due under the Mezzanine Loan because pursuant to the Operating Agreement, the Mezzanine Loan was a "Company Loan," and as such, the Mezzanine Loan was subordinate to the Anglo Senior Loan, and should only be repaid to the extent of available cash flow and capital event proceeds. (See Pls.' Mem. at 28-29; Tr. at 45.)  This argument, however, is also flawed.  Section 3.3(a) of the Operating Agreement states that "[a]ll loans made by the Members[11] to the Company [443 Partners] pursuant to this Section 3.3(a) shall be made on an unsecured basis . . . ." (Wilson Decl., Ex. 1 §3.3(a).)  As

---

[10] The phrase "or other payments required under the note when due," appears to refer to the Borrower's obligation under the Note to make payments to W-D Lender if it receives any equity distributions. (See Wilson Decl., Ex. 4 ¶ 2(i)-(ii).) Had the drafters intended § 3.1(a) to have the meaning Plaintiffs contend, they would not have inserted the phrase "any installment of."

[11] SKG and W-D Partner.

Defendants explain, however, the Mezzanine Loan cannot be considered an unsecured loan because it is secured by the collateral that is the very subject of this litigation. (See Tr. at 58-59; Wilson Decl., Ex. 5 ¶ 1.)  The Mezzanine Loan and the contribution of its proceeds by the members of 443 Partners are included in Section 3.1(a) of the Operating Agreement entitled "Initial Capital Contributions."  (Id., Ex. 1 § 3.1(a).)  Schedule A to the Operating Agreement defines "Company Loan" as "any loan made by a Member or its Affiliates to the Company pursuant to Section 3.1(d)(iv) or Section 3.3," (id., Ex. 1 Schedule A ¶ 30), and thus the Mezzanine Loan, made pursuant to Section 3.1(a), is not designated as a "Company Loan."

### 4.     The Mezzanine Loan Agreement Was Not Modified in Writing

Plaintiffs also posit that because the maturity date of the Anglo Senior Loan was extended twice, "it had the effect of extending the maturity of the Mezzanine Loan," because W-D Lender was unable to accept payment under the Anglo Senior Loan Agreement as long as the Anglo Senior Loan was outstanding. (Tr. at 50.)  This argument is another attempt by Plaintiffs to incorporate the provisions of the Intercreditor Agreement into the Mezzanine Loan Documents, notwithstanding the fact that they were not parties to, nor third party beneficiaries of, the Intercreditor Agreement.

Under Section 4.26(d) of the Mezzanine Loan Agreement, Section 10 of the Pledge and Security Agreement, and Paragraph 10 of the Note, modification of the terms of each of the Mezzanine Loan Documents could only be amended by a written agreement.[12] (See Wilson

---

[12] "No waiver by the Lender or modification of the terms [of the Mezzanine Loan Agreement] hereof shall be effective unless it is in writing and then only in the specific instance and for the specific purpose for which given and, notwithstanding anything to the contrary herein, all such waivers and modifications may be given or withheld in the sole judgment of the Lender . . . [t]he Borrower hereby irrevocably waives any right to claim that any provision of this Agreement, including the provisions set forth in this Subsection, have been waived orally or by the acts or omissions of the Lender." (Wilson Decl., Ex. 3 § 4.26(d).); "This [Pledge and Security] Agreement may not be changed, modified, or discharged in whole or in part unless set forth in a writing signed on behalf of the Secured

Decl., Ex. 3 § 4.26(d), Ex. 4 ¶ 10, Ex. 5 § 10.)  Plaintiffs have not alleged or asserted that a

writing exists that modifies the Maturity Date of the Mezzanine Loan, and thus the terms of the

Mezzanine Loan are unaffected by an extension of the maturity date of the Anglo Senior Loan in

the Intercreditor Agreement. See Lehman Bros. Holdings Inc. v. Walji, No. 09 Civ. 1995 (SHS),

2011 WL 184283, at *3 (S.D.N.Y. May 11, 2011) (finding an oral modification unenforceable

where the note and security agreement clearly and unambiguously prohibited oral modification

and required all amendments to be in writing and signed); John St. Leasehold, LLC v. F.D.I.C.,

196 F.3d 379, 382 (2d Cir. 1999) (stating that New York law enforces requirements of

amendment by writing "and does not permit oral modification when the original written

agreement provides that modification must be in writing and signed").

In sum, the language of the agreements regarding the parties' rights is clear and

unambiguous.  Section 8(h)(i) of the Intercreditor Agreement explicitly states that:

> nothing herein shall impair, as between the Mezzanine Borrower and Mezzanine
> Lender, the obligation of the Mezzanine Borrower, which is unconditional and
> absolute, to pay the Mezzanine Loan in accordance with its terms, nor shall
> anything herein prevent Mezzanine Lender from exercising all remedies
> otherwise permitted by applicable law or under the Mezzanine Note, Mezzanine
> Pledge or other Mezzanine Loan Documents, subject to the provisions of this
> Agreement.

(Wilson Decl., Ex. 2 § 8(h)(i).)  Furthermore, the "General Conditions" as laid out in Section

4.26 of the Mezzanine Loan Agreement, state that "[n]othing in this Agreement or in the Note

shall affect the obligation of the Borrower to pay the Debt in the manner and place therein

respectively expressed." (Id., Ex. 3 § 4.26(c).)  While the Intercreditor Agreement appears to

prohibit the Borrower from making any payments or W-D Lender from accepting any such

---

Party by one of its duly authorized officers." (Id., Ex. 5 § 10.); "The Note may not be changed or terminated orally."
(Id., Ex. 4 ¶ 10.)

payments on the Mezzanine Loan until the senior Anglo Loan has been satisfied in full, (id., Ex. 2 § 4(d)), the Intercreditor Agreement does not relieve Plaintiffs, non-parties to the Intercreditor Agreement, from their duty as parties to the Mezzanine Loan to adhere to the terms of the Mezzanine Loan Documents.  Thus, the language of the Mezzanine Loan Documents shows that 443 Partners, SKG and W-D Partner were in default under the terms of the Mezzanine Loan Documents, and as a result, W-D Lender was permitted to foreclose on the membership interests and sell Plaintiffs' membership interest, an action which the Intercreditor Agreement in Sections 4(c), 7(b), and 8(h)(i) contemplated.

**B.      Plaintiffs' Claim for Tortious Interference With Contract**

Plaintiffs' second claim alleges "that all Defendants, other than W-D Lender, were aware of the contractual and other relationships between [SKG] and W-D Lender," (Am. Compl. ¶ 85), and "acted with malice for the purpose of injuring [SKG]"and inducing W-D Lender to breach the contractual relationship with SKG, (id. ¶¶ 86, 87).  A claim for tortious interference with contract requires a plaintiff to show (1) the existence of a valid contract between plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom. Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 424 (1996).  For the foregoing reasons, Plaintiffs' tortious interference claim fails.

There are no factual allegations that any Defendant other than W-D Lender took any action to procure or induce W-D Lender to breach the Mezzanine Loan Documents.  Instead, the Amended Complaint uses conclusory language that lacks the specificity required for pleading a tortious interference with contract claim.  See e.g., Masefield AG v. Colonial Oil Industries, No. 05 Civ. 2231 (PKL), 2006 WL 346178, at *4 (S.D.N.Y. Feb. 15, 2006) (no tortious interference

22

with contract claim when Plaintiff merely provided conclusory allegations, unsupported by specific facts); Worldwide Commc'ns, Inc. v. Rozar, No. 96 Civ. 1056 (NRB), 1997 WL 795750, at *7-8 (S.D.N.Y. Dec. 30, 1997) (mere conclusory language will not suffice; the law requires specificity in pleading a claim for tortious interference with contract).

Furthermore, under New York law, since the Defendant entities are all affiliated companies, they have the "right to interfere" with each other's contracts "in order to protect [their] economic interests." Koret, Inc. v. Christian Dior, S.A., 554 N.Y.S.2d 867, 869 (N.Y. App. Div. 1990); accord MTI/The Image Group v. Fox Studios East, Inc., 690 N.Y.S.2d 576, 579 (N.Y. App. Div. 1999). Moreover, none of the Defendants other than W-D Lender that are alleged to have induced W-D Lender to breach the Mezzanine Loan Documents were "strangers" to those contracts. Messer's Wertheimer and Dagmi were the ultimate owners of all the W-D Defendants including W-D Lender and W-D Partner, and Mr. Dagmi executed the Mezzanine Loan Documents on behalf of both entities. Thus, neither W-D Partner nor any of the other W-D Defendants could have tortiously interfered with those contracts under New York law. See Primetime 24 Joint Venture v. Echostar Commc'ns Corp., No. 98 Civ. 6738 (RMB), 2002 WL 44133, at *8 (S.D.N.Y. Jan. 11, 2002) (only a "stranger" to a contract, such as a third party, can be liable for tortious interference with a contract under New York law); see also Kassover v. Prism Venture Partners, LLC, 862 N.Y.S.2d 493, 498 (N.Y. App. Div. 2008).

Plaintiffs also assert that a conflict of interest existed because Wertheimer and Dagmi were the principals of both W-D Partner and W-D Lender. (Am. Compl. ¶ 29.) Plaintiffs argue that this conflict was exacerbated by the Pledge and Security Agreement which gave W-D Lender – as holder of the Mezzanine Loan debt – the right to foreclose upon SKG's interest in 443 Partners. (Id.) Plaintiffs, however, were aware of W-D Lender's conflict with the interests

of W-D Partner as an owner from the beginning of their relationship with the Defendants.

Plaintiffs maintain that Defendants "fabricated a default" in an effort to take the whole Company

for themselves, "without making any payment or having to fulfill commitments to [SKG]." (Id. ¶

30.)  As discussed supra, however, a "fabrication" was not necessary as the right to foreclose on

SKG's interest in 443 Partners existed under the terms of the Mezzanine Loan Documents.

To rebut Defendants assertion that Plaintiffs have not pled with any degree of

specificity, Plaintiffs point to paragraphs 71-74 of the Amended Complaint. (Pls.' Mem. at 19.)

Therein, Plaintiffs allege that in January of 2011, W. Family 1 Ltd., an entity owned by Mr.

Wertheimer, purchased the Anglo Senior Loan after 443 Partners was declared to be in default

by Anglo Irish Bank. (Id. ¶¶ 72-73.)  With the purchase of the Anglo Senior Loan, Plaintiffs

allege that "the W-D Defendants acquired all the debt and equity in the 443 project." (Id. ¶ 74.)

Plaintiffs' allegation that Mr. Wertheimer's (W. Family 1 Ltd.) purchase of the Anglo Senior

Loan was "part of the W-D Defendants' strategic plan," (id. ¶ 72), and thus was somehow

improper, is not accompanied by any allegations of fact supporting a claim for tortious

interference with contract.  Plaintiffs have not alleged what actions Wertheimer, W. Family 1

Ltd., or any of the W-D Defendants took to induce W-D Lender to breach the contract.  The

tortious interference with contract claim is therefore dismissed.

## C.      Plaintiffs' Claim for Breach of the Operating Agreement

In their third claim, Plaintiffs allege that W-D Partner breached the Operating Agreement

by removing SKG as Operations Member of the Company and "denuded [SKG's] entitlement to

receive some or all of the SKG Preferred Return, as set forth in the Operating Agreement." (Am.

Compl. ¶ 90.)  Furthermore, Plaintiffs argue that pursuant to the Operating Agreement, SKG is

entitled to reimbursement from the Company and W-D Partner for costs incurred as Operations

Member in relation to the redevelopment of the Property. (Id. ¶¶ 91-92.)  These claims are also without merit.

As an initial matter, Plaintiffs were not removed as Operations Member for default under the Operating Agreement as it is defined in Section 11.1 of that Agreement. (See Wilson Decl., Ex. 1 § 11.1.)  Rather, Plaintiffs were removed as Operations Member for a default under the Mezzanine Loan Documents.  In view of this default on the Mezzanine Loan, W-D Lender, pursuant to the Mezzanine Note and Pledge and Security Agreement, was entitled to remove SKG as Operations Member.[13] (See Wilson Decl., Ex. 5 ¶ 1(h).)  Removal was proper since SKG, as a Pledgor, had placed as collateral for the Mezzanine Loan "all of [its] right, title and interest in . . . voting and rights to make decisions on behalf of the Company and the right to be named as a member on the books and records of the Company." (Id.)   SKG, as a Pledgor, also placed as collateral "all of [its] right, title and interest in . . . (d) property of the Company to which Pledgor now or in the future may be entitled . . . (f) general intangibles for money due or to become due . . . from the Company." (Id., Ex. 5 ¶ 1(d) and (f).)

Furthermore, after its default on the Mezzanine Loan and the subsequent foreclosure sale, SKG no longer had standing to make claims to continue as the Operations Member of 443 Partners, or make claims for any property of 443 Partners – property SKG now believes it is

---

[13] Paragraph 1 of the Mezzanine Pledge and Security Agreement provides that the Pledgor (defineds as SKG and W-D Partner):

> hereby pledges, hypothecates, mortgages, assigns, transfers and grants to the Secured Party [W-D Lender] . . . (h) all other rights of the Pledgor in the Company, including, without limitation, rights to reports, accounting, information, voting and rights to make decisions on behalf of the Company and the rights to be named as a member on the books and records of the Company and in all proceeds of the foregoing (all of the foregoing referred to in clauses (a) through (h) above, collectively, are hereinafter referred to as the "Collateral") upon and subject to the terms and conditions hereafter in this Agreement set forth.

(Wilson Decl., Ex. 5 ¶ 1(h).)

entitled to.  W-D Lender enforced its rights under the Pledge and Security Agreement – not the

Operating Agreement – thus Plaintiffs are not entitled to receive any claim to property under the

provisions of the Operating Agreement.

**D.      Plaintiffs' Claim for an Account Stated**

Plaintiffs bring a fourth claim for an account stated for approximately $800,000 in the

form of an imputed allocation of overhead charges on behalf of the Company, and for the

Company's accounts, pursuant to the Operating Agreement. (Am. Compl. ¶¶ 93-99.)  The

Operating Agreement calls for reimbursement of "all reasonable out-of-pocket costs, expenses

and salaries  . . . incurred by the Operations Member and its Affiliates in connection with

providing the Company with the services listed hereinabove as the Operations Member."

(Wilson Decl., Ex. 1 § 6.1(c)(v).)

As discussed <u>supra</u>, SKG and W-D Lender were the "Pledgor" to the Pledge and Security

Agreement in connection with W-D Lender's Mezzanine Loan of $20 million to SKG and W-D

Partner (collectively, as the "Borrower") in 2006.  As the Borrower defaulted on the Mezzanine

Loan Documents, Plaintiffs have lost their rights to any monies due under the Operating

Agreement. (<u>See</u> <u>supra</u> pp. 24-25.)  Nor do Plaintiffs allege any equitable grounds, i.e. fraud,

mistake, or deceit, upon which relief may be granted.

Furthermore, Plaintiffs have failed to adequately plead an account stated claim. Under

New York law, an "account stated" refers to a promise by a debtor to pay a stated sum of money

which the parties had agreed upon as the amount due. <u>See</u>, <u>e.g.</u>, <u>White Diamond Co., Ltd. v.</u>

<u>Castco, Inc.</u>, 436 F. Supp. 2d 615, 623 (S.D.N.Y. 2006).  The promise may be either express or

implied, but must be founded upon previous transactions creating the relationship of debtor and

creditor. Id.; see also Chisholm-Ryder Co., Inc. v. Sommer & Sommer, 421 N.Y.S.2d 455, 457

(N.Y. App. Div. 1979).

Here, Plaintiffs' Amended Complaint merely parrots the elements of an account stated

claim without providing any factual specifics other than the allegation that between September

2006 and October 2010 "[SKG] incurred costs of approximately $800,000 in the form of

imputed overhead on behalf of the company, and for the Company's accounts, pursuant to the

Operating Agreement." (Am. Comp. ¶ 94); see Bell Atlantic v. Twombly, 550 U.S. 544, 570

(2007) (plaintiff must plead enough facts to state a claim to relief that is plausible on its face).

While the Amended Complaint states that "[SKG] demanded that [443 Partners] pay these

amounts," it fails to state the amount of any account stated provided to Defendants, the nature of

the work provided, or the dates on which the statement of account was provided.

**E.       Plaintiffs' Claim for Breach of Fiduciary Duty**

Plaintiffs' fifth claim states that W-D Partner breached its fiduciary duties to SKG by (1)

inducing W-D Lender to breach the Mezzanine Loan Agreement and foreclosing on SKG's

interest, and (2) wrongfully terminating SKG as Operations Member of 443 Partners. (Am.

Compl. ¶¶ 29-31, 63-65, 70-71.)

In order to state a claim for breach of fiduciary duty under Delaware law,[14] Plaintiffs

must show that a fiduciary duty existed, and that W-D Partner breached that duty. See Beard

Research, Inc. v. Kates, 8 A.3d 573, 601 (Del. Ch. 2010).  It is important to note that fiduciary

duties "may be expanded or restricted or eliminated by provisions in the limited liability

company agreement." 6 Del. C. § 18-1101(c).  As such, Delaware law authorizes broad

---

[14] There is no dispute that 443 Partners and W-D Lender are Delaware limited liability companies, and that
Delaware law applies to this claim. (See Pls.' Mem. at 24 n.10.)

exculpation clauses, even to the extent of eliminating fiduciary duties altogether. See Abry Partners V, LP v. F & W Acquisition, LLC, 891 A.2d 1032, 1063 (Del. Ch. 2006). There is nothing in the Operating Agreement which states that W-D Partner had an affirmative duty to prevent a foreclosure sale on SKG's interests. The exculpation and indemnification clause of the Operating Agreement expressly limits the parties' obligations to those required by that Agreement. (See Wilson Decl., Ex.1 § 6.3(a)(ii).)

To the extent that Plaintiffs maintain that W-D Partner breached its duty to SKG by inducing W-D Lender to foreclose on SKG's interest, this argument lacks merit for reasons that have already been addressed with respect to Plaintiffs' claim for tortious interference with contract. While Plaintiffs argue that the exculpation clause does not limit liability for bad-faith acts or omissions, (Pls.' Mem. at 25), based on the clear and unambiguous language of the Mezzanine Loan Documents, if SKG defaulted, the Documents permitted the sale of its interest and its removal as Operations Member of 443 Partners by W-D Lender. (See Wilson Decl., Ex. 5 ¶ 1(h).) No breach of a fiduciary duty occurred since the Mezzanine Loan Documents contemplated that such a sale might occur. See Madison Realty Partners 7, LLC v. Ag ISA, LLC, 2001 WL 406268, at *6 (Del. Ch. Apr.17, 2001) (when a fiduciary duty claim is inconsistent with a contractual bargain, the fiduciary duty claim must fail).

## F.  **Plaintiffs' Promissory Estoppel Claim**

Plaintiffs' sixth claim alleges that W-D Defendants orally assured Plaintiffs that they would finance the redevelopment of the Property to completion. In reliance on this promise, Karmely provided personal completion guaranties to obtain extensions of the Anglo Senior Loan

maturity date to December 31, 2009 and December 31, 2010 respectively.[15] (Am. Compl. ¶¶ 40,

43, 47- 49, 103-104.)  Plaintiffs seek a declaratory judgment enjoining the W-D Defendants

"from taking any action to enforce any of the personal guaranties" provided by Karmely. (Am.

Compl. ¶ 106.)

In New York, a claim for promissory estoppel requires: (1) a clear and unambiguous

promise; (2) reasonable and foreseeable reliance on that promise; and (3) injury to the relying

party as a result of the reliance.  Ashland Inc. v. Morgan Stanley & Co., Inc., 700 F. Supp. 2d

453, 472 (S.D.N.Y. 2010).  Here, Plaintiffs have failed to set forth any injury sustained as a

result of signing the guaranties.  Plaintiffs do not allege that Anglo Irish Bank, or the present

owner of the Anglo Senior Loan, have taken, or have threatened to take, any steps to collect on

the personal guaranties. (Tr. at 55.)  A declaratory judgment order, however, requires a ripe

controversy. See Friends of the Earth Inc. v. Laidlaw Envtl. Servs., 528 U.S. 167, 180-81 (2000)

(injury must be actual or imminent, not conjectural or hypothetical).  Under the present

circumstances, the Court finds that Plaintiffs' request for a declaratory judgment is not ripe for

adjudication.  Thus, Plaintiffs' sixth cause of action based on promissory estoppel does not lie.

## IV.    CONCLUSION

---

[15] Defendants argue that the alleged oral promises by the W-D Defendants that they would fund 100% of the 443
Property development violate New York's statute of frauds.  The New York statute of frauds provides in pertinent
part that an "interest in real property . . . cannot be created, granted, assigned, surrendered or declared, unless by act
or operation of law, or by a deed or conveyance in writing, subscribed by the person creating, granting, assigning,
surrendering or declaring the same." N.Y. Gen. Oblig. Law § 5-703(1).  Defendants argue that "the statute of frauds
also applies to construction loans, which like traditional mortgages, are secured by an interest in the underlying
property." (Defs.' Mem. at 27.)  As such, Defendants contend that Plaintiffs can only invoke the doctrine of
promissory estoppel if they can demonstrate unconscionable injury as a result of Defendants' oral promises. (Id.)
Plaintiffs argue that the application of the statute of frauds is a factual issue that cannot be resolved by this motion.
Specifically, they argue that "nothing in the limited record . . . warrants a conclusion, as a matter of law, that a loan
by Defendants would have been secured by an interest in real property, and thus subject to the statute of frauds."
(Pls.' Mem. at 29 (emphasis in original).)  The Court need not determine if the statute of frauds applies to
Defendants' oral promises to provide construction financing because Defendants have not shown that Plaintiffs'
personal guarantees are or will be sought to be enforced against Plaintiffs.

For the foregoing reasons, the Defendants' motion to dismiss (ECF No. 19) is granted in its entirety.

IT IS SO ORDERED.

Dated:  New York, New York
        August 20, 2012

                                        Robert P. Patterson, Jr.
                                                U.S.D.J.

**Copies of this order were faxed to:**

*Counsel for Plaintiffs*:

Jamie Benjamin Walton Stecher
Tannenbaum Helpern Syracuse & Hirschtritt LLP
900 Third Avenue
New York, NY 10022
(212)-508-6738
Fax: (212)-937-3621
Email: stecher@thshlaw.com

Amy Susan Beard
Tannenbaum Helpern Syracuse & Hirschtritt LLP
900 Third Avenue
New York, NY 10022
(212)-508-6700
Fax: (212)-371-1084
Email: beard@thshlaw.com

Carl David Lesueur
Phillips Nizer LLP
666 5th Avenue
New York, NY 10103
(212)-508-6792
Fax: (212)-858-6792
Email: clesueur@phillipsnizer.com

David Jeffrey Kanfer
Talisman, Rudin & DeLorenz P.C.,
499 Fulton Street
Brooklyn, NY 11201
212-508-6700
Fax: 646-390-6946
Email: kanfer@thsh.com

David Allan Pellegrino
Phillips Nizer LLP
666 5th Avenue
New York, NY 10103
(212)-977-9700
Fax: (212)-262-5152
Email: dpellegrino@phillipsnizer.com

31

*Counsel for Defendants*:

Bradley Reid Wilson
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
(212)-403-1000
Fax: (212)-403-2108
Email: brwilson@wlrk.com

Stephen R. DiPrima
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
(212) 403-1382
Fax: (212) 403-2000
Email: srdiprima@wlrk.com

32