# UNITED STATES COURT OF APPEALS

## FOR THE
## SECOND CIRCUIT

**MANDATE**

_____

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 17th day of December, two thousand and thirteen.

Before:     Jon O. Newman,
            Ralph K. Winter,
            Christopher F. Droney,
                    *Circuit Judges*.

1:11-cv-00541-RPP

_____

Shahab Karmely, SK Greenwich LLC,

    Plaintiffs - Appellants,

                                                        **JUDGMENT**
                                                        Docket No. 12-3781

v.

Eitan Wertheimer, Ezra Dagmi, W-D Group (2006) LP, W-D Group NY1, LLC, John Does, 4-20, 443 Greenwich LLC, 443 Greenwich Partners LLC, W. Family 1 Ltd.,

    Defendants - Appellees.

Anglo Irish Bank Corporation Limited,

    Defendant,

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: January 9, 2014

_____

        The appeal in the above-captioned case from a judgment of the United States District Court for the Southern District of New York was argued on the district court record and the parties' briefs. Upon consideration thereof,

        IT IS HEREBY ORDERED, ADJUDGED and DECREED that the judgment of the district court is VACATED and REMANDED in accordance with the opinion of this court.

                     For The Court:

                     Catherine O'Hagan Wolfe,

                     Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

MANDATE ISSUED ON 01/09/2014

12-3781-cv
Karmely v. Wertheimer

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2013

Heard: June 26, 2013          Decided: December 9, 2013

Docket No. 12-3781-cv

- - - - - - - - - - - - - - - - - - - - - - - - -
SHAHAB KARMELY, SK GREENWICH LLC,
     Plaintiffs-Appellants,

                    v.

EITAN WERTHEIMER, EZRA DAGMI, W-D GROUP (2006)
LP, W-D GROUP NY1, LLC, JOHN DOES, 4-20, 443
GREENWICH LLC, 443 GREENWICH PARTNERS LLC,
W. FAMILY 1 LTD.,
     Defendants-Appellees,

ANGLO IRISH BANK CORPORATION LIMITED,
     Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - -

Before: NEWMAN, WINTER, and DRONEY, <u>Circuit Judges</u>.

     Appeal from the August 22, 2012, judgment of the United

States District Court for the Southern District of New York

(Robert P. Patterson, District Judge), granting a motion to

dismiss a complaint challenging foreclosure of collateral for

nonpayment of a loan. The Appellants contend that ambiguities

in the relevant documents preclude granting a motion to dismiss.

     Judgment vacated, and case remanded for further proceedings.

-1-

> David A. Pellegrino, Phillips Nizer LLP, New York, NY (Chryssa V. Valletta, Carl D. LeSueur, Phillips Nizer LLP, New York, NY; John J. Giardino, NYT Law Group, New York, NY, on the brief), for Appellants.
>
> Stephen R. DiPrima, New York, NY (Bradley R. Wilson, Wachtell, Lipton, Rosen & Katz, New York, NY, on the brief), for Appellees.

JON O. NEWMAN, <u>Circuit Judge</u>.

This appeal presents the recurring issue of whether relevant documents are ambiguous, precluding their interpretation on a motion to dismiss, but the issue arises in the unusual context of an agreement for a loan from a lender to himself and his partner. A minor though intriguing issue, rarely if ever encountered in a judicial opinion, is whether the character "i" identifying a subparagraph in one of the documents is a lower case letter "i" or a lower case version of a Roman numeral "I," sometimes referred to as a romanette.[1]

_____

[1] The term "romanette" was discussed during the oral argument of two cases in the Supreme Court in 2008, <u>see</u> http://www.volokh.com/posts/1226638091.shtml (Nov. 18, 2008); http://legaltimes.typepad.com/blt/2008/12/romanette-revisited.html (Dec. 18, 2008), and has occasionally been mentioned in opinions of federal courts, <u>see</u> <u>Gourche v. Holder</u>, 663 F.3d 882, 887 (7th Cir. 2011); <u>United States v. Goodpasture</u>, 595 F.3d 670, 671 (7th Cir. 2010); <u>In re 15375 Memorial Corp. v. Bepco, L.P.</u>, 589 F.3d 605, 613 n.6 (3d Cir. 2009), although none of these opinions had to distinguish between a lower case letter

Plaintiffs-Appellants Shahab Karmely and SK Greenwich LLC appeal from the August 21, 2012, order of the United States District Court for the Southern District of New York (Robert P. Patterson, Jr., District Judge), granting the motion to dismiss by Defendants-Appellees Eitan Wertheimer, Ezra Dagmi, 443 Greenwich LLC, 443 Greenwich Partners, LLC, W. Family 1 Ltd., W-D Group (2006) LP, W-D Group NY1, LLC, and John Does 4-10.

We conclude that in two respects the documents are ambiguous, precluding dismissal of the Amended Complaint, and we therefore remand for further proceedings.

### Background

The following facts are taken from the Amended Complaint and assumed to be true for purposes of the motion to dismiss.

<u>People and entities.</u>  Appellant Karmely is an experienced New York City real estate developer.  Appellee Eitan Wertheimer is an Israeli citizen, and Appellee Ezra Dagmi is a dual citizen of Israel and the United Kingdom.  Dagmi and Werthheimer are close friends and partners in real estate ventures.  Dagmi and

---

"i" and a lower case version of a Roman numeral "I."  The first reported use of the term in a court opinion occurred in 1999. <u>See Oneok, Inc. v. Southern Union Co.</u>, No. 99-CV-345-H(M), 1999 WL 34861197, at *6 (N.D. Okla. May 11, 1999).  The opinions do not capitalize the word, except <u>United States ex rel. Adkins v. Hardy</u>, No. 11 C 5507, 2013 WL 361765, at *1 (N.D. Ill. Jan. 30, 2013), which mentions petitioner's girlfriend, Romanette Norwood.

-3-

his family have had a close personal relationship with Karmely and his family for more than 35 years. Dagmi has repeatedly referred to this relationship as a "family relationship of trust."

The entities involved are:

- Appellant SK Greenwich, LLC ("SK Greenwich") a Delaware Limited Liability Company, of which Karmely is the sole member;

- Appellee W-D Group (2006) LP ("W-D Lender"), an Israeli limited partnership, controlled by Wertheimer and Dagmi;

- Appellee W-D Group NY1 LLC ("W-D Partner"), a Delaware Limited Liability Company, of which W-D Lender is the sole member;

- Appellee 443 Greenwich Partners LLC ("443 Partners" or the "Company"), a Delaware Limited Liability Company, of which SK Greenwich and W-D Partner are the sole members;

- Appellee 443 Greenwich LLC ("Greenwich Owner"), a Delaware Limited Liability Company, of which 443 Partners is the sole member;

- Anglo Irish Bank Corporation PLC ("Anglo Irish Bank").

In 2005, Wertheimer and Dagmi approached Karmely about developing a multi-billion dollar real estate portfolio. Karmely agreed to act as a developer for this venture, and instead of requiring a customary development fee, agreed to accept a percentage of the profits on each development as compensation for his services. In September 2006 SK Greenwich agreed with W-D Partner to form the Company to purchase and develop a building

-4-

at 443-53 Greenwich Street, New York, NY (the "Property").  SK Greenwich, _i.e._, Karmely, contributed approximately $5 million and W-D Partner, _i.e._, Wertheimer and Dagmi, contributed approximately $20 million of capital to the Company, for which they received 20 percent and 80 percent ownership interests, respectively, of the Company.

In September 2006, the Company created Greenwich Owner, which purchased the Property for $113 million.  To fund the purchase and development of the Property, two loans were obtained.  The Company obtained an $85 million mortgage loan from Anglo Irish Bank Corporation PLC (the "Anglo Senior Loan"), with a maturity date of October 1, 2008.  SK Greenwich and W-D Partner obtained a $20 million mezzanine loan (the "Mezzanine Loan") from W-D Lender, with a maturity date of October 1, 2009.[2]

_The documents._  Several documents are relevant to this litigation. We only identify them at this point and set forth their relevant terms in the paragraphs that follow:

- an Operating Agreement to govern the operation and management of the Company, signed, as **MEMBER**, by W-D Partner and SK Greenwich;

---

[2] A mezzanine loan is similar to a second mortgage, except that it is secured by the stock of the company that owns the real estate, rather than the real estate itself, which secures the primary loan.

-5-

- a Mezzanine Loan Agreement, signed, as **LENDER**, by W-D Lender and, as **BORROWER**, by W-D Partner and SK Greenwich;

- a Promissory Note, signed, as **BORROWER**, by W-D Partner and SK Greenwich, in favor of W-D Lender;

- a Pledge and Security Agreement ("Pledge Agreement"), signed, as <u>PLEDGOR</u>, by W-D Partner and SK Greenwich, and, as <u>Lender</u>, by W-D Lender.

- a Subordination and Intercreditor Agreement (Intercreditor Agreement"), signed, as **SENIOR LENDER,** by Anglo Irish Bank and, as **MEZZANINE LENDER**, by W-D Lender.

All five documents are dated September 7, 2006.

The Mezzanine Loan was senior to the equity investments of SK Greenwich and W-D Partner in the Company, but subordinate to the Anglo Senior Loan. The Mezzanine Loan Agreement gave W-D Lender, upon an "Event of Default," the remedies provided by the Loan Documents, which included the Pledge Agreement. The Pledge Agreement gave W-D Lender the right to foreclose on the interests of either SK Greenwich or W-D Lender in the Company (hence in the Property) upon an "Event of Default." The Mezzanine Loan Agreement provided several definitions of an "Event of Default." A major issue on this appeal, discussed in detail below, is which of two of these definitions applied to nonpayment of the Mezzanine Loan. One definition identified nonpayment of the Promissory Note as an Event of Default only if there was Available Net Cash Flow.

-6-

The Promissory Note, evidencing the Mezzanine Loan, stated that it would mature on October 1, 2009. It was secured by 100 percent of the ownership interests of W-D Partner and SK Greenwich in the Company, i.e., their shares in the Company, which owned the Property through Greenwich Owner.

The Pledge and Security Agreement obligated SK Greenwich and W-D Partner to "pay or satisfy all of the Obligations" including the full amount of the Promissory Note.

The Intercreditor Agreement recited the agreement of Anglo Irish Bank to lend $85 million to Greenwich Owner. Paragraph 4(d) of the Intercreditor Agreement provided:

> Until all of Borrower's [i.e., the Company's] obligations under the Anglo Senior Loan Documents have been paid and performed in full, no payment whatsoever shall be made to Mezzanine Lender [i.e., W-D Lender] by or on behalf of Borrower [i.e., the Company], Mezzanine Borrower [i.e., W-D Partner and SK Greenwich], or any Guarantor for or on account of any amount due under the Mezzanine Loan Documents.

Despite the prohibition on payment of the Mezzanine loan prior to the full payment of the Anglo Senior Loan, the Intercreditor Agreement also provided that "upon the occurrence of an event of default under the Mezzanine Loan Documents," W-D Lender could commence an "Enforcement Action" to "enforce the Mezzanine Pledge or conduct a sale of the Ownership Interests pursuant to the Mezzanine Pledge." Id. ¶ 7(b). The Intercreditor Agreement also

-7-

stated, "This agreement is for the sole benefit of the Anglo Senior Lender, Mezzanine Lender, and their respective successors and permitted assigns." Id. ¶ 22.

Extension of the Anglo Senior Loan.  In the summer of 2008, a few months before the Anglo Senior Loan was to mature, the Company was preparing to spend more than $500,000 developing the Property.  The Company still needed to remove tenants, develop architectural and design plans, obtain proper building and zoning permits, and secure construction financing.  In anticipation of these steps, Karmely and Dagmi, as the Company, negotiated an extension of the Anglo Senior Loan from a maturity date of October 1, 2008, to December 31, 2009 — a date ninety days after the stated maturity of the Mezzanine Loan.  There was no discussion, however, about extending the Mezzanine Loan maturity date past October 1, 2009.  In exchange for the extension, the Company had to pre-pay an interest and carry reserve of several million dollars, provide $20 million in personal security for the loan, and give a $10 million personal completion guaranty. Relying upon Dagmi's alleged statements that the W-D entities would fund the project to completion, SK Greenwich posted $4.3 million in cash, representing its share of the required capital contribution.  In a meeting on December 9, 2008, Wertheimer reaffirmed Dagmi's commitment to fund the project to completion.

-8-

Throughout 2009, SK Greenwich continued its efforts to redevelop the Property by meeting with designers, architects, and contractors. The Company again requested an extension of the Anglo Senior Loan. The Anglo Irish Bank agreed, but the extension was conditioned upon the Company's paying $1.2 million as an interest and carry reserve. SK Greenwich paid approximately $250,000 of that amount. In July 2010, Anglo Irish Bank again extended the maturity date of the loan, this time to December 31, 2010.

Default and sale of SK Greenwich's interests. On September 30, 2010, W-D Lender sent a letter to SK Greenwich and W-D Partner, stating that the principal and interest on the Mezzanine Loan, due on October 1, 2009, had not been paid and that an Event of Default had occurred under the Mezzanine Loan Agreement and the Pledge Agreement. On October 4, 2010, W-D Lender sent another letter to SK Greenwich, stating that W-D Lender intended to sell SK Greenwich's 20 percent interest in the Company at a public auction on October 20, 2010.

On October 12, 2010, SK Greenwich filed a complaint in New York State Supreme Court, seeking a declaratory judgment that SK Greenwich was not in default, and that no Event of Default could occur until (1) payments to W-D Lender were permitted under the Anglo Senior Loan documents, and (2) there was Available Net Cash

-9-

Flow under the Operating Agreement.  SK Greenwich also sought an order barring W-D Lender from selling SK Greenwich's interest in the Company.  Appellees removed the case to the Southern District of New York.  The Court denied the Appellants' motion for a temporary restraining order and a preliminary injunction.  After the District Court's order, W-D Lender auctioned SK Greenwich's interest in the Company.  The only participant in the auction was W-D Lender's representative, who successfully bid $100,000 for SK Greenwich's interest in the Company.

On January 4, 2011, Anglo Irish Bank declared the Company in default for failure to pay the Anglo Senior Loan on its extended maturity date of December 31, 2010.  Shortly thereafter, a Wertheimer family company purchased the Anglo Senior Loan from Anglo Irish Bank.  The W-D entities eventually sold the property for $150 million, realizing profits of more than $10 million, and without providing compensation to SK Greenwich for its capital contributions or work as an Operating Member.

The Appellants filed an Amended Complaint seeking monetary damages for (1) breach of the Mezzanine Loan Documents; (2) tortious interference with contract; (3) breach of the Operating Agreement; (4) account stated; (5) breach of fiduciary duty; and (6) promissory estoppel.  The essence of their claims was that the Appellees were not entitled to foreclose on SK Greenwich's

-10-

interests in the Company, thereby extinguishing SK Greenwich's interest in the Property. The Appellees filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6). The District Court granted the motion to dismiss in its entirety and dismissed the Amended Complaint. <u>Karlemy</u>, No. 11 Cv. 541, 2012 WL 3583141 (S.D.N.Y. Aug. 21, 2012). The Court ruled that the language of the Mezzanine Loan Agreement was unambiguous and that an Event of Default had occurred within the meaning of subparagraph 3.1(c) of that Agreement, entitling the Appellees to foreclose on SK Greenwich's interest in the Company and the Property.

## Discussion

Two aspects of the transaction at issue should be noted at the outset. First, Karmely, the party complaining of the foreclosure of its interests, and Dagmi, who, along with his partner Wertheimer, control the entity that foreclosed on Karmely's interests, have been close friends, in a "family relationship of trust," for more than 35 years. Second, unlike a typical loan transaction between a bank and a borrower, the Mezzanine Loan underlying the foreclosure of Karmely's interests was made by a lender to itself and the lender's partner. The lender was W-D Lender; the borrowers were SK Greenwich, <u>i.e.</u>, Karmely, and W-D Partner, acting by W-D Lender, the sole member

of W-D Partner.[3]  We do not doubt that an entity can make a loan to itself and its partner, but the unusual nature of such an arrangement prompts close scrutiny of the documents purporting to provide the lender with a right to foreclose on the partner's interests for an alleged default on the loan.

I. Availability of a Foreclosure Remedy

The ultimate issue is whether the relevant documents unambiguously accord W-D Lender a right to foreclose on SK Greenwich's 20 percent interest in the Property for failure to pay the Promissory Note at maturity.  W-D Lender did not sue the Appellants for nonpayment of the Mezzanine Loan, but instead foreclosed on SK Greenwich's collateral securing the loan.  SK Greenwich's pending lawsuit seeks damages for what it contends was an unauthorized foreclosure.[4]  Cf. Mellon Bank, N.A. v. United Bank Corp. of New York, 31 F.3d 113, 115 (2d Cir. 1994)

---

[3] The signature page of the Promissory Note reflected that W-D Lender, acted as borrower by W-D Group LP, an Israeli limited partnership, which, in turn, acted by Dagmi, its authorized signatory, who actually signed the Promissory Note.

[4] Although the Appellants make some arguments that they were not obligated to repay the Mezzanine Loan at maturity, their essential point, that foreclosure was not authorized, is not duplicative of any claim not to be liable for payment of the Loan; having to pay 20 percent of the Mezzanine Loan of $20 million, or possibly even the entire amount, absent contribution from their partner, would have been far less of a loss to the Appellants than foreclosure of their 20 percent interest in the Property, which was later sold for $150 million.

-12-

(neither party disputed that breach had occurred; question was whether an "Event of Default" had occurred permitting the remedy of acceleration of a loan).

In considering whether the Appellants' Amended Complaint was properly dismissed, we do not decide whether the relevant documents accord W-D Lender a right to foreclose. Our concern at this preliminary stage of the litigation is only whether there is sufficient ambiguity, either in the phrases of any one document or between conflicting language in any of the documents, to preclude granting a motion to dismiss the Amended Complaint.

The Promissory Note itself does not contain a foreclosure remedy in the event of nonpayment of the principal. Its one reference to an "event of default" is in section 2, which provides that the failure of the Borrower (SK Greenwich and W-D Partner) to pay W-D Lender any equity distributions while the Note remains outstanding is an "event of default." The Pledge Agreement and the Mezzanine Loan Agreement both provide foreclosure remedies upon an "Event of Default." Subparagraph I(ii) of Schedule D of the Pledge Agreement includes as an "Event of Default" failure to make timely payment of any amounts due under "the Loan."[5] Section 3 of the Mezzanine Agreement includes

---

[5] The Appellants attach significance to the fact that this provision refers to "the Loan" rather than the Note.

-13-

a more detailed list of eleven items each of which is an "Event of Default" and some of which are subject to limitations.

We focus on the items in the section 3 list for two reasons. First, "specific language in a contract will prevail over general language where there is an inconsistency between two provisions." Paneccasio v. Unisource Worldwide, Inc., 532 F.3d 101, 111 (2d Cir. 2008). As we discuss below, the repayment obligation, failure of which constitutes an "Event of Default," is more restrictive in the Mezzanine Agreement than in the Pledge Agreement. Second, the Appellees' notice of default to SK Greenwich asserted that an Event of Default had occurred under one of the default provisions of section 3 of the Mezzanine Agreement, specifically, paragraph 3.1(c).

Section 3.1 of the Mezzanine Agreement contains two definitions of an "Event of Default," the choice of which is at the heart of the current controversy.

Paragraph 3.1(a) provides:

> the failure by the Borrower to pay any installment of principal, interest, or other payments required under the Note when due, provided however that at the time such payment is due (i) payments to the Lender are permitted under the Senior Loan Documents [referring to the Anglo Irish Loan], and (ii) there is Available Net Cash Flow or Capital Events Proceeds (as defined in the Operating Agreement of 443 Partners). (emphasis in original).

-14-

Paragraph 3.1(c) provides:

> the failure of the Borrower or any other party to any Loan Document other than this Agreement to observe or perform any agreement, covenant or obligation of it contained in such Loan Document, which failure continues beyond the expiration of any applicable notice and cure period if one is provided[.]

A principal issue is whether 3.1(a), with its Available Net Cash Flow limitation on the Borrower's payment obligation, or 3.1(c), without such a limitation, applies, not to SK Greenwich's repayment obligation, but to W-D Lender's right to foreclose as a remedy for nonpayment, in other words, whether "an Event of Default" permitting foreclosure occurred.

The Appellees argue that they were entitled to foreclose by virtue of the definition of an "Event of Default" in subparagraph 3.1(c) of the Mezzanine Agreement. The Appellants argue that subparagraph 3.1(a) controls and prevented W-D Lender from deeming nonpayment an "Event of Default" permitting foreclosure because net cash flow was not then available.

The District Court rejected the Appellants' argument for two reasons. First, Judge Patterson read subparagraph 3.1(a) to apply only to timely nonpayment of any *installment* of principal and not to the obligation to pay the principal amount at maturity, leaving subparagraph 3.1(c) to apply to nonpayment of the principal amount at maturity. See Karmely, 2012 WL 3583141,

-15-

at *10-11.  He cited the Black's Law Dictionary definition of "installment" as "a periodic partial payment of a debt." Id. at *10 (citing Black's Law Dictionary 868 (9th ed. 2009)).  Second, he reasoned that the Appellants' argument, precluding default for nonpayment in the absence of available net cash flow, could lead to the perpetual nonpayment of the principal amount if the project did not generate revenue, a prospect he thought sophisticated parties would not have agreed to. Id. at *10.

Although the terms of subparagraph 3.1(c) itself are not ambiguous, we see several ambiguities in the Mezzanine Loan Agreement, starting with an initial ambiguity as to whether subparagraph 3.1(a) or subparagraph 3.1(c) applies to the determination of whether an "Event of Default" had occurred. Comparison of the wording of 3.1(a) and 3.1(c) reveals a textual argument favoring application of 3.1(a), or, at least creating ambiguity as to whether 3.1(c) applies.  3.1(a) defines an "Event of Default" as "the failure of the Borrower to pay any installment of principal, interest, or other payments," whereas 3.1(c) defines an "Event of Default" as "the failure of the Borrower to observe or perform any agreement, covenant, or obligation." Mezzanine Loan Agreement, ¶¶ 3.1(a), (c) (emphases added).  This variation in the emphasized wording suggests that 3.1(a) applies to all requirements to pay money and 3.1(c)

-16-

applies to requirements to do things other than pay money. The Loan Documents impose on the Borrower many requirements other than the payment of money, e.g., to furnish financial data, Mezzanine Loan Agreement ¶ 2.20, to give the Lender prompt notice of damage to the property, id. ¶ 2.17, to comply with Environmental Laws, id. ¶ 2.32(c), and to deliver to the lender copies of insurance policies, Pledge Agreement ¶ 5(b). Having separately stated requirements to make payments and to perform obligations not requiring payments is not unusual. See, e.g., Abundance Partners LP v. Quamtel, Inc., 840 F. Supp. 2d 758, 761 (S.D.N.Y. 2012); Greystone Bank v. Skyline Woods Realty, LLC, 817 F. Supp. 2d 57, 60 (N.D.N.Y. 2011); In re Cabrini Medical Center, No. 09-14398, 2009 WL 7193578, at *9 (Bankr. S.D.N.Y. July 30, 2009).[6]

Even if a comparison of the wording of 3.1(a) and 3.1(c) favors making 3.1(a) the applicable definition of an "Event of Default," the wording of 3.1(a) itself creates a further ambiguity as to its applicability. There is an ambiguity in the phrase of 3.1(a) requiring the Borrowers "to pay any installment

---

[6] We note that subparagraph 7(b) of the Intercreditor Agreement uses the wording "Monetary and Non-Monetary Defaults," indicating the understanding of the parties to that agreement that there were two distinct categories of defaults, one concerning monetary defaults.

-17-

of principal, interest, or other payments required under the Note when due." One interpretation of that phrase is that "installment" applies to each of the three items in the series, i.e., "principal," "interest," and "other payments." A second interpretation is that "installment" applies only to "principal," and does not apply to "interest" or "other payments." The District Court ruled that the first interpretation applied and also ruled that payment of the entire principal of the Mezzanine Loan would not be payment of an installment. See Karmely, 2012 WL 3583141, at *10. From these rulings, the Court concluded that 3.1(a) was not the relevant provision defining "Event of Default," leaving 3.1(c), the provision without the Available Net Cash Flow limitation, as the applicable provision defining a default warranting foreclosure. See id. at *7.

Courts encountering the issue whether an adjective modifying the first word of a series modifies all the words in the series have yielded varying results.[7] Several courts have ruled that the adjective modifies all the words in the series. See e.g.,

_____

[7] The interpretive issue confronting these courts is similar to, but not identical with, the issue whether a modifying phrase after a series of words modifies all the words in the series or only the last word of the series. See Barnhart v. Thomas, 540 U.S. 20, 26 (2003) (explaining the "'rule of the last antecedent,'" according to which "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows").

-18-

Washington Education Assn. v. National Right to Work Legal Defense Foundation, Inc., 187 Fed. Appx. 681, 682 (9th Cir. 2006); United States Fidelity & Guaranty Co. v. Fireman's Fund Insurance Co., 896 F.2d 200, 203 (6th Cir. 1990). At least one court has ruled that the adjective modifies only the first word of the series. See Clarkson v. Town of Florence, 198 F. Supp. 2d 997, 1012 (E.D. Wisc. 2002). Some courts have ruled that the adjective modifies all the words in the series unless another adjective modifies a word in the series, see Village of Hobart v. TCGC, LLC, No. 08-MC-59, 2008 WL 5377911, at *3 (E.D. Wis. Dec. 23, 2008); Ward General Insurance Services, Inc. v. Employers Fire Insurance Co., 114 Cal. App. 4th 548, 554 (Cal. Ct. App. 2003), as when the word "other" modifies the last word in the series, see Kelley v. Dahle, No. 11-C-600, 2012 WL 3071108, at *5 (E.D. Wis. July 26, 2012), which is true of the wording of 3.1(a). Encountering the problem in the context of statutory language, the Ninth Circuit observed that the text alone was unclear. See United States v. Lacy, 119 F.3d 742, 747 (9th Cir. 1997).[8]

---

[8] Although all of these cases involved a one-word adjective, they shed light on the ambiguity of 3.1(a), in which the series of three items is introduced by the three-word phrase "any installment of."

In the pending case, the arguments for not reading "an installment of" to modify "other payments" are that (a) principal is often repaid in installments, and partial repayments of principal were explicitly contemplated, see Promissory Note ¶ 1(C); (b) interest was specified to be paid quarterly, see id. first ¶, and installment payments of quarterly interest payments would be unusual; and (c) there is nothing in the documents to suggest that "other payments required under the Note when due" were to be paid in installments.[9]

Under the Appellants' interpretation, limiting "installment" to partial payments of principal, payment of the entire principal at maturity would be an example of "other payments required under the Note when due." Judge Patterson expressed the view that the "other payments" phrase applied to any equity distributions that the Mezzanine Borrower received, distributions that it was obliged to turn over to the Mezzanine Lender. See Karmely, 2012

_____

[9] The ambiguity as to whether "any installment of" applies only to "principal" or also to "interest" and "other payments" could easily have been avoided by drafting 3.1(a) to read either:

    payment of (a) any installment of principal, (b) interest, or (c) other obligation,
or

    payment of any installment of (a) principal, (b) interest, or (c) other obligation.

-20-

WL 3583141, at *10 n.10. Even if that is so, the phrase could also have applied to the Mezzanine Borrower's obligation to pay the principal of the Note at maturity.

The Appellants cite a Delaware District Court decision that lends considerable support to their interpretation of 3.1(a). See Falco v. Alpha Affiliates, Inc., No. CIV.A.97-494, 1999 WL 222464 (D. Del. Mar. 24, 1999). A lease provided for immediate termination "[i]n the event of any default of Tenant in paying any installment of Basic Rental, additional rent or other sums payable hereunder." Id. at *1, *7. For other defaults, the tenant had 30 days to cure. See id. The dispute concerned failure to pay a security deposit. The Court ruled that all "monetary defaults" entitled the landlord to immediate termination and that failure to pay the security deposit was a monetary default. See id. at *7. The Court implicitly applied the word "installment" only to the first of the three listed items. There was no claim that the security deposit was to be paid in installments. By reading the phrase "other sums payable" not to be modified by the word "installment," the Court favored the reading advanced by the Appellants in our case. The Appellees here attempt to distinguish Falco by pointing out that the document in that case was a lease, rather than a loan, but

-21-

they offer no reason why that should make any difference.  The
Delaware District Court's interpretation of similar language
gives the Appellants here at least sufficient support to render
the wording of 3.1(a) ambiguous.

Even if the phrase "other payments" in 3.1(a) is modified by
"installment," that interpretation would not necessarily carry
the day for the Appellees.  Such an interpretation would create
a tension between the unlikelihood that payment of the entire
principal at maturity would be considered an installment and the
comparison of the wording of 3.1(a) and 3.1(c) that makes only
3.1(a) applicable to obligations to pay money.  Judge Patterson
resolved that tension by deeming 3.1(c) applicable.  That is one
way but not the only plausible way to resolve the ambiguity.

Judge Patterson offered an additional reason for rejecting
the possibility that 3.1(a), with its Available Net Cash Flow
limitation, applied to SK Greenwich's payment obligation and
consequent exposure to the foreclosure remedy.  He reasoned that
sophisticated parties would not agree to a loan agreement that
might never be paid.[10]  Although that may be true of traditional

---

[10] The Appellants dispute the District Court's premise that
the Available Net Cash Flow limitation, if applicable to SK
Greenwich's repayment obligation, could result in perpetual non-
payment.  They point out that the Appellees sold the Property,
after foreclosing on SK Greenwich's interests, for $150 million,

lender/borrower transactions such as loans by a bank, it is not
necessarily true of a lender and a borrower who, as partners,
both put up capital in a real estate venture.  The lender partner
might well have required the loan to be repaid at maturity, but,
at the time the documents were drafted for the parties' joint
real estate development, it might also have been willing to defer
foreclosure of its partner's interests as a remedy for nonpayment
until cash flow from their development project was available.
That seems likely, and at least plausible, where the  partners
have enjoyed a "family relationship of trust" for more than 35
years.  This likelihood is enhanced by the assurance that the
Appellees gave Karmely that they would fund the project to
completion, an assurance on which Karmely relied to advance fresh
funds.[11]

---

$45 million more than the total of the Anglo Loan and the
Mezzanine Loan.  But the District Court did not say that the cash
flow limitation made repayment impossible, only that it "could
lead to the perpetual non-payment of the principal balance of the
Mezzanine Loan if the project foundered or did not generate
revenue." Karmely, 2012 WL 3583141, at *10 (emphasis added).
Obviously, fluctuations in the real estate market would determine
whether the project would produce cash flow or could be sold for
more than the total of the loans.

[11] We note that the Mezzanine Lender, in its capacity as the
Mezzanine Borrower's partner, provided in the Operating Agreement
of the Company that Company Loans are repayable only if there is
Available Net Cash Flow. See Operating Agreement § 3.3(b).

An Appellate Division decision has noted that "the most persuasive evidence of the agreed intention of the parties in those circumstances [where agreements are not clear] is what the parties did when the circumstances arose." Webster's Red Seal Publications, Inc. v. Gilberton World-Wide Publications, Inc., 67 A.D.2d 339, 341 (N.Y. App. Div. 1979), aff'd, 53 N.Y.2d 643 (N.Y. 1981). The Appellants contend that after October 9, 2009, at a time when the Appellees say that an "Event of Default" permitting foreclosure had occurred, the Appellees continued to deal with Karmely as an operating member of the partnership, insisted that he help obtain extensions of the Anglo Senior Loan, that he make additional capital contributions, and that he extend his $10 million personal guarantees of the Anglo Senior Loan, and that these dealings with Karmely continued after the alleged "Event of Default."

In view of all of these considerations, we believe that on appeal of a ruling dismissing the Amended Complaint there is sufficient ambiguity to require a remand. The ambiguities are sufficient to let the Appellants present whatever extrinsic evidence they might offer on remand to resolve these ambiguities and show, at summary judgment or trial, that the Appellees' foreclosure remedy (as distinguished from a suit on the

-24-

Promissory Note) was not intended to be used in the absence of Available Net Cash Flow to pay the Note.[12] Such evidence would include at least the Appellees' continued dealings with Karmely after the maturity date of the Note, as alleged in the Amended Complaint. Discovery might well lead to other relevant evidence.

II. Whether the Intercreditor Agreement Benefits the Appellants

A second issue, distinct from the issue whether the Available Net Cash Flow limitation of 3.1(a) applies to limit W-D Lender's foreclosure remedy, is whether any provisions of the Intercreditor Agreement benefit the Appellants. That issue turns initially on whether all of the documents, including the Intercreditor Agreement, can be looked at as one set of integrated transactions. The documents were all executed on the same date, September 7, 2006, and relate to the same real estate development, and they should be construed together. See TVT

---

[12] It is arguable that if the Available Net Cash Flow limitation applied to the availability of the Appellee's foreclosure remedy, SK Greenwich, as the operating member of the partnership managing the Property, might have had an incentive to avoid generating profits, even though it also had an incentive to maximize profits in which it ultimately expected a 20 percent share. Because under subparagraph (c)(v) of section 5.1 of the Operating Agreement, SK Greenwich could receive a share of profits only after the Mezzanine Loan was repaid, the main incentive of SK Greenwich would have been to maximize profits sufficiently to pay off the loan and then maximize profits further to obtain its 20 percent share. In any event, such speculation, if relevant, can be explored on remand.

-25-

Records v. Island Def Jam Music Group, 412 F.3d 82, 89 (2d Cir. 2005); This is Me, Inc. v. Taylor, 157 F.3d 139, 143 (2d Cir. 1998).  Doing so, however, does not necessarily carry the day for the Appellants unless language in the Intercreditor Agreement benefits the Appellants.

The Appellants begin their invocation of the Intercreditor Agreement by citing section 4.27 of the Mezzanine Loan Agreement, which states that its terms and those of the Mezzanine Loan "are expressly made subject to the terms and provisions of the Intercreditor Agreement," and section 26 of the Pledge Agreement, which contains virtually identical language.  From the Intercreditor Agreement itself the Appellants rely primarily on paragraph 4(d), which provides that until the Anglo Senior Loan has been paid, "no payment whatsoever shall be made to Mezzanine Lender by . . . Mezzanine Borrower . . . ."[13]  The Appellants argue that this prohibition on payment of the Mezzanine Loan insulates them from having to pay the Mezzanine Loan at maturity because the Anglo Senior Loan was then unpaid.

---

[13] Recital E(c) in the Intercreditor Agreement similarly provides that "unless and until the Anglo Senior Loan is paid and performed in full, except as otherwise expressly permitted hereunder, Mezzanine Lender shall have no right to receive any payment with respect to the Mezzanine Loan or to exercise any rights and remedies with respect to the Mezzanine Loan."

-26-

Judge Patterson rejected the Appellants' reliance on paragraph 4(d) for several reasons. First, he interpreted it not to prohibit payments by the Mezzanine Borrower to the Mezzanine Lender. See Karmely, 2012 WL 3583141, at *9. Although the prohibitory language of paragraph 4(d) seems clear, he pointed out that paragraph 4(d) also contains language obliging the Mezzanine Borrower to hold in trust and pay to the Anglo Senior Lender any payments received by the Mezzanine Borrower on the Mezzanine Loan. See id. From this language he concluded that "the terms of the Intercreditor Agreement contemplated that W-D Lender might receive payments from the Borrower, and outlined W-D Lender's obligations if such a situation came to pass."[14] Id.

Judge Patterson also ruled that nothing in the Intercreditor Agreement could benefit the Appellants because they were neither parties to that Agreement nor third-party beneficiaries of it, and because, as he interpreted the Agreement, several of its provisions preserved the obligation of the borrowers of the Mezzanine Loan to repay the loan at maturity and also preserved W-D Lender's enforcement remedies in the event of nonpayment. See

---

[14] The Appellees go so far as to contend that the "function" of paragraph 4(d) was only to make sure that the Anglo Senior Loan was repaid before the Mezzanine Lender "was entitled to retain any payments made to it by the mezzanine borrowers." Br. for Appellees at 30 (emphasis in original).

-27-

_Karmely_, 2012 WL 3583141, at *8-9.  He cited paragraphs 4(c),
7(b), "8(h)(i)," and section 22.  We consider each of these
provisions separately.

Paragraph 4(c) provides:

> [U]ntil all of the obligations of [the Mezzanine
> Lender] set forth in the Anglo Senior Loan Documents
> have been paid and performed in full:
>
>> . . .
>>
>> (c) Mezzanine Lender shall not exercise any
>> rights or remedies available to Mezzanine
>> Lender upon the occurrence of a breach or
>> default under the Mezzanine Loan Documents .
>> . . provided, however, that the foregoing
>> shall not prohibit Mezzanine Lender from
>> exercising its rights under the Mezzanine
>> Pledge . . . subject to the limitations set
>> forth herein . . . .

Paragraph 4(c) is not entirely clear.  It first bars the
Mezzanine Lender from exercising its remedies upon default under
the Mezzanine Loan, then permits the Mezzanine Lender to exercise
its rights under the Mezzanine Pledge, never defines "default"
by cross-reference or otherwise, and finally makes the permission
to exercise rights subject to "the limitations set forth herein,"
which might well include paragraph 4(d) if "herein" means the
entire document.

Paragraph 7(b) also does not resolve the controversy.  It
appears to contemplate an enforcement action against the

-28-

Appellants as long as five days' notice is given to the Senior Lender, but its precise meaning is to specify that, as long as notice is given, "no consent [of Anglo Irish Bank] shall be required for Mezzanine Lender to institute or enforce an Enforcement Action . . . upon the occurrence of an event of default under the Mezzanine Loan Documents . . . ."  That language, however, does not authorize an enforcement action, nor override paragraph 4(d).  And even if paragraph 7(b) implies the availability of an Enforcement Action by Mezzanine Lender, such an action is tied to "an event of default under the Mezzanine Loan Documents," which brings into play the ambiguities of the Mezzanine Agreement, discussed in Part I above.

What Judge Patterson referred to as paragraph or section "8(h)(i)" is set forth in an unnumbered and unlettered subparagraph placed within paragraph 8(h) of the Intercreditor Agreement. That subparagraph provides:

> The foregoing provisions are solely for the purpose of defining the relative rights of the holder or holders of the Mezzanine Loan and the holder or holders of the Anglo Senior Loan, and nothing herein shall impair, as between the Mezzanine Borrower and Mezzanine Lender, the obligation of the Mezzanine Borrower, which is unconditional and absolute, to pay the Mezzanine Loan in accordance with its terms, nor shall anything herein prevent Mezzanine Lender from exercising all remedies otherwise permitted by applicable law or under the Mezzanine Note, Mezzanine Pledge or other Mezzanine Loan Documents, subject to the provisions of this Agreement.

-29-

Whether this subparagraph precludes application of paragraph 4(d) turns initially on the coverage of the words "foregoing" and "herein," and resolution of the coverage issue requires, regrettably, an elaborate examination of the structure of the Intercreditor Agreement and the numbering and lettering of its sections, paragraphs, and subparagraphs. The Agreement has 14 numbered sections, most of which include several paragraphs designated with a lower-case letter. The language quoted by Judge Patterson is the second of two subparagraphs placed within paragraph (h) of section 8. The first subparagraph is designated "(i)"; the second subparagraph is not designated at all.

Judge Patterson referred to this second subparagraph as "paragraph[] 8(h)(i)," <u>Karmely</u> 2012 WL 3583141, at *9, *10 n.9, or "Section 8(h)(i)," <u>id.</u> at *12, and ruled that the words "foregoing" and "herein" in that subparagraph applied to the entirety of the Intercreditor Agreement. This is apparent because he ruled that what he called "8(h)(i)" denied the Appellants the benefit of paragraph 4(d) of the Agreement, a paragraph appearing in the document several pages before section 8. By repeatedly citing the subparagraph as "8(h)(i)," Judge Patterson obviously thought that the provision was a subparagraph within paragraph (h) of section 8, and he read "i," the character

-30-

designating that subparagraph, as a lower case version of the Roman numeral "I" (a romanette), rather than a lower case letter "i."  Unfortunately, just looking at the "i" provides no way of telling whether it is a lower case Roman numeral or a lower case letter; most, possibly all, type fonts use the character "i" for both the lower case letter "i" and the lower case version of Roman numeral "I."[15]

However, from the face of the Agreement and in the absence of extrinsic evidence of intent, we conclude, at this stage of the litigation, that there is no ambiguity in the proper interpretation of the "(i)" that designates the first subparagraph within paragraph 8(h), and that it is a lower case letter and not a romanette.  Several aspects of the typographical construction of the Intercreditor Agreement make this clear, and also make clear that the second subparagraph within paragraph 8(h), is not to be understood as a subparagraph of section 8(h), but instead as the concluding text of section 8.  First, every

_____

[15] The question whether "i" is a lower case letter or a lower case version of a Roman numeral one arises in this case only because of the oddity of a paragraph that contains only one subparagraph designated with "(i)."  If two subparagraphs were designated "(i)" and "(ii)," respectively, within a paragraph designated with a letter, the designating characters would unquestionably be romanettes.

-31-

paragraph within every section of the Agreement is designated with a lower case letter, and the lettered paragraphs, other than paragraph 8(h), consist of only one paragraph.  Second, in every section, including section 8, the text at the beginning (before all lettered paragraphs) and at the end (after all lettered paragraphs) is set flush left at the left margin, and the text of all lettered paragraphs is set flush left with a single left indentation, whereas the text of both subparagraphs placed within paragraph 8(h) is set flush left with a double left indentation. Third, the second subparagraph placed within paragraph 8(h) is the only subparagraph not identified at all, _i.e._, not introduced with a  character that could be either a lower case letter or a romanette.  Fourth the entire text of the second subparagraph placed within paragraph 8(h) is identical to the text at the end of section 9, text that is placed at the left margin with no indentation and with no designating by either a lower case letter or a romanette, making it clear that this second paragraph should have been printed flush left at the left margin and that double indentation was a printer's error.  Fifth, elsewhere in the Intercreditor Agreement, in subparagraphs that are obviously identified by a romanette, the "(i)" and the "(ii)" that identify these subparagraphs are triple-indented, see subparagraphs

-32-

6(b)(i), (ii), 11(c)(i), (ii), 12(c)(i), (ii), whereas the "(i)" that identifies the first subparagraph within paragraph 8(h) is double-indented just like all the lower case letters that identify other subparagraphs of the Agreement.

From all of these circumstances, we conclude that no reasonable person, considering only the text and typesetting of the Agreement, could fail to conclude that the "(i)" that designates the first subparagraph placed within paragraph 8(h) is a lower case letter, not a romanette; that this first subparagraph is really paragraph 8(i), designated with a lower case letter, following, and not included within, paragraph 8(h) of section 8 and the text of this subparagraph should have been set with a single left indentation, like all the other paragraphs designated with a lower case letter in section 8; and that the text of the second subparagraph, not designated with any letter or number and placed within paragraph 8(h), is really the ending text of section 8, and should have been set flush left at the left margin with no indentation, like the identical ending text of section 9. The printer simply made mistakes in the indentation of the two subparagraphs placed within paragraph 8(h), which the lawyers who proof-read the documents overlooked. Of course, if, on remand, extrinsic evidence of intent is

-33-

presented that tends to prove that the "(i)" is a romanette, the interpretation of the "(i)" will be a factual matter for resolution in the district court.

With the paragraph containing the words "foregoing" and "herein" properly understood as the ending text of section 8, it is clear from the text, at this stage of the litigation, that these words apply only to all of the paragraphs of section 8, and not to the entirety of the document.  If this ending text, with the word "foregoing," was meant to apply to the entire document, it would have been placed at the end of the document, and there would have been no need to repeat the identical text at the end of section 9.  Furthermore, when the parties wanted language in a paragraph to apply to the entirety of the document in which the paragraph appears, they knew how to say that.  Paragraph 4.26(c) of the Mezzanine Agreement states: "Nothing in this Agreement or in the Note shall affect the obligation of the Borrower to pay the Debt in the manner and at the time and place therein respectively expressed."

Paragraph 22 of the Intercreditor Agreement provides in part:

This agreement is for the sole benefit of the Anglo Senior Lender, Mezzanine Lender, and their respective successors and assigns.  Nothing herein shall be deemed to modify, limit, or in any way affect the rights and obligations of Borrower or any Guarantor under the Anglo Senior Loan Documents or the Mezzanine Loan Documents,

-34-

except as otherwise expressly set forth herein.  Neither borrower nor any Guarantor is or shall be deemed to be a third-party beneficiary hereunder.

(emphases added).

Although the emphasized words appear to make clear that the payment obligation of the Borrowers under the Mezzanine Loan remains unaffected by the Intercreditor Agreement, the qualifying phrase of paragraph 22, "except as otherwise expressly set forth herein," might preserve the force of paragraph 4(d), which prohibits any payment to the Mezzanine Lender while the Anglo Senior Loan remains unpaid.  As with the interpretation of the "(i)" discussed above, if extrinsic evidence of intent as to the coverage of "herein" and "foregoing" is presented on remand, the resulting factual issue will be a matter for determination in the district court.

Our review of the various provisions of the Intercreditor Agreement leaves us perplexed.  It is difficult to understand how the Mezzanine Loan can be "expressly made subject to" the terms of the Intercreditor Agreement, with one of those terms, paragraph 4(d), providing that "no payment shall be made to Mezzanine Lender by . . . Mezzanine Borrower" until the Anglo Senior Loan has been paid, while at the same time section 22 that the Intercreditor Agreement states that it "is for the sole

-35-

benefit of the Anglo Senior Lender, Mezzanine Lender, and their respective successors and assigns." [A261] If the Appellants, though "subject to" the Intercreditor Agreement, cannot benefit from it, paragraph 4(d) would prohibit only W-D Partner, as the only other Mezzanine Borrower, from paying itself, as Mezzanine Lender, while the Anglo Senior Loan remains unpaid. That seems odd, to say the least, and nothing in the record thus far developed explains why that outcome is what the parties intended.

We do not agree with Judge Patterson, that on a motion to dismiss, the contradictory nature of the provisions that both prohibit the Appellants from making payments and also deny them any benefit from that prohibition can be reconciled by interpreting paragraph 4(d) as mainly a prohibition on retention of payments and as "contemplat[ing] that W-D Lender might receive payments from the Borrower." Karmely, 2012 WL 3583141, at * 9. A contractual clause that prohibits a payment and then provides a turnover requirement in the event payment is made contrary to the prohibition, is not, facially at least, a negation of the payment prohibition.

In sum, it remains unclear whether, in light of paragraph 4(d), an event of default occurred permitting foreclosure.  This uncertainty also requires a remand.[16]

### Conclusion

The judgment is reversed, and the case is remanded for further proceedings.

_____

[16] If, on remand, it is determined that paragraph 4(d) does not insulate the Appellants from a foreclosure remedy, we agree with the District Court that the Appellants' payment obligation remained unaffected by the extension of the maturity date of the Anglo Senior Loan, despite the Appellants' contention that the extension of the Anglo Senior Loan extended the maturity date of the Mezzanine Loan.  Why the parties would extend the maturity date of the Anglo Senior Loan without extending the date of the Mezzanine Loan is not clear, but that is the result their documents achieve.